## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| TOMMY RAY MAYS II and QUINTON NELSON SR., individually and on behalf of all others similarly situated, | Case No. 2:18-cv-1376 |
| Plaintiffs, | JUDGE MICHAEL H. WATSON<br>Magistrate Judge Chelsey M. Vascura |
| v. | **PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND MEMORANDUM IN SUPPORT** |
| JON HUSTED, in his official capacity as Secretary of State, | |
| Defendant. | **CLASS ACTION** |

Plaintiffs respectfully move this Court to enter an order certifying this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), and appointing the undersigned counsel as class counsel, for the reasons set forth in this Motion and the accompanying Memorandum of Law. In Ohio, qualified voters who are arrested after the deadline to request an absentee ballot and held in detention through Election Day are not permitted to vote, in violation of the First and Fourteenth Amendments of the United States Constitution. Named plaintiffs Mays and Nelson seek to serve as Class Representatives and represent a class pursuant to Counts One and Two of Plaintiffs' Complaint, to be defined as:

> All individuals arrested and held in detention in Ohio on or after close of business for the county election board on the Friday prior to the Election who (1) are eligible to vote in Ohio and are registered to do so, (2) did not vote absentee in person or by mail prior to their detention, (3) were provided neither an absentee ballot nor transportation to a voting center nor access to any other method of voting while held in detention, and (4) will remain in detention through close of polls on Election Day.

As explained in the accompanying Memorandum of Law, class certification is appropriate under Federal Rules of Civil Procedure 23(a) and 23(b)(2) because (1) joinder of all class members

1

is impracticable, (2) the class presents common questions of law and fact, (3) the claims of Class Representatives are typical of the claims of the members of the putative class, (4) Class Representatives and their attorneys are adequate representatives for the putative class, and (5) Defendant has acted or refused to act on grounds that apply generally to the class, such that declaratory and injunctive relief is appropriate for the class as a whole.

This Motion is based on (1) the accompanying Memorandum of Law, (2) the concurrently filed expert submission of Mark Salling, PhD, (3) the concurrently filed declarations of Mark Gaber, Chiraag Bains, and Laura Bishop, undersigned counsel, (4) all pleadings and papers on file with the Court in this action, and (5) all other materials as may be presented to the Court at or before the hearing on this Motion.

WHEREFORE Plaintiffs respectfully request that the Court certify their proposed class pursuant to Rule 23(b)(2) and appoint the undersigned as class counsel.

Dated: November 6, 2018

Mark P. Gaber*
Danielle M. Lang*
Jonathan M. Diaz*†
CAMPAIGN LEGAL CENTER
1411 K St. NW, Ste. 1400
Washington, DC, 20005
(202) 736-2200
mgaber@campaignlegalcenter.org
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org

Locke E. Bowman*
Alexa Van Brunt*
Laura C. Bishop*
RODERICK AND SOLANGE MACARTHUR
JUSTICE CENTER
NORTHWESTERN PRITZKER SCHOOL OF LAW
375 East Chicago Avenue

Respectfully submitted,

*/s/ Naila S. Awan*
Naila S. Awan, Trial Attorney (0088147)
DĒMOS
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6055
nawan@demos.org

Chiraag Bains*‡
DĒMOS
740 6th Street NW, 2nd Floor
Washington, DC 20001
(202) 864-2746
cbains@demos.org

*Attorneys for Plaintiffs*

Chicago, Illinois 60611
(312) 503-1271
l-bowman@law.northwestern.edu
a-vanbrunt@law.northwestern.edu
laura.bishop@law.northwestern.edu

*motions for admission* pro hac vice
*forthcoming*
†*admitted to practice only in New York,*
*supervision by Danielle Lang, a member of the*
*D.C. Bar*
‡*admitted to practice only in Massachusetts;*
*practice limited pursuant to D.C. App. R.*
*49(c)(3)*

**MEMORANDUM OF LAW**

**INTRODUCTION**

Plaintiffs respectfully move this Court to enter an order certifying this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2). In Ohio, qualified voters who are arrested after the deadline to request an absentee ballot and held in detention through Election Day are not permitted to vote, in violation of the First and Fourteenth Amendments of the United States Constitution. Although Ohio law provides an emergency absentee ballot procedure for individuals who are hospitalized after these deadlines due to unforeseen accidents or medical emergencies (or whose minor children experience the same), there is no similar mechanism for late-jailed electors to access the ballot. Because these electors are unable to vote in-person on Election Day due to their detention, their lack of access to absentee ballots or other emergency voting procedures results in total disenfranchisement.

Named Plaintiffs Tommy Ray Mays II and Quinton Nelson Sr. seek to represent a class pursuant to Counts One and Two of Plaintiffs' Complaint, which alleges that Ohio's current election law and policies and administration thereof place a significant burden on Plaintiffs and plaintiff class members' fundamental right to vote, such that their ability to exercise the franchise is denied in violation of the First and Fourteenth Amendments to the United States Constitution.

For the reasons described herein, Plaintiffs' class claims are well suited for class treatment and satisfy the requirements of Federal Rule of Civil Procedure 23. Plaintiffs thus respectfully request that the Court certify these claims as a class action.

**ARGUMENT**

The Court should certify Counts One and Two of Plaintiffs' Complaint for class treatment pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2). To have a suit certified as a class action, Plaintiffs must satisfy the requirements of Rule 23(a) as well as the additional requirements

of one of three categories of class actions. Rule 23(a) has four requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a)(1)–(4). A class action may be maintained pursuant to Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). In assessing whether a suit satisfies Rule 23(a)'s requirements, courts should err on the side of favoring class treatment, particularly in civil rights suits. "Rule 23(b)(2) has long been recognized as an appropriate and important vehicle for civil rights actions." *Ball v. Kasich*, 307 F. Supp. 3d 701, 713 (S.D. Ohio 2018) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 361 (2011)).

As discussed below, because Plaintiffs clearly satisfy the requirements of Rule 23(a) and class certification is appropriate under Rule 23(b)(2), Plaintiffs' motion for class certification should be granted.

## I.     Proposed Plaintiff Class Definitions

An order certifying a class action must define the class. *See* Fed. R. Civ. P. 23(c)(1)(B). Plaintiffs propose one class. The plaintiff class applicable to the claims in Plaintiffs' Complaint is defined as:

> All individuals arrested and held in detention in Ohio on or after close of business for the county election board on the Friday prior to the Election who (1) are eligible to vote in Ohio and are registered to do so, (2) did not vote absentee in person or by mail prior to their detention, (3) were provided neither an absentee ballot nor transportation to a voting center nor access to any other method of voting while held in detention, and (4) will remain in detention through close of polls on Election Day.

Should the Court ultimately grant the declaratory and injunctive relief Plaintiffs seek with respect to the proposed plaintiff class, Defendants will be required to provide the plaintiff class

members with a method of accessing the ballot, such as by allowing plaintiff class members to avail themselves of the emergency absentee ballot request procedure afforded to individuals and their minor children who are hospitalized between the standard absentee ballot request deadline and Election Day. The plaintiff class members are easily identifiable using arrest and detention records and voter registration records. The proposed class definition relies upon objective criteria and can be easily administered, thus satisfying the requirement for a class certified under Rule 23(b)(2).[1]

## II. The Proposed Plaintiff Class Satisfies the Criteria of Rule 23(a)

### A. Numerosity

---

[1] In any event, where injunctive and declaratory relief is sought under Rule 23(b)(2), rather than monetary damages under Rule 23(b)(3), the requirements of definiteness and ascertainability of class members do not apply. *See* Fed. Judicial Ctr., *Manual for Complex Litigation*, § 21.222 (4th ed. 2004). ("[B]ecause individual damage claims are likely, Rule 23(b)(3) actions require a class definition that will permit identification of individual class members, while Rule 23(b)(1) or (b)(2) actions may not."). Moreover, notice is not required in Rule 23(b)(2) actions, and it is the case that:

> relief obtained on behalf of the class is injunctive and therefore does not require distribution to the class. Because defendants are legally obligated to comply [with any relief the court orders] . . . it is usually unnecessary to define with precision the persons entitled to enforce compliance. Therefore, it is not clear that the implied requirement of definiteness should apply to Rule 23(b)(2) class actions at all.

1 William B. Rubenstein, Newberg on Class Action § 3:7 (5th ed. 2017) (internal quotation marks and footnote omitted). Thus, "while the lack of identifiability is a factor that may defeat Rule 23(b)(3) class certification, such is not the case with respect to class certification under Rule 23(b)(2)." *Shook v. El Paso Cty.*, 386 F.3d 963, 972 (10th Cir. 2004) (citing *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972)); *see also Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015) (holding that "ascertainability is not a requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief"); Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment (providing "illustrative" examples of (b)(2) classes as "various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration").

The proposed plaintiff class easily meets the numerosity requirement of Rule 23(a)(1). To be maintained as a class action, the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "While no strict numerical test exists, 'substantial' numbers of affected [individuals] are sufficient to satisfy this requirement." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 678 F.3d 409, 416 (6th Cir. 2012). The Court may consider class size, geographic distribution of members and the ability of class members to pursue individual litigation; however, courts in Ohio have typically held that a group of forty or more members is generally sufficient to meet the numerosity requirement of Rule 23(a). *See Treviso v. Nat't Football Museum, Inc.*, 2018 WL 4608197, at *4 (N.D. Ohio, Sept. 25, 2018).

The numerosity requirement is plainly met here. In 2015, approximately 383,326 individuals were admitted into jail in in Ohio—an average rate of 1,050 individuals admitted per day.[2] Thus, from Friday, November 2 to Monday, November 5, approximately 4,200 individuals will be booked into Ohio jails. An estimated 7,990,902 Ohioans are registered to vote.[3] Ohio's estimated population in 2017 was 11,658,609 individuals, 22.3% (2,559,869) of whom are under 18 years old.[4] Thus, an estimated 87.8%[5] of Ohioans over the age of 18 are registered to vote. Based on the rates of voter registration and jail admissions in Ohio, an estimated 3,689 eligible electors will be admitted into Ohio jails in the period from Friday, November 2 to Monday, November 5. With respect to the proposed plaintiff class, the potential for up to 3,689 affected plaintiffs clearly surpasses the numerosity requirement.

---

[2] http://trends.vera.org/rates/ohio?incarcerationData=all&admissions=count.
[3] https://www.sos.state.oh.us/elections/election-results-and-data/historical-election-comparisons/voter-turnout-in-general-elections/#gref.
[4] https://www.census.gov/quickfacts/fact/table/oh/AGE295217#viewtop.
[5] 7,990,902 Ohioans are registered to vote. The Census Bureau estimates that 9,098,740 individuals in Ohio are over the age of 18.

Further, a 2014 study conducted by Dr. Mark Salling, the Director of the Northern Ohio Data and Information Service, concluded that in the 2012 general election, between 438 and 479 voters registered in Ohio were unable to cast ballots because they were in jail the weekend and Monday before the election. *See* Expert Submission of Mark Salling, PhD, Exhibit A, at ¶ 6a. Although we cannot yet know the number of people affected in this election cycle, there is no reason to think that number has gone down significantly over the past few years.

### B. Commonality

Plaintiffs also satisfy the requirement that "there [be] questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury . . . .'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). "[F]or purposes of Rule 23(a)(2), [e]ven a single [common] question will do." *Id.* at 359 (internal quotation marks omitted; first bracket added). The commonality requirement is satisfied if the question "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. The Sixth Circuit has described the following analysis as necessary to determine commonality:

> The commonality requirement deals with shared questions of law or fact. Although Rule 23(a)(2) speaks of "questions" in the plural, we have said that here need only be one question common to the class. It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality. What we are looking for is a common issue the resolution of which will advance the litigation.

*Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc) (internal citations omitted); *see also Wal-Mart*, 564 U.S. at 359.

The commonality requirement is met here. This case presents common question applicable to the proposed plaintiff class, including, but not limited to:

- Whether Defendant has precluded eligible voters held in detention in Ohio county jails from exercising the fundamental right to vote;

- Whether Ohio law governing absentee voting by pretrial detainees and detainees with misdemeanor convictions, Ohio Rev. Code § 3509.08, is consistent with the U.S. Constitution;

- Whether declaratory relief holding unconstitutional Ohio's practice of disenfranchising qualified electors who are jailed the weekend before election day and who remain confined through election day is appropriate; and

- Whether injunctive relief is appropriate to require the Secretary of State to direct all members of all County Boards of Elections to provide a reasonable and practicable means of voting for all eligible, confined voters, at least equivalent to that provided for late-hospitalized persons pursuant to Ohio Rev. Code § 3509.08.

These issues are common both to the claims of the Named Plaintiffs and to the claims of the unnamed class members. Ohio's current law and practice regarding absentee voting systematically disenfranchises all qualified electors who are arrested and held in detention between the deadline for requesting an absentee ballot has elapsed and Election Day, and who remain in detention through Election Day.

For all of these questions, class treatment has the capacity "'to generate common *answers* apt to drive the resolution of the litigation.'" *Wal-Mart*, 564 U.S. at 350 (emphasis in original) (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)). Unlike in *Wal-Mart*, where the Court found that commonality did not exist

6

because plaintiffs had not "identified a common mode of [each supervisor] exercising discretion that pervade[d] the entire company," *id.* at 356, here, Ohio's election laws affect all class members in the exact same manner—by preventing them from exercising their fundamental right to vote for the sole reason that they have been detained. Injunctive and declaratory relief will resolve all class and subclass members' claims "in one stroke." *Id.* at 350. Plaintiffs easily satisfy the commonality requirement.

### C. Typicality

The third requirement of Rule 23(a) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). For the same reasons that plaintiffs' claims meet the commonality requirement, they also meet the typicality requirement. Indeed, the Supreme Court has noted that the typicality, adequacy of representation, and commonality requirements "tend[ ] to merge." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n. 20 (1997). The Sixth Circuit has stated the following with respect to the typicality requirement:

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct…. A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members.

*Sprague*, 133 F.3d at 399. "[T]he premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Id.*

Here, there is no question that the Named Plaintiffs' claims are in fact identically aligned with those of the unnamed class members. The Named Plaintiffs are all individuals who were effectively disenfranchised by virtue of their detention. *See* Exhibits A and B to Plaintiffs' Memorandum of Law in Support of their Emergency Motion for a Temporary Restraining Order.

The Named Plaintiffs seek injunctive and declaratory relief permitting them to vote, and the relief they seek is identical to that sought by all of the unnamed class members who are similarly disenfranchised by Ohio's early and absentee voting system. That relief would resolve the claims of all class members.

The claims of the Named Plaintiffs are therefore entirely aligned with the unnamed class members—all of them seek access to the ballot in order to exercise their fundamental right to vote, notwithstanding their arrests and detention—and injunctive and declaratory relief will address all of their claims. The typicality requirement is plainly satisfied.

### D. Adequacy of Representation

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), and this inquiry overlaps with the inquiries into commonality and typicality, *see Amchem*, 521 U.S. at 626 n.20. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id*. at 625. "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id*. "Accordingly, to satisfy the adequate representation requirements under Rule 23 . . . there must be an absence of a conflict of interest, and the presence of common interests and injury." *Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998). To determine whether a class of plaintiffs meet Rule 23(a)(4)'s adequacy of representation requirement, courts must consider two criteria: "(1) the representative must have common interests with unnamed members of the class; and (2) it must appear that the representative[ ] will vigorously prosecute the interests of the class through qualified counsel." *Willis v. Big Lots*, *Inc.*, 242 F. Supp. 3d 634, 648 (S.D. Ohio 2017).

Here, the representatives are plainly adequate. In this case, the Named Plaintiffs do not have *any* conflict, much less a fundamental one, with the other members of the class and subclasses. The injunctive and declaratory relief they seek will benefit the entire class in the same manner—granting all class members access to the ballot notwithstanding their detention. They are plainly adequate class representatives.

Plaintiffs' counsel similarly meet this requirement. "The adequacy [requirement] also factors in competency and conflicts of class counsel." *Amchem*, 521 U.S. at 626 n.20. Class counsel in this case easily meet the adequacy requirement of Rule 23(a)(4). "The adequacy of counsel prong of Rule 23(a)(4) asks whether counsel are qualified, experienced and generally able to conduct the litigation and whether counsel will vigorously prosecute the interests of the class." 1 William B. Rubenstein, *Newberg on Class Actions* § 3:72 (5th ed. 2017) (internal quotation marks and footnotes omitted); *see also Stout v. J.D. Byrider*, 228 F.3d 709, 71 (6th Cir. 2000).

Plaintiffs are represented by counsel with substantial experience in election law and voting rights litigation, civil rights litigation generally, and class actions. *See* Declaration of Mark Garber, Exhibit B; Declaration of Chiraag Bains, Exhibit C; Declaration of Laura Bishop, Exhibit D.

For these reasons, as demonstrated in counsel's declarations, class counsel also satisfy the requirements of Rule 23(g), which requires that the Court appoint class counsel at the time of certification, and that in doing so the Court consider (1) "the work counsel has done in identifying or investigating potential claims in the action," (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," (3) "counsel's knowledge of the applicable law," and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Plaintiffs' counsel Campaign Legal Center is a preeminent national nonpartisan, nonprofit election law organization with decades of experience litigating voting rights matters. Recent example litigation includes cases addressing Georgia's "exact match" voter registration system, North Dakota's "residential address" requirement as applied to Native Americans living on reservations, Alabama's system of felony disenfranchisement, Texas's photo ID requirement, and Arizona's dual registration system. *See* M. Gaber Dec. ¶¶ 4-5. Plaintiffs' counsel Mark Gaber has significant experience on these and other voting rights and civil rights matters, as well as litigating complex commercial cases, and has experience litigating putative and certified class actions, including having been found to be adequate class counsel in the past in a case challenging Virginia's marriage ban. *See id.* ¶ 4. Plaintiffs' counsel Danielle Lang likewise has years of experience litigating voting rights and civil rights matters, *see id.* ¶ 5, and Plaintiffs' counsel Jonathan Diaz has experience litigating complex matters and other civil rights actions, *id.* ¶ 6. Plaintiffs' counsel has invested significant work investigating and preparing for this matter, *id.* ¶ 2, and are committed to investing the resources necessary to pursue this matter, *id.* ¶ 7.

Plaintiffs' counsel Demos is a nonprofit, racial justice organization dedicated to an America in which we all have an equal voice and an equal chance. *See* C. Bains Dec. ¶ 3. Demos has significant experience litigating voting rights issues, including voter purges, language access, and voter registration requirements of the National Voter Registration Act ("NVRA"). *See id.* ¶¶ 4, 6. Plaintiffs' counsel Chiraag Bains has litigated many voting rights and redistricting cases, including *Veasey v. Abbott* and *United States v. Texas*. *Id.* ¶ 4. Plaintiffs' counsel Naila Awan likewise has significant experience in voting rights matters, including particular experience litigating such matters in Ohio. Her cases include *A. Philip Randolph Institute v. Husted* and *League of Women Voters v. Ashcroft*. *Id.* ¶ 6.

Plaintiffs' counsel the Roderick and Solange MacArthur Justice Center at the Northwestern Pritzker School of Law ("MacArthur Justice Center") is a public interest law firm that advocates for human rights and social justice through litigation. *See* L. Bishop Dec. ¶ 3. MacArthur Justice Center's attorneys have led significant litigation in areas that include the treatment of incarcerated men and women, the rights for the indigent in the criminal justice system, compensation for the wrongfully convicted, and police misconduct. *Id.* Plaintiffs' counsel Laura Bishop has experience litigating matters across a wide range of subjects, including serving as counsel on multiple putative class actions in federal courts. *Id.* ¶ 4. Plaintiff's counsel Locke E. Bowman is the Executive Director of MacArthur Justice Center and has a long track record litigating cases about individual and systemic injustice, *id.* ¶ 5, and Plaintiffs' counsel Alexa Van Brunt has experience with a variety of civil rights cases, including two recent class action cases in Illinois, *see id.* ¶ 6.

Plaintiffs have satisfied their initial burden to demonstrate adequacy of representation, 3 *Newberg on Class Actions*, *supra* § 3:72, and absent any evidence to the contrary, the Court should thus presume the adequacy has been satisfied, *id.*

### III. Class Certification is Appropriate Under Rule 23(b)(2)

The Court should certify the classes pursuant to Rule 23(b)(2). A class action may be maintained pursuant to Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Supreme Court has noted that certification under Rule 23(b)(2) is particularly appropriate in "[c]ivil rights cases against parties charged with unlawful, class-based discrimination." *Amchem*, 521 U.S. at 614. "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or

declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360.

That is precisely the case here. First, this is exactly the type of civil rights action that Rule 23(b)(2) was created to foster. Ohio categorically denies access to the ballot to its citizens who are arrested and detained in the days immediately preceding an election, despite the facts that they have not been convicted of any crime and are, in many instances, only detained because of their financial inability to meet their bail obligations. There is no substantive difference among the class members, and therefore injunctive and declaratory relief is "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The unifying features of the class—the timing of their arrests and detention, their eligibility and desire to vote, and the structural obstacles impeding their ability to vote—are precisely the characteristics of individuals disenfranchised by Ohio's law. The Court should certify this action under Rule 23(b)(2).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court certify their proposed class pursuant to Rule 23(b)(2) and appoint the undersigned as class counsel.

Dated: November 6, 2018

Mark P. Gaber*
Danielle M. Lang*
Jonathan M. Diaz*†
CAMPAIGN LEGAL CENTER
1411 K St. NW, Ste. 1400
Washington, DC, 20005
(202) 736-2200
mgaber@campaignlegalcenter.org
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org

Locke E. Bowman*

Respectfully submitted,

*/s/ Naila S. Awan*
Naila S. Awan, Trial Attorney (0088147)
DĒMOS
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6055
nawan@demos.org

Chiraag Bains*‡
DĒMOS
740 6th Street NW, 2nd Floor
Washington, DC 20001

Alexa Van Brunt*
Laura C. Bishop*
RODERICK AND SOLANGE MACARTHUR
JUSTICE CENTER
NORTHWESTERN PRITZKER SCHOOL OF
LAW
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-1271
l-bowman@law.northwestern.edu
a-vanbrunt@law.northwestern.edu
laura.bishop@law.northwestern.edu

(202) 864-2746
cbains@demos.org

*Attorneys for Plaintiffs*

*\*motions for admission* pro hac vice *forthcoming
†admitted to practice only in New York,
supervision by Danielle Lang, a member of the
D.C. Bar
‡admitted to practice only in Massachusetts;
practice limited pursuant to D.C. App. R. 49(c)(3)*

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2018, I served the foregoing on counsel for

Defendant via e-mail as indicated below:

Steven Voigt
Office of Ohio Attorney General
steven.voigt@ohioattorneygeneral.gov

Damian Sikora
Office of Ohio Attorney General
damian.sikora@ohioattorneygeneral.gov

Jack Christopher
Deputy Assistant Secretary of State and Legal Counsel
jchristopher@ohiosecretaryofstate.gov

/s/ Naila S. Awan
Naila S. Awan, Trial Attorney (0088147)
DĒMOS
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6055
nawan@demos.org

13

**Expert Submission of Mark Salling, PhD**

1. I am the Director of the Northern Ohio Data and Information Service ("NODIS"), headquartered at Cleveland State University, and a Senior Fellow in Cleveland State's Maxine Goodman Levin College of Urban Affairs. I have served in one or both of these positions for the past 36 years, since completing my Ph.D. in Geography. I have expertise in Demography, Geographic Information Systems, and Survey Design and Analysis, among other areas of expertise. A current version of my curriculum vitae is attached as Exhibit 1. A list of other litigation in which I have provided expert services is attached as Exhibit 2.

2. In 2013, I was retained by the plaintiffs in *Fair Elections Ohio, et al. v. Jon Husted*, Case No. 1:12-cv-797 (S.D. Ohio) to serve as an expert witness. My work on that matter fell into two primary subject areas, which were called in shorthand "Proximity Analysis" and "Incarcerated Voter Analysis."

3. The Proximity Analysis involved determining the distances that county Board of Elections personnel would have to travel in order to provide voting opportunities for jailed electors on Election Day, as compared with the distances such personnel currently must travel in order to provide voting opportunities for hospitalized electors on Election Day pursuant to ORC 3509.08(B). I created graphic illustrations of these distances in the form of maps, and summarized them in two reports.

a. "Analysis of the Proximity of Jails to Hospitals in Ohio," dated October 30, 2013 (Exhibit 3)

b. "Analysis of the Proximity of Jails and Hospitals to County Boards of Election," a supplement to "Analysis of the Proximity of Jails to Hospitals in Ohio," dated February 20, 2014 (Exhibit 4)

4. My Incarcerated Voters Analysis involved four principal tasks. I undertook [1] to assist with the study design and related data management issues; [2] to determine the number of inmates in the sampled jails that were not able to vote in the 2012 general election as a result of their incarceration; [3] then to use that number to estimate the number of such inmates statewide; and [4] to determine whether the inability of jailed electors to vote in the 2012 general election disproportionately affected African-Americans. I prepared three reports on these issues.

a. "Analysis of the Number of Incarcerated Registered Voters who could not Vote During Their Incarceration on the Weekend and Monday before the November 2012 General Election," dated October 30, 2013. (Exhibit 5)

b. "Supplement to 'Analysis of the Number of Incarcerated Registered Voters who could not Vote During Their Incarceration on the Weekend and Monday before the November 2012 General Election,'" dated February 20, 2014. (Exhibit 6)

c. "Analysis of the Racial Composition of Incarcerated Registered Voters Who Could Not Vote During Their Incarceration on the Weekend and Monday Before the November 2012 General Election," dated March 24, 2014 (Exhibit 7)

5. I understand that in the current matter, Plaintiffs are alleging that Ohio's absentee voting laws violate various federal laws and the federal constitution, and Plaintiffs allege that the absentee voting laws unlawfully deprive those who are incarcerated the weekend before an election day and held through election day of their right to vote. Based on my understanding, the evidentiary issues addressed in the reports I prepared for *Fair Elections Ohio v. Husted* are also evidentiary issues in the current matter. I understand from Plaintiffs' counsel in the current matter that all five reports I prepared for *Fair Elections Ohio v. Husted* are publicly available on PACER through the docket sheet for that litigation.

6. After being approached to assist in the current matter, I reviewed each of the reports identified in Paragraphs 3(a),(b) and 4(a),(b),(c) that I had prepared for *Fair Elections Ohio v. Husted*. I continue to stand by the methodology used and conclusions reached in those reports. In particular, I continue to stand by the following conclusions:

a. 438 persons or 479 persons are both good estimates of the number of incarcerated persons, statewide in Ohio, who were likely unable to vote in

3

the November 2012 general election because they were in jail the weekend and Monday before that election. *See* "Supplement to 'Analysis of the Number of Incarcerated Registered Voters . . .,' Exhibit 6 at 3. I reached those two estimates by applying two different reasonable methods for extrapolating the total affected number of persons statewide, based on data showing the exact count of affected persons in nine counties in the state. My analysis of the collected data found 207 registered voters in nine counties in Ohio who were prevented from voting during the relevant weekend period due to their incarceration. Id. To reach an estimate of 479 affected persons statewide, I extrapolated based on the percentage of state population in the sampled counties. Id. To reach an estimate of 438 affected persons statewide, I extrapolated based on the percentage of average daily prisoners statewide held in the sampled counties. Id. Both methods are reasonable to create a statewide estimate, and I have further confidence in accuracy of the estimates since both methods reached relatively similar numbers.

b. Within each county in Ohio, the distances from the Board of Election to the county's jails are not significantly different from the distances from the Board of Election to the county's hospitals. *See* "Analysis of the Proximity of Jails and Hospitals to County Boards of Election," Exhibit 4 at 2.

4

    c. There are fewer jails than hospitals in each county on average, and

therefore the aggregate distance for Board of Election members to travel is

less for jails than it is for hospitals. *See* "Analysis of the Proximity of Jails

and Hospitals to County Boards of Election," Exhibit 4 at 2.

7. My employer, Cleveland State University, is being paid $100 per hour by

Plaintiffs' counsel for my work on this submission. This is the rate I normally

charge to provide my expert services in litigation.

Mark Salling, PhD, GISP
November 5, 2018

# Exhibit 1

## Expert Submission of Mark Salling, PhD

# MARK J. SALLING, Ph.D., GISP[1]
November 1, 2018

## EDUCATION
Ph.D. (Geography) 1982, Kent State University
    Dissertation: Poverty and the Decision to Move: An Analysis of Public Housing for the Poor
M.A. (Geography) 1974, University of Cincinnati
B.A. (Geography) 1970, Kent State University

## ACADEMIC & PROFESSIONAL POSITIONS
1982-present---    Director, Northern Ohio Data & Information Service, Senior Research Associate, and College Fellow, Maxine Goodman Levin College of Urban Affairs, Cleveland State University (http://urban.csuohio.edu/nodis/)

2002-2012    Williamson Family Fellow and Director of Research, The Center for Community Solutions, Cleveland, OH (http://communitysolutions.com/)

1981-1982-----    Director, Base Resource Division, Graphco, Cleveland, OH.

1979-1982-----    Research Consultant/Methods & Data Specialist, Capone-White & Associates, Cleveland Heights, OH.

1976-1981-----    Planner and Senior Data Specialist, Northeast Ohio Areawide Planning Agency, Cleveland, OH.

1976------------    Planning Assistant, Medina County Planning Commission, Medina, OH.

1976------------    Temporary Instructor, Geography, Kent State University, Trumbull Branch.

1975-1976-----    Teaching Fellow, Department of Geography, Kent State University.

## PROFESSIONAL AFFILIATIONS, AWARDS, SERVICE
Urban & Regional Information Systems Association (URISA - http://www.urisa.org/):
- Managing Editor, Proceedings of the annual conference 1986-2004.
- Past member, URISA Board of Directors, 2002-2005
- Past Member, Core Committee, GISCorps (http://www.giscorps.org/)
- Recipient, URISA 1988 and 2000 Service Awards

Member, Ohio Geographically Referenced Information Program Council, representing universities (http://ogrip.oit.ohio.gov/)
Ohio's past Liaison to the U.S. Census Bureau's Redistricting Data Program
Chairman and Key Person, Cleveland Census Statistical Areas Committee (CenSAC)
Member, Association of Public Data Users (APDU - http://apdu.org/)
Past Recipient, Visiting Fellowship, National Center for Geographic Information and Analysis (NCGIA), 1994.
Affiliated Scholar, Center for Election Integrity, Cleveland State University (http://urban.csuohio.edu/cei)
Member of the test question review team of the Geographic Information Systems Professional Certification Institute (GISCI) - https://www.gisci.org/

## PRIMARY AREAS OF RESEARCH AND TEACHING EXPERIENCE
| | |
|---|---|
| Urban Social Geography | Research/Computer Methods |
| Urban Poverty, Mobility | Geographic Information Systems (GIS) |
| Demography | Demographic Forecasting |
| Redistricting | |

---

[1] Geographic Information System Professional, certified by the GIS Certification Institute (http://www.gisci.org/).

**NODIS DIRECTOR RESPONSIBILITIES**

Management- staff consisting of professional programmers, researchers, GIS specialists, information specialist, and several students; provide research, data, and GIS services to University and community data users.

Teaching------ courses taught: Urban Spatial Structure, Urban Geography, Graduate Research Methods, Introduction to Geographic Information Systems, GIS Capstone Seminar, Demography, and Computers for Urban Studies Students.

Research----- demographic and urban analysis; research includes analyses of redistricting outcomes and the use of GIS in the process, urban neighborhood economic structure, environmental equity (spatial association of toxic releases and demographic populations), the application of GIS to urban land redevelopment, and the use of GIS for social indicators and related areas.

Technical Assistance---- presentations on GIS, demographic trends, urban issues; employed GIS methods to provide a common database for redistricting in the State of Ohio; provide leadership in local Census data and geography issues.

**PUBLICATIONS**

Kaufman, Miron, Sanda Kaufman, and Mark **Salling**, "Dynamic firm location network model: empirical validation", forthcoming in Journal on Policy and Complex Systems.

**Salling**, Mark, and Hunter Morrison, "Legacy Cities and their Regions" forthcoming chapter in The Legacies of Legacy Cities: Continuity and Change amid Decline and Revival, Rosie Tighe & Stephanie Ryberg-Webster, eds.

**Salling**, Mark, "Change in Persons with Health Insurance Before and After the Affordable Care Act:  The Akron & Cleveland-Elyria MSAs", *Focus on Facts*, Maxine Goodman Levin College of Urban Affairs, Cleveland State University, June 2017, No.4.

**Salling**, Mark, "Change in Persons with Health Insurance Before and After the Affordable Care Act:  The State of Ohio", *Focus on Facts*, Maxine Goodman Levin College of Urban Affairs, Cleveland State University, June 2017, No.3.

**Salling**, Mark, "Change in Persons with Health Insurance Before and After the Affordable Care Act:  The National Picture", *Focus on Facts*, Maxine Goodman Levin College of Urban Affairs, Cleveland State University, June 2017, No.2.

**Salling**, Mark, "Persons with Health Insurance Before and After the Affordable Care Act", *Focus on Facts*, Maxine Goodman Levin College of Urban Affairs, Cleveland State University, June 2017, No.1.

**Salling**, Mark, "Did Low Voter Turnout in Minority Neighborhoods Drive Trump's Victory in Ohio? What the Cuyahoga County Results Indicate", *Focus on Facts*, Maxine Goodman Levin College of Urban Affairs, Cleveland State University, December 2016.

**Salling**, Mark, "The Vote for Trump/Pence in Cuyahoga County, by Race/Ethnicity and Educational Attainment", *Focus on Facts*, Maxine Goodman Levin College of Urban Affairs, Cleveland State University, November 2016.

**Salling**, Mark, "Map of the Month: Who Votes Early In-Person in Cuyahoga County?", *Focus on Facts*, Maxine Goodman Levin College of Urban Affairs, Cleveland State University, November 2016.

**Salling**, Mark**,** "Neighbors Building Community - a community empowerment initiative through community mapping", a report on a grant from the Office of Civic Engagement, Cleveland State University, December, 2015.

**Salling**, Mark, "Redistricting Congressional Districts in Ohio, An Example of a Partisan Process with Long-Lasting Consequences," in Miller, William J. and Jeremy D. Walling, eds. 2013, The Political Battle over Congressional Redistricting. Lanham, MD: Lexington Books.

Stephanie Ryberg, Mark **Salling**, and Gregory Soltis, "Putting Artists on the Map: The Geography of Artists in Cuyahoga County, Ohio," Journal of Urban Affairs, Vol. 35, Issue 2, May 2013, pp. 219-245. Online at http://onlinelibrary.wiley.com/doi/10.1111/j.1467-9906.2012.00623.x/pdf.

**Salling**, Mark and Norman Robbins, "Do White, African American, and Hispanic/Latino EIP Voters Differ from Election Day and Vote by Mail Voters in Income?" Northeast Ohio Voter Advocates, August 2012.

Norman Robbins and Mark **Salling**, "Racial and Ethnic Proportions of Early In-person Voting in Cuyahoga County, General Election 2008, and Implications for 2012," Northeast Ohio Voter Advocates, July 2012.

**Salling**, Mark, "Public Participation Geographic Information Systems for Redistricting A Case Study in Ohio," Journal of the Urban and Regional Information Systems Association, Vol. 23: Issue 1, 2011, pp. 33-40.

**Salling**, Mark, "GIS Will Affect the Political Landscape for the Next Decade and Beyond," GIS Professional, Issue 242, March/April 2011, pp. 1-3.

Joe Ahern and Mark **Salling**, "Racial/Ethnic Health Disparities in Northeast Ohio," Planning & Action, The Center for Community Solutions, Vol. 63, No. 4 (July), 2010, pp. 12-15.

**Salling**, Mark, "Ohio's Use of Geographic Information Systems to Demonstrate Public Participation in the Redistricting Process," Duke Journal of Constitutional Law & Public Policy, Vol. 5, 2010, pp.112-123.

**Salling**, Mark, and Jenita McGowan, "Census 2010 and Human Services and Community Development," Planning & Action, The Center for Community Solutions, Vol. 63, No. 2 (March), 2010, pp. 1-4.

Xiaoxing Z. He, Ellen Cyran, and Mark **Salling**, "National trends in the United States of America physician assistant workforce from 1980 to 2007," Human Resources for Health. Vol. 7:86, November 26, 2009.

Joe Ahern and Mark **Salling**, "A Statewide FBO/NPO Digital Inventory: Is it Feasible?" <u>Planning & Action</u>, The Center for Community Solutions, Vol. 62, No. 3 (August), 2009, pp. 9-10.

Joe Ahern and Mark **Salling**, "Survey Provides Insights into the Health of Ohioans," <u>Planning & Action</u>, The Center for Community Solutions, Vol. 62, No. 2 (May), 2009, pp. 15-16.

James Wyles and Mark **Salling**, "Districting Competition Tutorial Using ArcGIS 9.3 and Districting Wizard," Prepared for Ohio Secretary of State Jennifer Brunner, http://www.sos.state.oh.us/SOS/Upload/redistrict/tutorial.pdf, April 2009.

Mark **Salling**, Joe Ahern, George Coulter, and Rich Marountas, "New Study Shows County's Workforce Characteristics," <u>Planning & Action</u>, The Center for Community Solutions, Vol. 62, No. 1 (February), 2009, pp. 7-11.

Mark **Salling**, Ellen Cyran, Sharon Bliss, and Rich Marountas, "The Changing Face of Socioeconomic Conditions in Northeast Ohio," <u>Planning & Action</u>, The Center for Community Solutions, Vol. 61, No. 6 (November/December), 2008, pp. 14-17.

Mark **Salling**, "Beware of the Data. New Data from the Census Bureau's 2007 American Community Survey are Out and Still Coming," <u>Planning & Action</u>, The Center for Community Solutions, Vol. 61, No. 5 (September/October), 2008, p. 14.

Mark **Salling**, "More Persons Attending College and Getting Degrees, 2000 to 2007 The Cleveland-Akron-Elyria Region Doing Well," unpublished report available at http://nodisnet1.urban.csuohio.edu/nodis/publications.shtml, September 23, 2008.

Mark **Salling**, "Changes in Poverty and Educational Attainment, 2000 to 2007 Poverty Rates Increasing for those with College Education, Too," unpublished report available at http://nodisnet1.urban.csuohio.edu/nodis/publications.shtml, September 2, 2008.

Coulter, George, Mark **Salling**, and Rich Marountas, "A Major Study of the County's Workforce is in Progress," <u>Planning & Action</u>, The Center for Community Solutions, Vol. 61, No. 4 (July/August), 2008, pp. 6-9.

Brudney, Jeffery, Mark **Salling**, and Kym Hemley, "The Point – and Counterpoint -- of Agency Collaboration: A Critical Review and a Local Funder's Experience," <u>Planning & Action</u>, The Center for Community Solutions, Vol. 61, No. 3 (May/June), 2008, pp. 6-9.

Marountas, Richard, and Mark **Salling**, "New Economic Indicators Report: Employment and Productivity in Northeast Ohio, 2000-2007, Indicators of Industry Sustainability," <u>Planning & Action</u>, The Center for Community Solutions, Vol. 61, No. 2 (April), 2008, pp. 5-9.

**Salling**, Mark, and M. Egan, "Health Needs Analysis, Assessment Looks at the Region," <u>Planning & Action</u>, The Center for Community Solutions, Vol. 61, No. 1 (February), 2008, pp. 9-14.

Mark **Salling**, "Ohio Continues to Lag in Population Growth and Comments on Prospects for the Future: An Analysis of 2007 State Population Estimates," unpublished report available at http://nodisnet1.urban.csuohio.edu/nodis/publications.shtml, January 2, 2008.

Mark **Salling**, "Hispanics and Asians Increase in Numbers in Cuyahoga County An Analysis of 2007 County Population Estimates," unpublished report available at

http://nodisnet1.urban.csuohio.edu/nodis/publications.shtml, August 7, 2008.

Mark **Salling**, "Brief Description and Analysis of the Census Bureau's 2006 Population Estimates for Incorporated Places: Cleveland and Other Ohio Cities," unpublished report available at http://nodisnet1.urban.csuohio.edu/nodis/publications.shtml, June 28, 2008.

**Salling**, Mark, E. Cyran, S. Bliss, R. Marountas, "The Changing Face of Socioeconomic Conditions in Northeast Ohio," Planning & Action, The Center for Community Solutions, Vol. 60, No. 6 (November/December), 2007, pp. 14-17.

Mark **Salling**, "An Analysis of Services Provided by Faith-Based Organizations to Cleveland's Ward 17 Community," unpublished report available at http://nodisnet1.urban.csuohio.edu/nodis/publications.shtml, January 30, 2007.

**Salling**, Mark, George Zeller, and Rich Marountas, "The State Of Poverty in Ohio, 2007," Ohio Association of Community Action Agencies and The Center for Community Solutions, June 2007.

**Salling**, Mark, "GISCorps Helps United Nations High Commission for Refugees Map Resources for Refugees in Cairo, Egypt," URISA News, Urban and Regional Information Systems Association, No. 219 (May/June), 2007, p. 10.

**Salling**, Mark, "The Role of Faith-Based Organizations in Providing Social and Health Services to Cleveland's Ward 17 Community," Planning & Action, The Center for Community Solutions, Vol. 60, No. 3 (April), 2007, pp. 1-4.

Walton, B.M., M. **Salling**, and J. Wolin. "Biological Integrity of Urban Streams: Toward Resolving Multiple Dimensions of Urbanization," Landscape and Urban Planning, 2007, 79, pp. 110-123.

**Salling**, M., and E. Cyran. "Using the Census Bureau's Public Use Microdata for Migration Analysis," Proceedings of the annual conference of the Urban and Regional Information Systems Association, Vancouver, BC, Canada, September 2006, pp.336-348.

**Salling**, M., and E. Cyran. "Estimates of the Number of Voters Whose Driver's License Address May Differ from Their Voting Address," Cleveland State University, Center for Election Integrity, Research Series, August 2, 2006. [http://moritzlaw.osu.edu/electionlaw/litigation/documents/Moore-Reply-3-28-08-Ex3.pdf]

**Salling**, Mark, "Applied Research Speaks to the Region's Issues in Human Capital," Planning & Action, The Center for Community Solutions, Vol. 59, No. 5 (July/August), 2006, p. 3.

Lenahan T. and M. **Salling**. "Persons with Disabilities by Race, Cuyahoga County, 2000," Public Health GIS News and Information, Centers for Disease Control, May 2006 (No. 70), pp. 23-25.

**Salling** Mark, "Children Living in Severely Distressed Neighborhoods and Poor Housing". Public Health GIS News and Information, Centers for Disease Control, January 2006 (No. 68), pp. 19-22.

Lenahan, Terry, Mark **Salling**, , Richard Marountas, Joe Ahern, and George Weiner, 2004/2005 Social Indicators: Youth Development, The Center for Community Solutions, March 2005.

Croner C.M., T.L. Lenahan, M.J. **Salling**, and G.D. Weiner, "Geographic Information Systems and Public Health: Accomplishments and Horizons," Proceedings GeoHealth 2004 [eds. Skelly C, White P], Institute of Environmental Science & Research, Porirua, New Zealand, November 2004, pp. 22-31.

**Salling** M.J., Lenahan T. Inadequate Prenatal Care: Summit County, Ohio, 1996 to 2001. Public Health GIS News Information, Centers for Disease Control, September 2004, Vol. 60, pp. 21-22.

**Salling**, Mark, "Where is the Prison Population in Ohio?" Planning & Action, The Center for Community Solutions, Vol. 57, No. 6 (September), 2004, pp. 8-10.

**Salling**, Mark, James Williamson, and Elton Turnage, "Some Factors Considered in Teen Pregnancy Rates in Cuyahoga County," Planning & Action, The Center for Community Solutions, Vol. 57, No. 5 (July/August), 2004, pp. 11-14.

Lenahan, Terry, George Weiner, Mark **Salling**, Richard Marountas, and Joe Ahern, 2003/2004 Social Indicators: Older Persons, The Center for Community Solutions, June 2004.

**Salling**, Mark, "New Housing Indicators Report Highlights Challenges and Opportunities," Planning & Action, The Center for Community Solutions, Vol. 57, No. 3 (April), 2004, pp. 16-20.

**Salling**, Mark, Richard Marountas, Terry Lenahan, George Weiner, and Joe Ahern, 2003/2004 Social Indicators: Housing, The Center for Community Solutions, April 2004.

**Salling**, Mark, Michael J.S. Tevesz, Roberta Steinbacher, Sharon Bliss, and Brian McNamara, "Sacred Landmarks as a Resource for Community Empowerment and Regional Development," Proceedings of the annual conference of the Urban and Regional Information Systems Association, Atlanta, GA. October 2003.

Weiner, George, Lucy Malakar, Terry Lenahan, Joe Ahern, Mark **Salling**, and Richard Marountas, 2003 Social Indicators: Community Health, Federation for Community Planning, December 2003.

Lenahan, Terry, Lucy Malakar, George Weiner, Joe Ahern, Mark **Salling**, and Richard Marountas, 2003 Social Indicators: Children and Families, Federation for Community Planning, October 2003.

**Salling**, Mark, "2003 Social Indicators: Education, Employment, and Income," Planning & Action, Federation for Community Planning, Vol. 56, No. 4 (May/June), 2003, pp. 16-18.

**Salling**, Mark, and Sharon Bliss, "Older Adult Profile: A Census Demographic Profile Report," prepared for Western Reserve Area Agency on Aging, May 2003.

**Salling**, Mark, Rich Marountas, Terry Lenahan, Joe Ahern, and George Weiner, 2003 Social Indicators: Education, Employment, and Income, Federation for Community Planning, April 2003.

**Salling**, Mark, "Cleveland Neighborhood Conditions and Trends," prepared for Cleveland City Council, May 2001.

**Salling**, Mark, "Estimating Low and Moderate Income Persons at the Census Block Level in the City of Cleveland," prepared for City of Cleveland, Department of Community Development, July 24, 2000.

Simons, Robert, and Mark **Salling**, "Using GIS to Make Parcel-Based Real Estate Decisions for Local Government: A Financial and Environmental Analysis of Residential Lot Redevelopment in a Cleveland Neighborhood," URISA Journal, Vol. 7, No. 1 (Spring), 1995, pp. 7- 19.

Bowen, William, Mark **Salling**, Kingsley Haynes, and Ellen Cyran, "Toward Environmental Justice: Spatial Equity in Ohio and Cleveland," Annals of the Association of American Geographers, Vol. 85, No. 4, 1995, pp. 641-663.

**Salling**, Mark, et.al., A Guide to State and Local Census Geography, U.S. Department of Commerce, Bureau of the Census, June 1993.

**Salling**, Mark, and William L. Mumbleau, "Introduction: A New Era for GIS in URISA," Proceedings, Volume II, Urban and Regional Information Systems Association Conference, Washington, D.C. July, 1992.

Tobin, J., and Mark **Salling**, "NODIS Procedures for Demographic Analysis," Proceedings, SAS Users Group International, Ninth Annual Conference, Hollywood, FL. March 1984.

Henry, N.H., J.W. Frazier, M. Budin, and Mark **Salling**, "Applications of Geography to Housing Problems," Chapter 5 in Applied Geography, Selected Perspectives, (J. Frazier, ed.), Prentice-Hall, Inc. Englewood Cliffs, N.J. 1982.

**Salling**, Mark, and M.E. Harvey, "Poverty, Personality, and Sensitivity to Residential Stressors," Environment and Behavior, Vol. 13, No. 2 (March), 1981, pp.131-163.

**Salling**, Mark, and T. Bier, "Factors Affecting the Geographic Distribution of Mortgage Loans in Cuyahoga County, Ohio," Proceedings, Applied Geography Conference, (J.W. Frazier and B.J. Epstein, eds.), Vol. 3, Kent, Ohio. 1980.

**Salling**, Mark, "Regionalization at the Areawide Planning Level: the Merger of Subjective and Objective Methods," Proceedings, Applied Geography Conference, (J. Frazier and B.J. Epstein, eds.), Vol. 1, Binghamton, N.Y. 1978.

**Salling**, Mark, "Residential Preferences in Three Neighborhoods of Different Racial Composition," East Lakes Geographer, Vol. 11, June, 1976, pp. 91-109.

<u>Presented:</u>

"Some Thoughts about Equity and Social Justice for GISP Professionals", presented at GIS-Pro 2018, the annual conference of the Urban and Regional Information Systems Association, Palm Springs, CA., October 11, 2018.

"Changes in the Geographic Distribution of the Need for Food/Meal Services in Cuyahoga County, Ohio", presented at GIS-Pro 2018, the annual conference of the Urban and Regional Information Systems Association, Palm Springs, CA., October 11, 2018.

"Boundaries that Matter: Redistricting Congressional Election Districts", Presented to the Lake County League of Women Voters, Mentor, Ohio, January 17, 2018.

"Metropolitan spatial patterns of firm locations as a self-organizing system over time", presented at GIS-Pro 2017, the annual conference of the Urban and Regional Information Systems Association, Jacksonville, FL., October 25, 2017.

"Opioid Deaths and the Availability of Rehab Beds In Facilities Serving Persons with Addictions" Presented at the Northeast Ohio GIS Symposium, Cleveland, Ohio, August 31, 2017.

"Metropolitan spatial patterns of firm locations as a self-organizing system over time: An empirical evaluation in Cleveland–Akron-Elyria, Ohio CSA", with Sanda Kaufman and Miron Kaufman, presented to the 47th Annual Conference of the Urban Affairs Association, Minneapolis, Minnesota, April 21, 2017.

"Boundaries That Matter: Redistricting Congressional Election Districts'", with Paul Moke, presented to First Unitarian Church of Cleveland, Shaker heights, Ohio, February 26, 2017.

"Why We Should Know and Care About the Census Bureau's Redistricting Data Program", presented at GIS-Pro 2016, the annual conference of the Urban and Regional Information Systems Association, Toronto, Canada, November 1, 2016.

"GISCorps: GIS Professionals Volunteering for Communities in Need", presented at the 2015 Levin College Research Conference, Cleveland, Ohio, August 20, 2015.

"Racially and Socioeconomically Disparate Impacts of Relocating the Hamilton County, Ohio Board of Elections'" presented at GIS-Pro 2013, the annual conference of the Urban and Regional Information Systems Association, New Orleans, LA., September 10, 2014.

"Use of GIS to Analyze Impacts of Relocating Hamilton County, Ohio Board of Elections", presented at the Northeast Ohio Regional GIS Symposium – 2014, Cuyahoga Heights, Ohio, August 28, 2014.

"Community Mapping Initiatives in Cleveland, Ohio," presented with Wansoo Im at GIS-Pro 2013, the annual conference of the Urban and Regional Information Systems Association, Providence, RI, September 17, 2013.

"Urban Geography 101: What do you know about Cleveland and the Region?" presented at the Community Forum of First Unitarian Church of Cleveland, Shaker Heights, Ohio, March 3, 2013.

8

"GIS and Democracy, How GIS Affects the Political Landscape," presented at GIS-Pro 2012, the annual conference of the Urban and Regional Information Systems Association, Portland, OR, October 2, 2012.

"Some Data on Representational Fairness, One Person, One Vote, and Public Participation Redistricting," presented at the Symposium on Baker v. Carr After 50 Years: Appraising the Reapportionment Revolution, Case Western Reserve University School of Law, Cleveland, Ohio, November 4, 2011

"Putting Artists on the Map: A Study of Artists' Housing and Neighborhoods in Cuyahoga County, Ohio," with Kristin L. Tarajack-Puch, presented at the Urban Affairs Association annual conference. New Orleans, LA., March 19, 2011.

"How Will Geographic Information Systems be Used for Redistricting: A Case Study in Ohio," presented at presented at GIS-Pro 2010, the annual conference of the Urban and Regional Information Systems Association, Orlando, FL, September 29, 2010.

"An Analysis of Health Disparities in Northeast Ohio Using the 2008 Ohio Family Health Survey," with Joseph Ahern and Terese Lenahan. presented at presented at GIS-Pro 2010, the annual conference of the Urban and Regional Information Systems Association, Orlando, FL, September 29, 2010.

"Anticipating Census 2010…Some Data on Population Change Affecting Redistricting in Ohio." presented at the "Redistricting Forum Redrawing the Boundaries: An Ohio Discussion," March 1, 2010. Columbus, Ohio.

"The Uses of Geographic Information Systems for Redistricting and a Case Study in Ohio," presented at the "Symposium on Drawing Lines: The Future of Redistricting in America," February 26, 2010. Duke University School of Law, Durham, NC.

"The 2008 Ohio Family Health Survey: Initial Analyses of Cuyahoga County," with Joe Ahern, presented to the Community Partners and Friends of The Center for Community Solutions, Cleveland, Ohio, July 15, 2009.

"The 2008 Ohio Family Health Survey: Initial Analyses of Ohio and Cuyahoga, Lorain, and Summit Counties," with Timothy Sahr, Heather Beaird, and Joe Ahern, presented to the Summit County Healthy Connections Network, Akron, Ohio, April 23, 2009.

"Ohio Redistricting Competition: Competition Rules and Scoring," with James Wyles, presented for Ohio Secretary of State Jennifer Brunner's Districting Competition, Columbus, Ohio, April 10, 2009.

"2008 Ohio Family Health Survey: Profile of the Uninsured in Cuyahoga, Lorain, and Summit Counties," with Joe Ahern, presented to The Center for Community Solutions Human Services Institute, Cleveland, Ohio, March 13, 2009.

"Using Social Indicators and Related Data for Grant Applications," presented to The Center for Community Solutions Human Services Institute, Cleveland, Ohio, March 13, 2009.

"Challenges Related to Multiple Estimates of the Census Bureau's American Community Survey," presented at the 2009 annual conference of the National Association of Planning Councils, Austin Texas, March 2, 2009.

"Cuyahoga County Workforce Indicators," with Joe Ahern and George Coulter, presented to The Center for Community Solutions - Partners and Friends, Cleveland, Ohio, February 27, 2009.

"The Point of Partnering? Achieving Service Outcomes through Agency Collaboration," annual conference of The Center for Community Solutions' Human Services Institute, Cleveland, Ohio, March 28, 2008.

"Income of Older Persons in Ohio," Ohio AARP Conference on Sensible Solutions for Retirement Security: A Public Policy Discussion, New Philadelphia, Ohio, March 20, 2008.

"Some Recent Data on the Economic Health of the Region," with George Zeller, Partners and Friends of The Center for Community Solutions, Cleveland, Ohio, November 15, 2007.

"Some Recent Data on the Economic Outlook for Cuyahoga County Based on the American Community Survey," presented to Cuyahoga County Commissioners and department heads, Cleveland, Ohio, September 19, 2008.

"Implications of Geocoding Methods, Geographic Reference Files, And Population Estimates for Community Health Indicators," with Chris Kippes, David Bruckman, Ellen Cyran, and Urban and Elizabeth Larkin, Centers for Disease Control and Prevention 2007 Assessment Initiative Annual Conference, Atlanta, Georga, August 23, 2007.

"Implications of Geocoding Methods, Geographic Reference Files, And Population Estimates for Community Health Indicators," with Chris Kippes, David Bruckman, Ellen Cyran, and Urban and Elizabeth Larkin, Urban and Regional Information Systems Association conference on GIS in Public Health, New Orleans, Louisiana, May 21, 2007.

"Foreign Migration: What Census Data Tell Us," annual conference of The Center for Community Solutions' Human Services Institute, Cleveland, Ohio, March 23, 2007.

"GIS as a Tool for Political Geography and Analysis," Conference on Computer-Assisted Reporting, Cleveland, Ohio, March 9, 2007.

"What We Are Learning from Recent Census Data," with Michael Finney, New Member Orientation, Ohio Legislative Service Commission, Columbus, Ohio, November 29, 2006.

"Sprawl, Taxes and the Cost of Ohio's Competitiveness," presented to New Member Orientation, Ohio Legislative Service Commission, Columbus, Ohio, November 29, 2006.

"Using the Census Bureau's Public Use Microdata for Migration Analysis," with Ellen Cyran, annual conference of the Urban and Regional Information Systems Association, Vancouver, BC, Canada, September, 2006.

"The Use of Geographic Information Systems (GIS) to Reveal Inordinate Public Health Burden in Cleveland's African American Neighborhoods," with C.M. Croner, T.L. Lenahan, G.D. Weiner, and C. Kippes, American Public Health Association 133rd Annual Meeting, Philadelphia PA., December 13, 2005.

"The Use of GIS for Social and Health Community Indicators," presented at the annual conference of the Urban and Regional Information Systems Association, Kansas City, Missouri, October, 2005.

"The Public Health Burden of Cleveland's African American Community," with C.M. Croner, and T.L. Lenahan Annual Meeting of the Association of American Geographers, Denver CO., April 6, 2005.

"What Have We Learned about Ohio from Recent Census Data?," with Michael Finney, presented to the New Member Orientation of the Ohio Legislature, Columbus, Ohio, November 17, 2004.

"Ecological Quality of Urban Streams: Resolving Multiple Dimensions of Urbanization," with B.M. Walton and J. Wolin. Symposium on Great Lakes Water Quality, Headwater Streams Section. Cleveland Museum of Natural History. October 2004.

"Updating the Census Bureau's School District Boundaries Using Geocoded Voter Registration Addresses," presented to the 2004 Ohio GIS Conference, Columbus, Ohio, September 30. 2004.

"Social Indicators Data for Community Development Corporations," workshop presentation at the Ohio CDC Association, 2004 annual conference, Cleveland, Ohio. September 29, 2004.

"Visualizing Health Inequalities with GIS: Exploring Geospatial Issues with IHS Area Planning Officers and Statisticians," with C.M. Croner, D. Taylor, T.L. Lenahan, and E. Arias DHHS Indian Health Service Area Planning Officers/Statisticians Conference, Washington, D.C., September 23, 2004.

"Geographic Information Systems: Revealing Public Health Inequalities in African American Communities," with C.M. Croner, T.L. Lenahan, and G.D. Weiner, 1st Annual Conference on Race, Ethnicity and Place, Howard University, Washington D.C., September 17, 2004.

"Using Social Indicators for Grantmaking," with Edwin Balzerzak, workshop sponsored by the Ohio Grantmakers Forum, Cleveland, Ohio. September 28, 2004.

"Geographic Information Systems and Public Health: Accomplishments and Horizons," with C.M. Croner, T.L. Lenahan, and G.D. Weiner, GeoHealth 2004: Surveillance and Intervention, Wellington, New Zealand, November 23-25, 2004.

"Geographic Information Systems: Revealing Public Health Inequalities in African American Communities," with C.M. Croner, T.L. Lenahan, 1st Annual Conference on Race, Ethnicity and Place, Howard University, Washington D.C. September 17, 2004.

"Geographic Information Systems and African American Health: Visualizing Disease Burden," with C.M. Croner, T.L. Lenahan, E. Cyran, B. McNamara, L. Malakar, C. Kippes, and R. Marountas, 21st Annual Historical Black Colleges and Universities Summer Faculty GIS Workshop, National Capital Planning Commission, Washington, D.C., July 21, 2004.

"Assessing Biological Integrity within Substantially Urbanized Catchments," with B. M. Walton and J. Wolin, presented at the Symposium on Urbanization and Stream Ecology, Melbourne, Australia. December, 2003.

"Sacred Landmarks as a Resource for Community Empowerment and Regional Development," presented at the annual conference of the Urban and Regional Information Systems Association, Atlanta, Georgia. October, 2003.

"Using Geographic Information Systems to Target Elevated Lead Blood Levels in Children," presented at the annual conference of the Urban and Regional Information Systems Association, Atlanta, Georgia. October, 2003.

"GIS Certification: A Status Report," presented to the 2003 Ohio GIS Conference, Columbus, Ohio. September 18. 2003.

"Some Thoughts on Social Indicators," presented to the National Association of Planning Councils, Monterey, California. May 10, 2003.

"Census 2000: Good News for Northeast Ohio's Economy?," presented at the Census 2003 Forum, Maxine Goodman Levin College of Urban Affairs, Cleveland State University, Cleveland, Ohio. May 2, 2003.

"Race, Hispanic/Latino Ethnicity, Ancestry, and the Foreign-born Population, Some Demographic Data from the Census," presented to the 2003 Health and Human Services Institute, Federation for Community Planning, Cleveland, Ohio. March 21, 2003.

"Changing Demography of Ohio's House Districts," with Mittie Olion Chandler, presented to the Ohio Urban University Program Annual Forum, Columbus, Ohio. March 27, 2003.

"Demographic Change in Ohio: What Have We Learned for the 2000 Census?," with Michael Finney, presented to the New Member Orientation of the Ohio Legislature, Columbus, Ohio. October 18, 2002.

"Application of Geographic Information Systems and a Street-length-based Estimation Methodology to Develop a Redistricting Database," presented to the annual conference of the Urban and Regional Information Systems Association, Long Beach, California. October 2001.

"Use of Geographic Information Systems in the Analysis and Reporting of Child Mortality Statistics," with Cindie Carroll-Pankhurst, presented to the National Conference of County Boards of Health, Cleveland, Ohio. July 2001.

"GIS Customization of a Water Distribution Model Application for Hydraulic Modeling," with Ellen Cyran, Lindle Wilnow, and Pierre Haddad, presented at the conference on Public Works/Geographic Information Systems, Chicago, Illinois. May 7, 2001.

"What Can the 2000 Census Tell You About Your Community?," presented to The Neighborhood & Community Press Association (NCPA) of Greater Cleveland, Cleveland, Ohio. April 28, 2001.

"Using Geographic Information Systems for Community Economic Development," presented at the Emerging Leadership conference of the National Coalition of Community Economic Development, Washington, D.C. February 18, 2001.

"Demographic Trends and Patterns in Ohio," presented to the New Member Orientation Program of the Ohio General Assembly, Columbus, Ohio. November 28, 2000.

"Geographic Information Systems," in "Electronic Records: Access and Use" panel discussion at Midwest Archives and Mid-Atlantic Regional Archives Conference, Cleveland, Ohio. October 21, 2000.

"A Progress Report on Using Geographic information Systems to Prepare for Elections in the 21st Century," presented at the Ohio GIS annual conference, Columbus, Ohio. October 28, 1999.

"Modeling Neighborhood Economic Transformation," presented at the annual conference of the Urban and Regional Information Systems Association, Chicago, Illinois. August 11, 1999.

"Using Geographic information Systems to Prepare for Elections in the 21st Century," presented at the GIS/LIS annual conference, Cincinnati, Ohio. November 29, 1997.

"Applying Geographical Information Systems (GIS) Technology in Devising Effective Student Recruitment Strategies," panel at the 36th annual forum of the Association for Institutional Research, Albuquerque, New Mexico. May 6, 1996.

"Development of an Implementation Plan for Sharing Geographic Information in Greater Cleveland," presented to the Applied Geography Conference, Akron, Ohio. October 14, 1994.

"Using GIS to Make Micro-Level Real Estate Decisions: A Financial and Environmental Analysis of Residential Lot Redevelopment in a Cleveland Neighborhood," with Robert Simons, presented at the annual conference of the Urban and Regional Information Systems Association, Milwaukee, Wisconsin. August 11, 1994.

"Census 2000: Saving the Data - For Whom?" presented at the annual conference of the Urban and Regional Information Systems Association, Atlanta, Georgia. July 26, 1993.

"The Geography of Environmental Equity in Ohio: A Descriptive Analysis," with W. Bowen, presented at the annual conference of the Association of American Geographers, Atlanta, Georgia. April 9, 1993.

"The Geography of Environmental Disadvantage in Cuyahoga County, Ohio: A Descriptive Analysis," with W. Bowen, presented at the annual conference of the East Lakes Region of the Association of American Geographers, Youngstown, Ohio. November 2, 1991.

"NORGIN: Development of a GIS Project in the Cleveland Area," presented to the AM/FM-IKO & URISA Great Lakes Conference, Columbus, Ohio. June, 1991.

"Implementing A Departmental Computing System for Novice, PC, and Mainframe Users," presented to the annual conference of the Urban and Regional Information Systems Association, Ft. Lauderdale, Florida. August, 1987.

"A Method for Projecting Population for Census Tracts in a Declining City," presented to the annual conference of the Urban and Regional Information Association, Ft. Lauderdale, Florida. August, 1987.

"Developing an Arson Early Warning System from Public Records," presented to the annual conference of the Urban and Regional Information Systems Association, Ottawa, Ontario. July 1985.

"Dissemination of a Dynamic Database in Cleveland, Ohio," presented to the annual conference of the Urban and Regional Information Systems Association, Seattle, Washington. August, 1984.

13

"Development and Application of a Research-Oriented Geographic Information System," presented to the annual conference of the Urban and Regional Information Association, Seattle, Washington. August, 1984.

"NODIS Procedures for Demographic Analysis," with J. Tobin, presented to SAS User's Group International, Hollywood, Florida. March, 1984.

"From Arson To Enterprise Zones: Applications of a Cleveland Based Geographic Information System," presented to the Applied Geography Conference, Toronto, Ontario. March, 1983.

"Home Mortgage Investment Patterns in the Cleveland Region," with T. Bier, presented to the Applied Geography Conference, Binghamton, New York. Fall 1979.

"Poverty, Personality, and Residential Mobility," presented to the East Lakes Meetings of the Association of American Geographers, Ann Arbor, Michigan. October, 1976.

"Residential Preferences in Three Neighborhoods of Different Racial Composition," presented to the East Lakes Meetings of the Association of American Geographers, Saint Catherine, Ontario. October, 1975.

"The Direction of Urban Transportation Network Extent: A Relationship, Model, and Case Study," presented to the Ohio Academy of Science, Marietta, Ohio. April, 1972.

Exhibit 2

Expert Submission of Mark Salling, PhD

**Testimony, Depositions, and Affidavits**
**Mark J. Salling, PhD, GISP**
November 1, 2018

1. <u>Ohio State Conference of the National Association for the Advancement of Colored</u>
   <u>People, et al., Plaintiffs, v. John Husted, et al.</u>, Case No. 2:14-cv-00404 (S.D. Ohio).
   Research entitled "The Use of Early In-Person Voting Opportunities in the 2008, 2010,
   and 2012 General Elections In Ohio's Largest Urban Counties: Comparisons by Race and
   Hispanic/Latino Ancestry", submitted with "Amicus Brief of the County of Cuyahoga,
   Ohio Supporting Plaintiffs' Motion for Preliminary Injunction". Declaration on October 8,
   2014.

2. <u>William D. Gearhart, Jr. v. Nationwide Mutual Insurance Co. , et al.,</u> Case No. CV-2012-
   09-5216, Court of Common Pleas, Summit County, Ohio. Analysis of the distance from
   two addresses in Cuyahoga Falls, Ohio to an address in Canal Fulton, Ohio. Affidavit on
   September 19, 2013.

3. <u>Nationwide Mutual Insurance Co. v. Michael T. Grossi, et al</u>., Case No. CV-2012-12-6660,
   Court of Common Pleas Summit County, Ohio. Analysis of the distance from two
   addresses in Cuyahoga Falls, Ohio to an address in Canal Fulton, Ohio. Affidavit on
   October 2, 2013.

4. <u>Fair Elections Ohio v. Husted</u>, Case No. 1:12-cv-797 (S.D. Ohio). Expert for Plaintiffs,
   including deposition testimony.

5. <u>New Longwood Associates d.b.a. Arbor Park Village v. Nikita Perry,</u> Case No. 2009 CVG
   012567, Cleveland Municipal Court, Housing Division, Cuyahoga County, Ohio, Expert
   Report based on an analysis of Census data on the racial composition of prison
   population.

6. <u>ACLU of Ohio v. Brunner</u>. Case 1:08-cv-00145 (N.D. Ohio), Expert for Plaintiffs.

1

7. <u>Cleveland Metropolitan Housing Authority v. Sylvia  Barnes and Mustafa Jefferson,</u> Consolidated Cases No. 2007 CV 22831, No. 07-Cvg-022831, No. 07-Cvg-10717 Cleveland Municipal Court, Housing Division, Cuyahoga County, Ohio. Written deposition August 13, 2008.

8. <u>United State of America vs. City of Euclid, et. al.</u> Case No. 1:06-cv-1652. (N.D. Ohio) Deposition June 6, 2007.

9. <u>Boustani v. Blackwell</u>, Civil Action No. 06-2065. (N.D. Ohio) Salling report documented the number of naturalized citizens in Ohio using data from the Census Bureau.

10. <u>Huntsman v. Akron Tower Partnership, et al.</u> Case No. 5:05CV1739 (N.D. Ohio), Civil Rights - Housing/Accommodations.

11. <u>Effie Stewart, et al. v. J. Kenneth Blackwell, et al.</u>, No. 5:02-cv-2028 (N.D. Ohio)

12. <u>Cleveland Firefighters for Fair Hiring Practices, et al., v. City of Cleveland, et. al.</u>, Case No. I:00 CV 301, Case No. C73-330 (N.D. Ohio). Expert witness for the plaintiff; testified December 19, 2012.

13. <u>Buckeye Community Hope Foundation v. City of Cuyahoga Falls</u>, No. 5:96-CV-1458 (N.D. Ohio)

2

# Exhibit 3

Expert Submission of Mark Salling, PhD

## Analysis of the Proximity of Jails to Hospitals in Ohio[1]

Mark Salling, PhD, GISP
Senior Research Associate
Maxine Goodman Levin College of Urban Affairs
Cleveland State University

October 30, 2013

This study maps the geographic distributions of hospitals and jails in the State of Ohio and calculates the average distance between jails and their nearest hospital. The purpose is to assess how close the jails are to hospitals.

### Data and Methods

Geographic Information Systems (GIS) software is used to geocode and map two Excel files, one containing the address of hospitals and the other the addresses of jails in the state. The U.S. Census Bureau's 2010 TIGER data were used as the street reference file for geocoding addresses (i.e., locating them on the reference or base map).  In GIS terms, once the addresses have been geocoded the software, if requested, provides the distance between each jail and its nearest hospital when the jail layer is spatially joined by hospital layer. An average distance between the jails and their nearest hospitals is then calculated.

Since temporary holding facilities (THFs) hold persons for less than six hours, we exclude them in a second part of the analysis.

### Results

Map 1 shows the geographic distributions of both the hospitals and the jails. It also reports the average distance between jails and their nearest hospital, which is 3.77 miles.

Among the 320 jails, more than three quarters (77%) are within five miles of a hospital and almost half (48%) are within 2 miles.

Map 2 shows the type of jail, with THF facilities excluded. The average distance to the closest hospital for these jails is 3.67 miles.

---

[1] The analysis was requested by the Ohio Justice & Policy Center and data used in the analysis were supplied by that organization.

Analysis of the Proximity of Jails to Hospitals in Ohio                                                                    1

Case: 1:12-cv-00979-SJD Doc #: 69-1 Filed: 02/28/14 Page: 42 of 91 PAGEID #: 17

Map 1: Geographic Distribution of Jails and Hospitals



Fair Elections Ohio, et al. v. Husted, et al.                    Defendants' Emergency Motion to Exclude
Case No. 1:12cv979                    Exhibit B, p|3

Ma0 2: Geographic Distribution of Non-THF Jails and Hospitals



# Exhibit 4

Expert Submission of Mark Salling, PhD

**Analysis of the Proximity of Jails and Hospitals to County Boards of Elections**

Mark Salling, PhD, GISP

Senior Research Associate

Maxine Goodman Levin College of Urban Affairs

Cleveland State University

February 20, 2014

This study maps the geographic distributions of county boards of elections (BOEs), hospitals, and jails in the State of Ohio and calculates the distances from jails and hospitals to the county's BOE. These distances are compared. This analysis is meant to address the issue of whether travel by BOE staff to jails in order to acquire election ballots of eligible inmates is more or less burdensome than travel to hospitals in the county to acquire such ballots from hospital patients.

**Data and Methods**

Geographic Information Systems (GIS) software is used to geocode and map three Excel files[1], one containing the address of BOEs, a second of hospitals, and a third of jails in the state. The U.S. Census Bureau's 2010 TIGER data were used as the street reference file for geocoding addresses (i.e., locating them on the reference or base map).  In GIS terms, once the addresses have been geocoded, the software, if requested, provides the distance between each jail and hospital and the county's BOE. An average distance between the BOEs and both jails and hospitals in the county is then calculated.

Since temporary holding facilities (THFs) hold persons for less than six hours, we exclude them in the analysis of jail distances.


**Results**

Map 1 shows the geographic distributions of BOEs, hospitals, and jails. It also reports the average distance between jails and hospitals in that county's BOE, which are 5.77 and 5.07 miles, respectively.[2] While the average distance to jails is greater than to hospitals, statistically there is no difference in these means at the 95 percent confidence level.[3]

---

[1] The analysis was requested by the Ohio Justice & Policy Center and data used in the analysis were supplied by that organization.

[2] Nine jails and three hospitals were not able to be geocoded and are excluded from this analysis.

[3] The null hypothesis, that there is no difference, cannot be rejected with 95 percent confidence (p = 0.0716).

Figure 1 shows the distribution of hospitals and jails within each mile from the county's BOE.

While 14 percent of hospitals are within a mile of the BOE, 24 percent of jails are within that distance (see Figure 2). Thirty-five (35.2) percent of hospitals and 32.8 percent of jails are within two miles of the BOE, a difference of 2.4 percent. This last percentage difference grows as distance from BOEs increases, but it reaches only 8.6 percent at 10 miles from BOEs, i.e., 85.2 percent of hospitals are within that distance, while 76.6 percent of jails are within 10 miles.

It should also be noted that there are significantly fewer jails than hospitals to which BOE staff might have to travel to at various distance from the BOE office. See Figures 1 and 3. The aggregate distance from BOEs to hospitals is 1,269 miles; the aggregate distance to jails is 1,108 miles.

**Conclusion**

Distances from BOEs to jails in the same county in Ohio are not significantly different from distances to hospitals in those counties. Indeed, assuming that all hospitals and jails in this study have equal chances of having eligible voters who have not voted, the relative burden of travel to these facilities is likely less for jails since there are many fewer of them and the aggregate distance to be covered is less.

Map 1: Geographic Distribution of BOEs, Jails, and Hospitals



Fair Elections Ohio, et al. v. Husted, et al.                                    Defendants' Emergency Motion to Exclude
Case No. 1:12cv979                                                                                              Exhibit E, p|3

Figure 1: Number of Hospitals and Jails within Distances  to Board of Elections in Same County



Figure 2: Percentage of Hospitals and Jails within Various Distances of the County Board of Elections in the Same County



Fair Elections Ohio, et al. v. Husted, et al.
Case No. 1:12cv979

Defendants' Emergency Motion to Exclude
Exhibit E, p|4

Case: 1:12-cv-00979-SJD Doc #: 69-14 Filed: 02/28/14 Page: 1 of 91 PAGEID #: 728

Figure 3: Number of Hospitals and Jails within Various Distances of the County Board of Elections in the Same County



Analysis of the Proximity of Jails and Hospitals to County Boards of Election                    5

Fair Elections Ohio, et al. v. Husted, et al.                           Defendants' Emergency Motion to Exclude
Case No. 1:12cv979                                                                          Exhibit E, p|5

# Exhibit 5

Expert Submission of Mark Salling, PhD

### Analysis of the Number of Incarcerated Registered Voters who could not Vote During Their Incarceration on the Weekend and Monday before the November 2012 General Election[1]

Mark Salling, PhD, GISP
Senior Research Associate
Maxine Goodman Levin College of Urban Affairs
Cleveland State University

October 30, 2013

This study calculates the number of jailed persons, in nine Ohio counties, who were registered to vote and had not voted by absentee ballot, but could not exercise their voting rights during their confinement the three days before the election on November 6, 2012. The following nine counties are analyzed: Adams, Athens, Butler, Cuyahoga, Franklin, Hamilton, Lawrence, Montgomery, and Summit. These counties included the five most populous counties in Ohio, as well as four smaller counties – accounting for 42 percent of the state's 2010 population.[2]

**Data and Methods**

The study objective is to identify and count inmates who were registered to vote, had not voted absentee, and were incarcerated for the entire period from Saturday, November 3, 2012, through Tuesday, November 6, 2012, or later. This count does not include inmates if they were released on Election Day since such persons would have had the opportunity to vote if released before the polls closed. The calculation of the number of persons denied opportunity to vote just before the election is thus made more conservative by this exclusion, since some of these excluded persons may not have been able to vote that day.

The time frame used here for counting persons who could not vote due to incarceration also excludes persons jailed Friday evening, November 2, 2012, after close of the offices of the boards of elections (BOEs), even though persons entering jails that evening and not leaving until after Election Day would have been unable to vote.

Thus the time frame used in this study – entering jail after midnight on Friday the 2[rd] and not discharged until midnight Tuesday the 6th or later – provides a conservative window of time in which incarcerated persons would be prevented from voting.

All the 12 Hour, 12 Day, Minimum Security and Full Service Jails in the nine counties were subpoenaed for data on all inmates held between November 2, 2012 and November 6, 2012. The inmate information includes booking data from all these jails with the exclusion of four jails that did not

---

[1] The analysis was requested by the Ohio Justice & Policy Center and data used in the analysis were supplied by that organization. See Appendix A.

[2] The nine counties had 42.2 percent of the state's adult (age 18 and older) 2010 population.

Incarcerated Registered Voters who could not Vote During Weekend and Monday before the November 2012 General Election                                                                                          1

respond to the subpoena in time for this analysis - Euclid City Jail, Shaker Heights Jail, and North Randall Village Jail in Cuyahoga County, and Richfield Village Jail in Summit County.

The process of identifying such persons involves the following basic steps:

1) Identify the registered electorate who voted absentee.
2) Identify and count persons who were incarcerated in jails during the target period noted above, were registered to vote, and had not already voted absentee.

The boards of elections of the nine counties were subpoenaed for data on registered and absentee voters. Boards of Elections for Cuyahoga, Hamilton, Franklin, Lawrence, and Montgomery counties provided data files that enabled automated (computerized) matching of registered voters to those who voted with absentee ballots.[3] These records were then matched to records of jailed persons. Those that were held in jails throughout the target period were flagged as to whether they were registered but had not voted with an absentee ballot. These records were then summed.

Files obtained from Adams, Athens, Butler, and Summit County BOEs were in PDF form and were not suitable for automated (computer) manipulation and calculation. For the last four counties, matching inmates to the absentee and registered voter records was performed manually and then summed to get counts of persons in jail during the target period, were registered to vote, and had not cast an absentee ballot.

Criteria used to match absentee and registered voter records, and well as jailed person records to the registration and absentee data, are indicated in Table 1.

A unique voter ID was found on both the automated voter registration and absentee files for Hamilton and Montgomery counties and was used to match those records. After a cursory examination of the files from both Cuyahoga and Franklin counties, it was determined that matching absentee records to the registered voter file could be achieved using first and last names, address fields (street address, city, and ZIP code), and birth date.

Automated matching of inmate records to the registered/absentee records required testing several alternative combinations of criteria. It was determined that including middle names would lead to many missed correct matches since the data sources frequently recorded these names differently or not at all. Street addresses, too, missed some correct matches due to differences (including errors) in street spelling. In addition, even city names and ZIP codes were at times recorded differently. This may be due to a number of possible causes, including the possibility that a jailed person had moved since being registered to vote. Postal codes for mailing purposes can, at times, be different from actual residential postal code areas.

---

[3] These included CSV or delimited txt files that could be readily converted to Microsoft Excel files and then ultimately to SAS data files.

Incarcerated Registered Voters who could not Vote During Weekend and Monday before the November 2012 General Election                                                                                           2

Fair Elections Ohio, et al. v. Husted, et al.
Case No. 1:12cv979

Defendants' Emergency Motion to Exclude
Exhibit A, p|3

Therefore, automated matching the jailed population records to the registered/absentee records used first and last name and birth date.

These automated matching procedures can lead to both incorrect matches (false positives) and missed matches that should have been made because the person in both files is the same. In regard to incorrect matches, for example, it is possible that a jailed inmate, who is not registered to vote, is incorrectly matched to a record in the registered voter file with the same name and birth date in that county.

Another instance of possible error of a false positive could occur if there are two registered voters with the same first and last names and birth date (in the same county) and both matched an inmate with the same first and last names and birth date. An incorrect result would occur if the matching procedure matched the wrong voter record to the jailed person record. That could mean that an inmate was incorrectly classified as one who was registered and had not voted absentee. It would improperly inflate the calculation of registered persons who could not vote. However, our programming would have detected this occurrence. It would have produced a duplicate record for that inmate in the output file, but no such duplicates were found in this analysis.

The alternative error is that the count is less than the actual number of persons who were registered and had not voted absentee. A difference or error in how a person's name is spelled between the inmate and registered voter files, though both spellings refer to the same person, would result in a missed correct match (false negative).

Meanwhile, manual matching, though more time consuming for such large databases, is generally more reliable in avoiding missed correct matches since the person can make interpretations of data with more intelligence than a computer operation.

One other caution is noted. A small proportion in the inmate database may have been ineligible to vote due to being sentenced for a felony. It is my understanding that such persons are ineligible to vote.

Nevertheless, based on the process used in this analysis it is highly likely that this calculation of the number of incarcerated registered voters, unable to vote during the weekend and day before the election in November 2012, is not much different than the actual number of such persons. Based on my professional experience and common sense, I believe that the exclusion of persons who could not vote because they entered jail Friday evening or left it on Election Day after the polls closed, together with the false negatives from differences in name spelling, is likely greater than the number of false positives from identical names in conjunction with identical birth dates.

Incarcerated Registered Voters who could not Vote During Weekend and Monday before the November 2012 General Election                                                                                                                          3

Fair Elections Ohio, et al. v. Husted, et al.                                            Defendants' Emergency Motion to Exclude
Case No. 1:12cv979                                                                                              Exhibit A, p|4

Table 1: Matching Variables

| County | Matching Variables | |
|---|---|---|
| | match absentee to registered voters | match registered voters to jailed inmates |
| **Adams** | NA | fn, ln, bd |
| **Athens** | NA | fn, ln, bd |
| **Butler** | NA | fn, ln, bd |
| **Cuyahoga** | fn, ln, mn, street address, city, ZIP code, bd | fn, ln, bd |
| **Franklin** | fn, ln, mn, street address, city, ZIP code, bd | fn, ln, bd |
| **Hamilton** | voter ID | fn, ln, bd |
| **Lawrence** | fn, ln, city, ZIP code | fn, ln, bd |
| **Montgomery** | voter ID | fn, ln, bd |
| **Summit** | NA | fn, ln, bd |

Note: Matching for Adams, Athens, Butler, and Summit counties was done manually; thus there was not automated matching of absentee to registered voter records.

| Abbreviation | Attribute |
|---|---|
| fn | first name |
| ln | last name |
| mn | middle name |
| bd | birth date |

**Results**

The results are presented in Table 2.

Among the eleven persons in the inmates file in Adams County, three were recorded as booked sometime after midnight, Friday, November 2nd and kept in jail until at least the end of the day (midnight) on Election Day, November 6, 2012. Of those, two were registered and had not voted absentee and one was not registered to vote. Among inmates in Athens County, six of the possible 19 jailed persons in that period were unable to vote though they were registered to do so. Butler County jails had 12, Cuyahoga 70, Franklin 36, Hamilton 26, Lawrence 3, Montgomery 21, and Summit County 20 such electors who were unable to exercise their voting rights while in jail that weekend and day before the election.

Because the methods of this analysis may have missed some such persons, it can be stated with some certainty that at least, but probably more than, 202 persons in the nine county study area were unable to vote due to these circumstances. It should also be noted that data on inmates in four jails in

Incarcerated Registered Voters who could not Vote During Weekend and Monday before the November 2012 General Election

Fair Elections Ohio, et al. v. Husted, et al.
Case No. 1:12cv979

Defendants' Emergency Motion to Exclude
Exhibit A, p|5

Cuyahoga County were not included in this study and may have increased the total had they been included.

A note is worth stating concerning what the totals for all 88 counties in the state would be. While there are other and possibly more accurate methods of determining the statewide total of such cases, a simple extrapolation using the relative portion of the state's 2010 adult (18+) population in the nine counties in the study counties would result in an estimate of 479 persons statewide who were in jails and unable to vote.

And finally, the issue of the possible disparate racial impact of the inability of registered jail inmates to vote in the final three days before the election could be addressed with the inmate data since race is included in the file. Without undertaking that full analysis, it is worth noting that 46 percent of all the inmates in the database are Black, while there are 20 percent of the adult 2010 Ohio population that are Black (1 race category only).

Table 2: Results

| County | Total in inmates database | Persons Incarcerated 11/3/2012 through 11/5/2012 | | | | Total registered voters | Total absentee voters |
|---|---|---|---|---|---|---|---|
| | | Total | Registered | Voted absentee | Not registered | | |
| Adams | 11 | 3 | 2 | 0 | 1 | NA | NA |
| Athens | 45 | 19 | 6 | 0 | 13 | NA | NA |
| Butler | 162 | 62 | 18 | 1 | 43 | NA | NA |
| Cuyahoga | 477 | 136 | 70 | 7 | 59 | 927,999 | 267,114 |
| Franklin | 271 | 108 | 36 | 5 | 67 | 814,246 | 201,227 |
| Hamilton | 152 | 92 | 26 | 2 | 64 | 546,693 | 173,459 |
| Lawrence | 22 | 8 | 3 | 1 | 4 | 54,021 | 7,670 |
| Montgomery | 125 | 48 | 21 | 0 | 27 | 656,797 | 52,831 |
| Summit | 111 | 67 | 20 | 3 | 44 | NA | NA |
| Total | 1,376 | 543 | 202 | 19 | 322 | 3,239,973 | 753,474 |

**Note:** Counts on inmates were done manually for Adams, Athens, Butler, and Summit so no automated counts of those counties' registered and absentee voters are available. Column totals do not include counts of registered and absentee voters for those four counties.

**APPENDIX A: Documents Provided by Plaintiffs' Counsel**

- Adams County Registered Voter List
- Adams County Absentee Voter List
- Athens County Registered Voter List
- Athens County Absentee Voter List
- Butler County Registered Voter Lists
- Butler County Absentee Voter List
- Cuyahoga County Registered Voter List
- Cuyahoga County Absentee Voter List
- Franklin County Registered Voter List
- Franklin County Absentee Voter List
- Hamilton County Registered Voter List
- Hamilton County Absentee Voter List
- Lawrence County Registered Voter List
- Lawrence County Absentee Voter List
- Montgomery County Registered Voter List
- Montgomery County Absentee Voter List
- Summit County Registered Voter List
- Summit County Absentee Voter List
- Lists of Ohio jails
- List of Ohio hospitals
- Spreadsheet of inmates in jail on 11/6/2012 who had been jailed after 11/1/2012
- Spreadsheet of Annual Data Sheet Information from jail inspection records
- Spreadsheet of Bureau of Adult Detention 2010 Survey results
- Spreadsheets of Bureau of Adult Detention database contents
- Ohio Department of Rehabilitation and Correction jail inspection records
- Booking records from jails in Adams, Athens, Butler, Cuyahoga, Franklin, Hamilton, Montgomery, and Summit counties
- Pleadings in the *Fair Elections Ohio v. Husted* Case

Incarcerated Registered Voters who could not Vote During Weekend and Monday before the November 2012
General Election                                                                                                          6

Fair Elections Ohio, et al. v. Husted, et al.                          Defendants' Emergency Motion to Exclude
Case No. 1:12cv979                                                                                   Exhibit A, p|7

# Exhibit 6

Expert Submission of Mark Salling, PhD

**Supplement to**

**Analysis of the Number of Incarcerated Registered Voters who Could Not Vote During Their Incarceration on the Weekend and Monday Before the November 2012 General Election[1]**

**February 20, 2014**

Mark Salling, PhD, GISP

Senior Research Associate

Maxine Goodman Levin College of Urban Affairs

Cleveland State University

This supplemental report offers a revised estimate of the number of jailed persons in Ohio who were registered to vote and had not voted by absentee ballot, but could not exercise their voting rights during their confinement the three days before the election on November 6, 2012. The report, dated October 30, 2013, used the proportion of adult population in the state that was in the nine counties in which sampled jails revealed the number of incarcerated registered voters in those counties the weekend and Monday before the 2012 general election. That initial method assumed that the number of such registered voters statewide would be proportionate to population share of the state's population in the sampled nine counties.

The revised estimate offered here incorporates an additional database - annual jail inventories of the Department of Rehabilitation and Correction. It also includes the addition of inmate data for the Euclid City and Shaker Heights jails, which were not received in time to be included in the previous analysis. Thus the Results section of the earlier report is revised to include these data.

The previous analysis noted the higher percentage among African Americans who were registered voters unable to vote during the few days before the election – 46 percent versus 20 percent for non-African Americans. The supplemental analysis of additional data from the annual inventories of jails presented here also provides further support for the fact that there is a disproportionate impact on African American voters who were not allowed to vote.

**Additional Data on Inmates in the Nine Sampled Counties**

The study identifies and counts inmates who were registered to vote, had not voted absentee, and were incarcerated for the entire period from Saturday, November 3, 2012, through Tuesday, November 6, 2012, or later. As with the earlier analysis, the count does not include inmates if they were released on Election Day since such persons would have had the opportunity to vote if released before the polls closed. The calculation of the number of persons denied opportunity to vote just before the election is

---

[1] The analysis was requested by the Ohio Justice & Policy Center and data used in the analysis were supplied by that organization. See Appendix A.

Supplemental Report with Revised Estimate of Incarcerated Registered Voters who Could Not Vote During Weekend and Monday before the November 2012 General Election 1

Fair Elections Ohio, et al. v. Husted, et al.  
Case No. 1:12cv979

Defendants' Emergency Motion to Exclude  
Exhibit D, p|1

thus made more conservative by this exclusion, since some of these excluded persons may not have been able to vote that day.

The time frame used here for counting persons who could not vote due to incarceration also excludes persons jailed Friday evening, November 2, 2012, after close of the offices of the boards of elections (BOEs), even though persons entering jails that evening and not leaving until after Election Day would have been unable to vote.

All the 12 Hour, 12 Day, Minimum Security and Full Service Jails in the nine counties were subpoenaed for data on all inmates held between November 2, 2012 and November 6, 2012. Since the initial analysis, data for Shaker Heights and Euclid City jails was received and included in this supplemental report. The exclusion of these jails (and several others) was noted in the earlier report.

For these additional two jails the process of identifying such persons (again) involves the following basic steps:

1) Identify the registered electorate who voted absentee.
2) Identify and count persons who were incarcerated in jails during the target period noted above, were registered to vote, and had not already voted absentee.

Data on incarcerated inmates were provided by the plaintiffs; data on registered voters and whether they had voted absentee in the election were from the boards of elections. Inmate records were manually matched to the registered voter data by the author based on a combination of names, addresses, and birth dates in the two sources.

**Results of Counts in the Sampled Jails**

The earlier analysis presented a table of results for each of the nine sampled counties. Table 2 is repeated here, but includes the additional data for the Shaker Heights and Euclid City jails.

Table 2: Results: Revised from the October 30th report (changes in *red* and *italicized*)

| County | Total in inmates database | Persons Incarcerated 11/3/2012 through 11/5/2012 | | | | | Total registered voters | Total absentee voters |
|---|---|---|---|---|---|---|---|---|
| | | Total | Registered, did not vote | Voted absentee | Not registered | | | |
| **Adams** | 11 | 3 | 2 | 0 | 1 | | NA | NA |
| **Athens** | 45 | 19 | 6 | 0 | 13 | | NA | NA |
| **Butler** | 162 | 62 | 18 | 1 | 43 | | 240,217 | 51,173 |
| **Cuyahoga** | *488* | *147* | *75* | 7 | *65* | | 927,999 | 267,114 |
| **Franklin** | 271 | 108 | 36 | 5 | 67 | | 814,246 | 201,227 |
| **Hamilton** | 152 | 92 | 26 | 2 | 64 | | 546,693 | 173,459 |
| **Lawrence** | 22 | 8 | 3 | 1 | 4 | | 54,021 | 7,670 |
| **Montgomery** | 125 | 48 | 21 | 0 | 27 | | 656,797 | 52,831 |
| **Summit** | 111 | 67 | 20 | 3 | 44 | | NA | NA |
| **Total** | *1,387* | *554* | *207* | 19 | *328* | | 3,239,973 | 753,474 |

**Revised State Estimate**

The previous estimate for the state total used a simple extrapolation based on the relative portion of the state's 2010 adult (18+) population in the nine counties to the state's total adult population, which was 42.2 percent. Since there were 202 (now 207) found registered voters who were incarcerated and were prevented from voting during the relevant weekend period in counties that constituted 42.2 percent of the state's population, it was assumed that another 57.8 percent of such persons in the state were in the other counties. The resulting estimate for the state was 479 registered persons were in jails and unable to vote.

Here we use an alternative method of estimating the state total (and we add 5 additional inmates not able to vote to the Cuyahoga and total sampled counties).

We acquired data from annual jail inventories by the Department of Rehabilitation and Correction on average daily number of prisoners in all jails in the state (excluding temporary holding facilities, i.e., those of less than 6 hours) and found that the sampled jails constituted 40.8 percent of the 201 jails and 47.3 percent of the state total average daily prisoner count.[2] We used the ratio of the prisoner count in the state to that of the sampled jails (2.115) to estimate the number of incarcerated persons who were likely to be unable to vote because they were in jail the weekend and Monday before the election. That estimate is **438** persons (i.e., 2.115*207).

---

[2] Collected annual jail inventory data covered years from 2004-2013, with some jails inventoried in multiple years. For this analysis we used only the latest year of data available for each jail. There was one jail inventory in 2013; 118 (58.7%) had data for 2012; there were 51 (25.4%) for which 2009 was the last year of available data; 30 (14.9%) jails had its latest inventory data in 2008; and one jail had an inventory with a missing year. Among the 82 sampled jails, 53 (64.6%) were last inventoried in 2012, 21 (25.6%) in 2009, and 7 (8.5%) in 2008.

Supplemental Report with Revised Estimate of Incarcerated Registered Voters who Could Not Vote During Weekend and Monday before the November 2012 General Election 3

**Racial Impact**

The issue of the possible disparate racial impact of the inability of registered jail inmates to vote in the final three days before the election can be addressed with the inmate data since race is included in the file. Forty-six percent (46%) of all the inmates in the database were Black, while there was 20 percent of the adult 2010 Ohio population that were Black (1 race category only).

The inventory of jails noted above also provides data on the racial composition of inmates statewide. Again using the latest inventories available, we find that 38.4 percent of adults in those jails were African American.  Though this percentage is smaller than for the sampled inmate population, it supports the conclusion that denial of voting opportunity for inmates is likely to have a disparate impact on African American voters.[3]

---

[3] Note that, nationally, voter participation rates among African Americans in the 2012 election exceeded that of non-Hispanic Whites, 66.2 percent versus 64.1 percent, respectively. Ohio also had a higher rate among African Americans than Whites in that election. See "The Diversifying Electorate—Voting Rates by Race and Hispanic Origin in 2012 (and Other Recent Elections)", Current Population Survey, U.S. Bureau of the Census, Issued May 2013. [http://www.census.gov/prod/2013pubs/p20-568.pdf]

Supplemental Report with Revised Estimate of Incarcerated Registered Voters who Could Not Vote During Weekend and Monday before the November 2012 General Election                                              4

Fair Elections Ohio, et al. v. Husted, et al.                                          Defendants' Emergency Motion to Exclude
Case No. 1:12cv979                                                                                          Exhibit D, p|4

# Exhibit 7

Expert Submission of Mark Salling, PhD

**Analysis of the Racial Composition of Incarcerated Registered Voters who Could Not Vote During Their Incarceration on the Weekend and Monday Before the November 2012 General Election[1]**

**March 24, 2014**

Mark Salling, PhD, GISP
Senior Research Associate
Maxine Goodman Levin College of Urban Affairs
Cleveland State University

This report evaluates the racial composition of the number of jailed persons in Ohio who were registered to vote and had not voted by absentee ballot, but could not exercise their voting rights during their confinement the three days before the election on November 6, 2012. It supplements the report, dated February 20, 2014, that provides the number of incarcerated adult registered voters in nine counties the weekend and Monday before the 2012 general election.[2]

The February 20th report noted that 46 percent of the inmates that were in the database of the jails of the nine counties used to identify those who were not provided an opportunity to vote were Black. Here we limit the analysis to only those inmates who were incarcerated during the entire period of November 3, 2012 through November 6, 2012, and were found to be registered voters who had not voted absentee.

The issue of the possible disparate racial impact of the inability of registered jail inmates to vote in the final three days before the election can be addressed with the inmate data since race is included in the file.

The results of this analysis demonstrate the disproportionate impact on African American voters who were not allowed to vote. Table 1 below provides the total number of inmates by race who were eligible but not able to vote during the specified period. Twenty-eight percent (28.4% of White inmates would have been eligible to vote, whereas almost half (45.5%) of the Black inmates were denied their voting rights. The difference is statistically significant at the 99 percent confidence level (z=4.14).

As noted in the earlier report, nationally, voter participation rates among African Americans in the 2012 election exceeded that of non-Hispanic Whites, 66.2 percent versus 64.1 percent, respectively. Ohio also had a higher rate of participation among African Americans than Whites in that election.[3]

---

[1] The analysis was requested by the Ohio Justice & Policy Center and data used in the analysis were supplied by that organization.

[2] The February report is titled "Supplement to Analysis of the Number of Incarcerated Registered Voters who Could Not Vote During Their Incarceration on the Weekend and Monday Before the November 2012 General Election".

[3] See "The Diversifying Electorate—Voting Rates by Race and Hispanic Origin in 2012 (and Other Recent Elections)", Current Population Survey, U.S. Bureau of the Census, Issued May 2013. [http://www.census.gov/prod/2013pubs/p20-568.pdf]

Analysis of the Racial Composition of Incarcerated Registered Voters who Could Not Vote During Week... Monday before the November 2012 General Election

EXHIBIT
15
Salling
FENGLD 200-031-0069

Table 1: Race of Inmates by Whether They Were Denied Voting Right

| Race | Eligible | Total | Percent Eligible |
|------|----------|-------|------------------|
| Black | 120 | 264 | 45.5% |
| White | 81 | 285 | 28.4% |
| Other | 3 | 15 | 20.0% |
| Total | 204 | 564 | 36.2% |

# DECLARATION OF MARK P. GABER
## (pursuant to 28 U.S.C. § 1746)

I, Mark P. Gaber, hereby declare as follows:

1.      I am Senior Legal Counsel at the Campaign Legal Center ("CLC") and counsel for plaintiffs in this case. The testimony set forth in this Declaration is based on first-hand knowledge, about which I could and would testify competently in open Court if called upon to do so. This Declaration is submitted in support of plaintiffs' Motion for Class Certification.

2.      CLC has been involved in this case since prior to its filing, working to research and develop the legal theories of the complaint, and has taken a leading role in the litigation as it has unfolded.

3.      CLC is a leading nonpartisan, nonprofit organization specialized in election law, including voting rights, redistricting, campaign finance, and government ethics. In that capacity, CL has gained considerable expertise in litigating voting rights cases aimed at expanding the franchise and working to eliminate the barriers to voter participating in democracy.

4.      I have experience litigating cases across CLC's issue areas, including voting rights, redistricting, campaign finance, and government ethics. Prior to joining CLC, I was an Associate at Jenner & Block LLP in Washington D.C., where I was a member of the firm's Appellate & Supreme Court, Election Law & Redistricting, and Media & First Amendment practice groups. I have worked on a number of election law and civil rights matters, including as counsel in Texas's statewide redistricting case, *Perez v. Abbott*, in *Alabama Legislative Black Caucus v. Alabama*, and *North Carolina v. Covington*. In addition, I serve as counsel for a putative class of plaintiffs challenging Alabama's felony disenfranchisement scheme in *Thompson v. Alabama*, for plaintiffs challenging Texas's photo ID law in *Veasey v. Abbott*, and plaintiffs challenging North Dakota's residential address identification requirements in *Spirit Lake v. Jaeger.* I was counsel for *amici* in

*Evenwel v. Abbott*, and served as counsel in a case involving the redistricting of Albuquerque's city council districts. I have experience in complex class action cases as both plaintiffs' and defendants' counsel. I represented plaintiffs in a class action challenging Virginia's ban on same-sex marriage, where the court concluded I was adequate class counsel, *See Harris v. Rainey*, 299 F.R.D. 486, 492 (W.D. Va. 2014), and represented internet service providers in defending against a putative consumer class action related to behavioral advertising. I am experienced and familiar with the obligations and role of class counsel. From 2011 to 2012, I clerked for Judge Judith W. Rogers of the U.S. Court of Appeals for the District of Columbia Circuit. I am a 2010 graduate of Stanford Law school, and a 2005 graduate of St. Norbert College.

5.      CLC's team also includes Danielle Lang and Jonathan Diaz. I am familiar with their experience and qualifications as my colleagues. Ms. Lang is Senior Legal Counsel, Voting Rights & Redistricting at CLC. She has experience litigating voting rights, redistricting, and other civil rights cases. Ms. Lang, *inter alia,* represents a putative class of plaintiffs challenging Alabama's felony disenfranchisement scheme in *Thompson v. Alabama,* plaintiffs challenging Texas's photo ID law in *Veasey v. Abbott*, and plaintiffs challenging North Dakota's residential address identification requirements in *Spirit Lake v. Jaeger*. She also maintains an active *amicus* practice in voting rights and redistricting cases before the Supreme Court and U.S. Courts of Appeals. Prior to joining CLC, Ms. Lang was a Skadden Fellow in the Employment Rights Project of Bet Tzedek Legal Services in Los Angeles, where she represented immigrant workers in wage and hour matters, including federal class actions, and human trafficking cases. From 2012 to 2013, Ms. Lang clerked for Judge Richard A. Paez on the U.S. Court of Appeals for the Ninth Circuit. She is a 2012 graduate of Yale Law School and a 2008 graduate of New York University.

6.      Mr. Diaz is Legal Counsel, Voting Rights at CLC, which he joined in September 2018. Prior to joining CLC, Mr. Diaz was an Associate at Jenner & Block LLP in New York, NY, where he litigated complex civil cases in Federal court, including as a member of the teams representing the plaintiffs in *Brennan Center v. Dept. of Justice*, a Freedom of Information Act case regarding the Presidential Advisory Commission on Election Integrity, *NAACP v. Bureau of the Census*, a constitutional challenge to the adequacy of the preparations for the 2020 Census, and *Kaffaga v. Steinbeck*, a complex tort dispute regarding control of the copyrights for the literary catalogue of the author John Steinbeck.  He is a 2016 graduate of Harvard Law School, and a 2013 graduate of the University of Miami.

7.      CLC is dedicated to litigating this case and vigorously representing its clients and the plaintiff class in this matter. CLC has, and will continue to, devote the necessary financial and employee resources to zealously litigating this matter on behalf of plaintiffs and the class.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and that this Declaration was prepared in Dayton, Ohio on November 5, 2018.

/s/ Mark P. Gaber
Mark P. Gaber

## DECLARATION OF CHIRAAG BAINS
### (pursuant to 28 U.S.C. § 1746)

I, Chiraag Bains, hereby declare as follows:

1.        I am the Director of Legal Strategies at Dēmos and counsel for plaintiffs in this case. The testimony set forth in this Declaration is based on first-hand knowledge, about which I could and would testify competently in open court if called upon to do so. This Declaration is submitted in support of plaintiffs' Motion for Class Certification.

2.        Dēmos has been involved in this case prior to its filing, working with co-counsel to investigate and develop the factual basis for the pleadings, the legal theories, and the strategy for the litigation.

3.        Dēmos, a nonprofit organized under Section 501(c)(3) of the Internal Revenue Code, is a racial justice organization dedicated to an America in which we all have an equal voice and an equal chance. Our name means "the people" and it is the root of the word "democracy." We use an integrated approach to advocacy—combining legal, research, communications, and policy strategies—to bring about a more inclusive, racially equitable democracy.

4.        Having joined Dēmos in February 2018, I oversee all of the organization's litigation and serve as counsel in a variety of trial level and appellate cases. These include challenges to states' voter purge practices, their failure to comply with the National Voter Registration Act (NVRA), and their failure to ensure language access under the Voting Rights Act. With regard to class actions, I am currently counsel to a putative class of 30,000 Puerto Rican voters with limited English proficiency in their challenge to Florida's failure to provide Spanish language ballot materials as required by Section 4(e) of the Voting Rights Act.

5.         From 2014 to 2017, I was Senior Counsel to the Assistant Attorney General of the Civil Rights Division at the U.S. Department of Justice. In that role, I supervised district and

appellate court matters involving systemic misconduct in criminal justice, voting rights, and housing discrimination. Among the notable cases on which I worked were *United States v. Ferguson, Mo.*, concerning abusive policy and court practices; *Veasey v. Abbott*, a challenge to Texas's photo ID law; and *United States v. Texas*, the Justice Department's challenge to Texas's congressional and state redistrictings. From 2010 to 2014, I was a prosecutor of crimes committed under color of law, hate crimes, and human trafficking with the Criminal Section of the Civil Rights Division, litigating cases in federal district court around the country. From 2009 to 2010, I clerked for Judge Karen Nelson Moore of the U.S. Court of Appeals for the Sixth Circuit. From 2008 to 2009, I clerked for Judge Nancy Gertner of the U.S. District Court for the District of Massachusetts. I am a 2008 graduate of Harvard Law School, and 2004 graduate of the University of Cambridge's master's program in criminology, and a 2003 graduate of Yale College.

6.     Dēmos' team also includes Naila Awan, Senior Counsel. As Ms. Awan's supervisor, I am familiar with her experience and qualifications. Ms. Awan joined Dēmos in February 2015. She has experience litigating voting rights cases, including *A. Philip Randolph Institute v. Husted*, a challenge to Ohio's voter purge practices that recently went to the Supreme Court and is now being litigated at the Sixth Circuit; *League of Women Voters v. Ashcroft*, a challenge to Missouri's failure to comply with the NVRA. Prior to joining Demos, Ms. Awan worked at the ACLU of Ohio, where she worked on a case challenging Ohio's elimination of same-day registration and reduction of early voting, as well as a constitutional challenge of Ohio's ballot access law. Ms. Awan is a 2011 graduate of the Ohio State University Moritz College of Law, has an L.L.M. from New York University in international studies, and earned her undergraduate degree from Miami University of Ohio in 2005.

7.     Dēmos is dedicated to litigating this case and vigorously representing its clients and the plaintiff class in this matter. Demos has, and will continue to, devote the necessary financial and employee resources to zealously litigating this matter on behalf of plaintiffs and the class.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and that this Declaration was prepared in Dallas, Texas on November 6, 2018.

/s/ Chiraag Bains
Chiraag Bains

## DECLARATION OF LAURA C. BISHOP
### (pursuant to 28 U.S.C. § 1746)

I, Laura C. Bishop, hereby declare as follows.

1.      I am the Voting Rights Project Attorney at the Roderick and Solange MacArthur

Justice Center at the Northwestern Pritzker School of Law ("MacArthur Justice Center") and

counsel for plaintiffs in the above-captioned case. The testimony set forth in this Declaration is

based on first-hand knowledge, about which I could and would testify to competently in open

Court if called upon to do so. This Declaration is submitted in support of Plaintiffs' Motion for

Class Certification.

2.      MacArthur Justice Center has been involved in this case throughout the

development of its pleadings and initial motions. MacArthur Justice Center has worked with all

of Plaintiffs' counsel to research and develop the legal theories and strategy for the litigation.

3.      MacArthur Justice Center is a public interest law firm founded in 1985 by the

family of J. Roderick MacArthur to advocate for human rights and social justice through

litigation. MacArthur Justice Center has offices at the Northwestern University School of Law, at

the University of Mississippi School of Law, in New Orleans, in St. Louis, and in Washington,

D.C.  MacArthur Justice Center's attorneys have led significant litigation in areas that include

the treatment of incarcerated men and women, the rights of the indigent in the criminal justice

system, compensation for the wrongfully convicted, and police misconduct.

4.      From 2012 until February 2018, I was an Associate at Jenner & Block LLP in

Chicago, IL, where I was a member of the Firm's Litigation and Professional Responsibility

Departments. While there I litigated matters across a wide range of subjects, including serving as

counsel on multiple putative class actions in federal courts. I am a 2012 graduate of Harvard Law

School (cum laude), and a 2008 graduate of The University of Chicago.

5.     MacArthur Justice Center's team on this case also includes Locke E. Bowman and Alexa Van Brunt. Mr. Bowman is the Executive Director of MacArthur Justice Center and has served in that position since 1992. One of Chicago's most prominent civil rights attorneys, Mr. Bowman has a long track record litigating cases about individual and systemic injustice.

6.     Ms. Van Brunt is Clinical Associate Professor of Law at MacArthur Justice Center. She has been at MacArthur Justice Center since 2010, and in her time there has litigated law enforcement misconduct and torture cases, challenged the use of cash bond in pretrial administration, and brought a first of its kind excessive force class action suit against the Chicago Police Department.  She has also won suits addressing conflicts of interest within the Cook County State's Attorney's Office and the violation of prisoners' rights in Illinois correctional facilities.  Recently, along with colleagues, Ms. Van Brunt settled two class action cases in which the State of Illinois agreed to appoint lawyers to people facing the revocation of their parole. Prior to joining MacArthur Justice Center, she clerked for the Hon. Myron Thompson, U.S. District Court – Middle District of Alabama. Ms. Van Brunt received a law degree, with distinction, from Stanford Law School, and a bachelor's degree, magna cum laude, from Brown University.

7.     MacArthur Justice Center is dedicated to litigating this case and vigorously representing its clients and the plaintiff class in this matter.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and that this Declaration was prepared in Illinois on November 5, 2018.


                                        /s/ Laura C. Bishop
                                        Laura C. Bishop

2