**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO,
EASTERN DIVISION**

| | | |
|---|---|---|
| TOMMY RAY MAYS, II, *et al.*, | : | |
| | : | |
| Petitioners, | : | Case No. 2:18-cv-1376 |
| | : | |
| v. | : | JUDGE WATSON |
| | : | |
| FRANK LaROSE, in his official capacity as | : | MAGISTRATE JUDGE VASCURA |
| Secretary of State of Ohio, | : | |
| | : | |
| Defendant. | : | |

---

**DEFENDANT SECRETARY OF STATE FRANK LaROSE'S MOTION FOR
SUMMARY JUDGMENT**

---

Defendant Ohio Secretary of State Frank LaRose moves this Court, pursuant to Federal

Rule of Civil Procedure 56, for an order granting summary judgment.  No genuine issues of

material fact exist, and Secretary LaRose is entitled to judgment as a matter of law.  This motion

is more fully supported with the attached Memorandum.

<div style="margin-left: 40%;">

Respectfully submitted,
DAVE YOST
Ohio Attorney General

*s/ Julie M. Pfeiffer*

JULIE M. PFEIFFER (0069762) *
   * *Trial Attorney*
BRIDGET C. COONTZ (0072919)
ANN YACKSHAW (0090623)
JEFFREY J. BOUCHER (0092374)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
Julie.Pfeiffer@OhioAttorneyGeneral.gov
Bridget.Coontz@OhioAttorneyGeneral.gov
Ann.Yackshaw@OhioAttorneyGeneral.gov
Jeffrey.Boucher@OhioAttorneyGeneral.gov

*Counsel for Defendant Ohio Secretary of State*

</div>

1

## MEMORANDUM IN SUPPORT

## INTRODUCTION

Viewing the full picture, Ohio unquestionably provides many opportunities to its voters. In addition to administering voting on Election Day, "Ohio is a national leader when it comes to early voting opportunities." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 623 (6th Cir. 2016).  It allows early, no-excuse voting starting nearly a month before Election Day.  And Ohioans have the option of early-in-person and absentee-by-mail methods.  Importantly here, Ohio also *already has* absentee voting procedures for confined individuals, including but not limited to people in jails.  Ohio Rev. Code § 3509.08(A).  Like nearly all other absentee voters, these individuals have up until noon on the Saturday before the election to request an absentee ballot.  *Compare id.*, *with* Ohio Rev. Code § 3509.03(D).  Looking at Ohio's whole election system, particularly in comparison to other options, these many opportunities *help* the right to vote; they do not *harm* it.

Still, despite the best-laid plans, sometimes life gets in the way.  If people forego their early-voting options, they naturally risk that some unexpected life event might disrupt their ability to vote on Election Day.  Plaintiffs identify one scenario: people arrested after the deadline for requesting absentee ballots the weekend before an election who are ultimately not released from confinement by Election Day ("late-jailed individuals" as shorthand).  But there are *many* others.  A person might have car trouble; be involved in a traffic accident; be stuck in a traffic jam; get caught in severe weather; have a flight back home cancelled; experience a death in the family; have food poisoning; have any other incapacitating (but non-hospitalizing) illness; be an emergency worker or health care professional called away to help others; have a last-minute work obligation; have a child-care emergency; be the victim of a crime; and so on. Indeed, in a similar case, this Court found it unclear that the burden on late-jailed individuals

"differs in any meaningful way from the burden suffered by non-incarcerated individuals who may be prevented from voting due to unforeseeable circumstances such as a last minute business trip or a death in the family." *Fair Elections Ohio v. Husted*, No. 1:12CV797, 2012 U.S. Dist. LEXIS 161614, at *55–56 n.9 (S.D. Ohio Nov. 1, 2012). Or, as the Sixth Circuit has described, "personal contingencies" can lead "any voter" to be "suddenly called away and prevented from voting on Election Day." *Obama for Am. v. Husted*, 697 F.3d 423, 435 (6th Cir. 2012). In sum, any number of circumstances could understandably prevent someone from making it to the polls on Election Day. But, in crafting election deadlines, Ohio cannot be reasonably expected—much less constitutionally required—to create deadline exceptions for groups who fail to vote early and cannot ultimately make it to the polls.

Plaintiffs' case depends on the Court having an unduly narrow perspective. Plaintiffs do not dispute that Ohio already has a voting process for jailed individuals. They just complain that the process eventually ends, shortly before Election Day. They selectively zoom in on the late-jailed scenario, which covers only a small subset of jailed individuals. And, in addition to covering a small subset to begin with, the late-jailed scenario is not a recurring concern for any individual. That is, any single elector will presumably face this unique, time-sensitive scenario at most once in a lifetime. Plaintiffs, however, demand a special carve-out deadline targeted at this scenario, running all the way until 3 p.m. on Election Day. This demand ignores (1) the many tasks election officials are busy completing during the final days before an election and (2) the many other scenarios that might lead someone to unexpectedly miss voting on Election Day.

Nothing in the Constitution requires Ohio to craft the special rule Plaintiffs seek. The Constitution instead recognizes that, for elections to be reliable and efficient, States must have the latitude to set election rules *even though* such rules will affect individual electors. Being

3

realistic, any voting restriction a State imposes no matter how modest or justified (such as a deadline) will inevitably exclude some people from voting (people who miss that deadline).  But this does not mean that every election rule is subject to strict scrutiny.  Put differently, no "if more is possible, then you must" presumption exists.  Rather, the baseline for constitutional analysis is that reasonable, generally-applicable election rules pass review.  *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 433–34 (1992).  Ohio's jail-voting process passes that test.

To avoid this conclusion, Plaintiffs will try to transform a single exemption into a mandatory requirement.  The *only* people that receive a more favorable absentee-request deadline under Ohio law are people who unforeseeably find themselves, or their minor child, hospitalized near or on Election Day.  Ohio Rev. Code § 3509.08(B).  Ironically, it is Ohio's "willingness to go further . . . in extending" such absentee voting privileges that paves the way for Plaintiffs' claim here.  *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 811 (1969).  Plaintiffs' comparison is an oversimplified one.  Any comparison is not simply between jailed and hospitalized people.  Returning to the full picture, election officials cannot possibly deliver ballots to *all* people facing unexpected events near Election Day.  So, a line has to be drawn somewhere, even if it is an imperfect one.  (Or, alternatively, nobody gets an exception.)

But no matter.  Even accepting Plaintiffs' flawed "jails versus hospitals" framing, Ohio's laws survive constitutional review.  Neither jailed nor hospitalized individuals are suspect classes.  And the two groups are *not* similarly situated in all material ways.  Jails are secure facilities in a way hospitals are not—election officials cannot simply go to a jail's front desk and quickly gain access to a detainee.  Instead, locating, moving, and securely voting jailed individuals requires cooperation with jail administrators and is best done with careful monitoring and advanced planning.  As discovery in this case reflects, even giving a jailed individual a pen

raises security concerns. Thus, when it comes to delivering ballots last minute on Election Day, lawmakers could justifiably decide that jailed and hospitalized individuals are different.

At day's end, requiring people to submit absentee applications by Saturday at noon is eminently reasonable. This deadline allows election officials a small cushion (three days) to perform the many tasks that make Election Day, and reporting timely election results, possible. The Court should, therefore, reject Plaintiff's attempt to micromanage Ohio's election deadlines. It should grant Ohio summary judgment.

## FACTUAL BACKGROUND

## I. Voting is easy in Ohio because the State offers its citizens many options.

A brief summary of Ohio's overall voting structure contextualizes Plaintiffs' claims. In 2005, Ohio greatly expanded absentee and early voting methods for its citizens. In particular, Ohio implemented a no-fault absentee voting system, including the option for in-person early voting. *See* Ohio Rev. Code §§ 3509.02, 3509.051; Seskes Dep. 33:16-18. Consequently, any eligible Ohio voter may vote by absentee ballot. Ohio Rev. Code § 3509.02(A). Although not required by statute, for the 2018 general election, the Secretary of State sent absentee-ballot applications to all registered voters in Ohio. *See* Ohio Secretary of State Directive 2018-18 (July 6, 2018), *available at* https://www.sos.state.oh.us/globalassets/elections/directives/2018/dir2018-18.pdf (last visited July 18, 2019).

As a result of these changes, Ohio voters now have three basic options for voting in Ohio: (1) in-person voting on Election Day, with polls open for thirteen hours—from 6:30 a.m. until 7:30 p.m., *see* Ohio Rev. Code § 3501.32; (2) in-person early voting at the appropriate Board of Elections or Board of Elections' designated location, *see* Ohio Rev. Code §§ 3509.01–.10; and (3) mailing a completed absentee ballot, *see id.*

5

Absentee voting by mail, the method this case most directly implicates, allows a voter to apply for an absentee ballot beginning January 1 of the election year or ninety days before the date of the relevant election, whichever is earlier. Ohio Rev. Code § 3509.03. Like early in-person absentee voting, these ballots are then made available beginning the first day after the close of voter registration, which is thirty days before the election. Ohio Rev. Code §§ 3509.01(B)(2), 3503.19(B)(2)(d). The Board of Elections must receive all mailed absentee ballot requests "not later than twelve noon of the third day before the day of the election at which the ballots are to be voted . . . ." Ohio Rev. Code § 3509.03(D). For the 2018 general election, this deadline fell on Saturday, November 3 at noon.

Ohio Revised Code § 3509.08 provides specific guidance for certain categories of disabled and confined voters unable to travel to the polls on Election Day. The provision allows voters "who, on account of the elector's own personal illness, physical disability, or infirmity, or on account of the elector's confinement in a jail or workhouse under sentence for a misdemeanor or awaiting trial on a felony or misdemeanor, will be unable to travel" to apply in writing for an absentee ballot. Ohio Rev. Code § 3509.08(A). Importantly, these voters are subject to exactly the same deadline for requesting an absentee ballot as the rest of Ohio voters: noon on the Saturday before the election. *Id.* And, as the Secretary explained during class briefing, confined individuals can satisfy this deadline using the mail *or* by having any person (a family member, friend, jail employee, etc.) deliver the request by noon. Resp. Opp'n Class Cert. 15–16, Doc. 35.

An absent voter's ballot can *either* be mailed to the applicant's residence or place of confinement *or* the Board of Elections may designate two board employees to deliver the ballot to the disabled or confined applicant who will then return the ballot to the board. Ohio Rev. Code § 3509.08(A).

6

Ohio law permits only one narrow exception to the general Saturday-noon deadline for mail-in absentee ballot requests. Specifically, the law provides a procedure for voters who are unable to travel to the polls on Election Day due to their own or their minor child's emergency hospitalization. Ohio Rev. Code § 3509.08(B). These voters may request an absentee ballot until 3:00 p.m. on Election Day. *Id.* If the request comes from a hospital located in the county in which the voter is registered to vote, the county Board of Elections must send two Board employees belonging to the two major political parties to deliver the ballot to the voter and return the completed ballot to the Board. Ohio Rev. Code § 3509.08(B)(2). The voter may also request that a family member retrieve and deliver the ballot. *Id.* Directive 2017-06 provides further instruction pertaining to this narrow exception, and states that the Americans with Disabilities Act may require reasonable accommodation on a case-by-case basis for hospitalized voters located out of the county in which they are registered. *See* Ohio Secretary of State Directive 2017-06 (Apr. 25, 2017), *available at* https://www.sos.state.oh.us/globalassets/elections/directives/2017/dir2017-06.pdf (last visited July 19, 2019).

Ohio's absentee-ballot laws, with no-fault eligibility and a Saturday-noon request deadline, compare favorably to other states in the Sixth Circuit. *See* Ky. Rev. Stat. Ann. § 117.085(1)(a) (absentee ballots must be received seven days prior to election); Mich. Comp. Laws § 168.759(2) (prohibiting the mailing of absentee ballots after 5:00 p.m. on the Friday before an election); Tenn. Code Ann. §§ 2-6-201, 2-6-202(a)(1) (absentee voter must fall under a specified category and absentee-ballot application must be received seven days before the election).

And Ohio is not alone in providing exceptions for people who are hospitalized or face medical emergencies without extending that exception to late-jailed individuals. *See, e.g.*, Ala.

Code § 17-11-3; Conn. Gen. Stat. § 9-150c; Ga. Code. Ann. § 21-2-384(a)(4); Ind. Code Ann. § 3-11-4-1; Iowa Code § 53.22(3); Ky. Rev. Stat. Ann. § 117.077; Mass. Gen. Laws ch. 54, § 89; Minn. Stat. § 203B.04(2); Mont. Code Ann. § 13-13-211(2); N.C. Gen. Stat. 163A-1308(b); 25 Pa. Cons. Stat. § 3146.2(e); S.C. Code Ann. § 7-15-330; S.D. Codified Laws § 12-19-2.1; Tenn. Code Ann. § 2-6-401(a); Utah Code Ann. § 20A-3-306.5; Va. Code Ann. § 24.2-705; Wis. Stat. § 6.86(3).

## II.    In an earlier case, a similar lawsuit failed both preliminarily and ultimately.

In 2012, a similar suit was filed against Ohio.  In that case, organizational plaintiffs challenged the Saturday-noon deadline for absentee-ballot requests for late-jailed individuals arrested after 6:00 p.m. on the Friday before Election Day.  *See generally Fair Elections Ohio v. Husted*, 47 F. Supp. 3d 607 (S.D. Ohio 2014).

The Court denied emergency relief for the 2012 general election.  *Fair Elections Ohio v. Husted*, No. 1:12CV797, 2012 U.S. Dist. LEXIS 161614, at *68 (S.D. Ohio Nov. 1, 2012).  As the Court explained, the evidence demonstrated that election officials "are particularly busy" in the weekend leading to an election.  *Id.* at *56.  For this reason, a request deadline "prevent[s] chaos."  *Id.* at *56.  The Court further noted that extending the deadline for prisoners only "still may be too onerous."  *Id.* at *58.  Finally, the Court noted that it was unclear how the burden on incarcerated individuals "differs in any meaningful way from the burden suffered by non-incarcerated individuals who may be prevented from voting due to unforeseeable circumstances." *Id.* at *55–56 n.9.

At the permanent stage, the Court granted plaintiffs' motion for summary judgment.  *Fair Elections Ohio v. Husted*, 47 F. Supp. 3d 607, 617 (S.D. Ohio 2014).  But on appeal, the Sixth Circuit reversed the trial court and held that voter-outreach organizations lacked standing to challenge absentee-ballot procedures.  *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir.

2014). Although reversing on standing grounds, the Sixth Circuit signaled that the district court's constitutional analysis did "*not appear sufficient to warrant the injunction*." *Id*. at 459 (emphasis added).

### III.    Plaintiffs filed this case last year on Election Day.

On November 6, 2018, the date of the 2018 general election, Plaintiffs Tommy Ray Mays II and Quinton Nelson Sr. filed this action against former Ohio Secretary of State Jon Husted. Plaintiff Mays is a registered voter who was arrested on Saturday, November 3, 2018, and was not released prior to Election Day.  Compl. ¶ 9, Doc. 1, PageID 2.  Plaintiff Nelson is a registered voter who was arrested on Friday, November 2, 2018, and was not released prior to Election Day.  Compl. ¶ 10, Doc. 1, PageID 3.

Plaintiffs challenge the Saturday-noon deadline for absentee ballot requests as applied to individuals arrested after the close of business on the Friday before Election Day, who are eligible to vote, have not already exercised their early-voting options, and are then detained through the close of polls on Election Day. Compl. ¶¶ 52–63, Doc. 1, PageID 11–13. Plaintiffs allege that the Saturday-noon deadline for absentee ballot requests (applied to detainees through Ohio Revised Code § 3509.08) violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution; and the First Amendment of the United States Constitution. *Id*.

Despite the highly-particularized circumstances of the detainees in question, Plaintiffs ask for broad relief, applying to all late-jailed individuals. Compl., Demand for Relief ¶ b, Doc. 1, PageID 13. They specifically seek to: (1) declare that all Ohio laws and policies prohibiting late-jailed individuals from accessing the ballot violate the First and Fourteenth Amendments of the United States Constitution; and (2) require the Ohio Secretary of State to issue a directive

calling for the broad dissemination of information and delivery of ballots to late-jailed individuals. Compl., Demand for Relief ¶¶ b, d, Doc. 1, PageID 13–14.

Contemporaneously with their Complaint, Plaintiffs filed an Emergency Motion for Temporary Relief, which the Court granted as to the individual named Plaintiffs after a hearing on the same day. *See* Doc. 3, Doc. 12. The Court denied Plaintiffs any class-wide relief. Doc. 12, PageID 153. Due to the filing of the Complaint on Election Day and the same-day hearing on the motion for emergency relief, then-Secretary Husted did not brief the merits of Plaintiffs' motion before the Court's order granting limited relief.

## LAW AND ARGUMENT

### I. Summary judgment is proper when a party is entitled to judgment as a matter of law.

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate if the evidence in the record demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Moldowan v. City of Warren*, 578 F.3d 351, 373 (6th Cir. 2009) ("Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." (quotation marks omitted)). The moving party bears the initial burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once the movant has met its burden, "the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the

material facts.'" *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018) (quoting *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993)). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Liberty Lobby*, 477 U.S. at 248). In other terms, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252; *Dominquez v. Carr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (same).

## II. Ohio's election laws do not unconstitutionally burden the right to vote.

### A. Reasonable, generally-applicable election rules are constitutional.

The Constitution does not afford voters the right to cast their ballots at any time, in any place, or by any means they choose. Instead, the Constitution entrusts the states with the authority to prescribe "the Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4. The state's power to regulate its own elections—a power specifically reserved to it in the Constitution—is "substantial." *Storer v. Brown*, 415 U.S. 724, 730 (1974). And election regulations are indispensable. An unregulated election system breeds "chaos," so states "may without transgressing the Constitution impose extensive restrictions on voting." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004); *see also Clingman v. Beaver*, 544 U.S. 581, 593 (2005) ("[I]t is beyond question 'that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.'" (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997))).

11

Ohio's power to regulate its elections is beyond doubt.  Of course, a state cannot act with impunity, and it may not impose election regulations that unconstitutionally impair its citizens' right to vote.  The question, therefore, is what level of scrutiny this Court may bring to bear on Ohio's regulatory decisions.

### 1. The Supreme Court has never applied heightened scrutiny to absentee ballot laws.

While recent decisions favor the balancing approach set forth in Section II.A.2 *infra*, no Supreme Court decision has ever applied that standard to absentee-ballot laws.  *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802 (1969); *O'Brien v. Skinner*, 414 U.S. 524 (1974); *Goosby v. Osser*, 409 U.S. 512 (1973).  Because there is no constitutional right to an absentee ballot, the Supreme Court repeatedly applied the rational-basis test to plaintiffs' claims that they were entitled to an absentee ballot.  *See Obama for Am. v. Husted*, 697 F.3d 423, 439 (6th Cir. 2012) (White, J., concurring in part and dissenting in part) (noting that all Supreme Court precedent dealing with absentee-ballot laws applied the rational-basis test).  Based on this precedent, this Court should apply rational-basis review to any absentee-ballot challenge.

The Secretary recognizes, however, that the Sixth Circuit has held that courts must use the flexible *Anderson-Burdick* balancing test when considering any election regulation challenged under the First or Fourteenth Amendment.  *See Green Party of Tenn. v. Hargett*, 791 F.3d 684, 692 (6th Cir. 2015).  Under either standard, as set forth below, the absentee-ballot deadline survives constitutional scrutiny.

### 2. Even under *Anderson-Burdick* balancing, reasonable election rules are presumptively constitutional.

The flexible *Anderson-Burdick* test recognizes that states need to impose regulations on elections.  The test also acknowledges that some burden on the right to vote is inevitable—and constitutional.  Indeed, any type of regulation imposes a corresponding burden on the regulated

entity. When the regulated entities are voters, an election law "will invariably" burden those voters "at least to some degree." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quotation marks omitted). If regulations are inevitable and burdens unavoidable, a state must enjoy some freedom to regulate without the specter of strict scrutiny haunting every election law. Indeed, a requirement that every election regulation meet strict scrutiny's exacting standards "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id*. at 433.

Accordingly, the *Anderson-Burdick* test detects when a regulation becomes an unconstitutional burden on the right to vote. Under this standard, the court first assesses the "character and magnitude" of a regulation's effect on the plaintiffs' rights under the First and Fourteenth Amendments. *Id*. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Next, the court evaluates the "precise interests put forward by the State" as justifications for the challenged regulation. *Id*. The court then balances the burden against the State's justifications. As the burden increases, so too must the regulation's importance in promoting the State's interests. For severe burdens, the regulation must advance a compelling State interest in a narrowly drawn manner. This test resembles that of strict scrutiny. *See Ohio Council 8 Am. Fed'n of State, Cty. & Mun. Emps. v. Husted (AFSCME)*, 814 F.3d 329, 335 (6th Cir. 2016). But for most laws, the presumption is that reasonable laws pass and that the State's justifications need not be compelling or narrowly drawn. "[T]he State's important regulatory interests are generally sufficient to justify" reasonable and generally-applicable restrictions. *Anderson*, 460 U.S. at 788. Indeed, the Sixth Circuit has at times described the balancing as "closer to rational basis" review. *AFSCME*, 814 F.3d at 335.

3.      **The Court must measure any burden by looking at the burden on voters generally, not by looking at the after-the-fact burdens on small groups of affected voters.**

Election regulations do not fall equally on all voters.  From the perspective of a business traveler who learns on Saturday afternoon that a multi-week trip will extend through Election Day, an absentee-ballot-request deadline imposes a heavy burden on her right to vote.  And viewed by a voter jailed on Saturday afternoon who will not be released by Tuesday, the absentee-ballot-request deadline looks like an insurmountable barrier to the right to vote.  But viewed in the context of all the ways in which eligible Ohioans can vote, the ballot-request deadline looks different.  For example, the 2019 general election will take place on November 5.  The ballot-request deadline falls on Saturday, November 2 at noon, months after the Boards of Elections begin accepting absentee-ballot requests on January 1.  The November 2 deadline also occurs after 19 days of early in-person voting (October 8–11, 14–18, 21–25, 28–November 1).  After the noon deadline passes, voters still may cast ballots in person on November 2-4, as well as on Election Day itself, as long as no absentee ballot has already been cast.  *See* Voting Schedule, *available at* https://www.sos.state.oh.us/elections/voters/voting-schedule/ (last visited July 19, 2019).  The absentee-ballot-request deadline simply cuts off one way to vote three days before an election, leaving the voter two others from which to choose.

The question becomes, then, from which perspective must the Court assess the deadline's effect on the plaintiffs' rights?  Those who find themselves unable to vote in person after the ballot-request deadline due to their unique or unforeseen circumstances?  Or Ohio voters generally, blessed with the choice of three different ways to vote spread throughout the month before the election?  Authority from the Supreme Court and the Sixth Circuit embrace the latter perspective, warning against homing in on the abnormal burden experienced by the plaintiff

personally. *See, e.g.*, *Burdick*, 504 U.S. at 437; *Clingman*, 544 U.S. at 593; *Ne. Ohio Coal. For the Homeless v. Husted (NEOCH)*, 837 F.3d 612, 631 (6th Cir. 2016).

In *Burdick*, for example, the Court turned back a challenge to Hawaii's ban on write-in voting. The ban completely prevented the plaintiff from voting for his preferred candidate, who did not appear on the primary ballot. Although the ban wholly foreclosed this particular plaintiff from voting for this candidate, the Court deemed the ban's burden "a very limited one." 504 U.S. at 437. By offering prospective candidates three mechanisms through which to appear on a ballot, Hawaii's overall system "provides for easy access to the ballot." *Id*. at 436. In other words, the Court considered Hawaii's "laws and their reasonably foreseeable effect on *voters generally*," not the plaintiff specifically. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 206 (2008) (Scalia, J., concurring) (citing *Burdick*, 504 U.S. at 436-37).

And in *Clingman*, the Court considered an Oklahoma law establishing semi-closed primaries in which only registered members of a political party (or, upon invitation, registered independents) can vote in a party's primary. 544 U.S. at 585–86. To calculate the law's burden on associational rights, the Court first tallied all the ways Oklahoma permits political parties to associate with individual voters—canvassing, enrolling members, nominating candidates, communicating with the public, and engaging in electoral activities. *Id*. at 587. With Oklahoma laws *generally* offering many ways for parties to associate with individuals, the Court determined that the burden imposed by the semi-closed primary *specifically* was minimal. *Id*. at 587–91.

The Sixth Circuit conducted a similar analysis in *AFSCME*. There, the court rejected a challenge to Ohio's law prohibiting judicial candidates' political party affiliation from appearing on the general election ballot. The court characterized the law's burden as "minimal" in light of all

15

the partisan campaign activities left open to judicial candidates under Ohio's election laws. 814 F.3d at 335.

At bottom, "[z]eroing in on the abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst." *NEOCH*, 837 F.3d at 631; *see also Crawford*, 553 U.S. at 206 (Scalia, J., concurring) ("Not all of our decisions predating *Burdick* addressed whether a challenged voting regulation severely burdened the right to vote, but when we began to grapple with the magnitude of burdens, we did so categorically and did not consider the peculiar circumstances of individual voters or candidates."). In calculating the burden, this Court should therefore consider the ballot-request deadline's impact on Ohio voters generally.

### 4. A challenger has the burden to present adequate evidence to quantify the magnitude of the burden.

In *Crawford*, a plurality of the Supreme Court explained that election burdens "arising from life's vagaries" are "neither so serious nor so frequent" to raise constitutional concerns. *Crawford*, 553 U.S. at 197 (plurality opinion). The plurality suggested, without ultimately deciding, that a generally-applicable law may pose a constitutional issue if it "imposes 'excessively burdensome requirements' on any class of voters." *Crawford*, 553 U.S. at 202 (quoting *Storer*, 415 U.S. at 738); *but see id.* at 205 (Scalia, J., concurring) ("[O]ur precedents refute the view that individual impacts are relevant to determining the severity of the burden it imposes."). But even accepting this "unique balancing analysis" of selective burden, a challenger must still produce sufficient evidence that allows the Court to quantify the burden, such as the "numbers of" affected individuals. *See Crawford*, 553 U.S. at 200–02 (plurality opinion). If the challenger can only point to a handful of citizens affected by a law, the law does not impose an unconstitutional burden. *Id.* Similarly, the Sixth Circuit has held that where the record "is devoid of quantifiable evidence from which an arbiter could gauge the frequency with

which [a] narrow class of voters has been or will become disenfranchised," the court must consider "the burden that the provisions place on all Ohio voters." *NEOCH*, 837 F.3d at 631.

    **B.    Ohio's interests in setting the Saturday-noon deadline for absentee voters easily outweigh any burden.**

    Applying these standards to Ohio's ballot-request deadline reveals, at most, a modest and non-repeating burden on First and Fourteenth Amendment rights. The State, meanwhile, has an interest in effectuating orderly elections, avoiding electoral chaos, and easing the burden on Boards of Elections.

        **1.    Viewed holistically, the burden of Ohio's deadline is minimal, and Plaintiffs fail to provide sufficient evidence quantifying any more selective burden.**

    In the context of an Ohio voter's myriad opportunities to vote, the ballot-request deadline imposes a limited burden on the right to vote. As set forth above, Ohio voters enjoy so many opportunities to vote that the Sixth Circuit has recognized it as "a national leader." *Ohio Democratic Party*, 834 F.3d at 623. "[I]t's easy to vote in Ohio." *Id*. at 628.

    For presidential general elections, Ohio voters may take advantage of 25 days of early in-person voting, including the Sunday and Monday after the Saturday-noon ballot-request deadline. *See* Ohio Secretary of State Directive 2017-02 (Jan. 31, 2017), *available at* https://www.ohiosos.gov/globalassets/elections/directives/2017/dir2017-02_eom-ch-05.pdf (last visited July 19, 2019). This early-voting period ranks as among the longest in the nation. *See Ohio Democratic Party*, 834 F.3d at 628. Should they prefer to vote from home, Ohio voters may request no-fault absentee ballots by mail up until the Saturday before Election Day. Ohio Rev. Code § 3509.03(D). For the November 2018 election, an Ohio voter did not even need to seek out an absentee-ballot application—then-Secretary Husted mailed applications to all registered Ohio voters in 2018. *See* Ohio Rev. Code § 3501.05 and Directive 2018-18. Confined

voters may also request absentee ballots by the Saturday-noon deadline. Ohio Rev. Code 3509.08. And, of course, voters may utilize 13 hours of in-person voting on Election Day. Ohio Rev. Code § 3501.32.

Requiring voters to request an absentee ballot three days before the election imposes just the slightest burden on Ohio voters, who—in most cases—have ample opportunities to vote before and after that deadline. *See, e.g.*, *Burdick*, 504 U.S. at 438 (noting that "[r]easonable regulation of elections . . . *does* require [voters] to act in a timely fashion if they wish to express their views in the voting booth"). Taking into account the entire spectrum of voting opportunities available to all Ohioans—even those who are eventually arrested the weekend before the election—the absentee-ballot deadline's burden is slight. Thus, under the appropriate standard set forth in *Clingman*, *Burdick*, and *AFSCME*, the absentee-ballot deadline imposes but a slight burden on the voting opportunities available to *all* Ohioans. *See Clingman*, 544 U.S. at 587-91; *Burdick*, 504 U.S. at 436-37; *AFSCME*, 814 F.3d at 335.

But even if this Court inappropriately zeroes in on Plaintiffs or other late-jailed individuals, it will find the record insufficient to show that the absentee-ballot deadline imposes a heavy burden. Plaintiffs turn to their proffered expert, Dr. Mark Salling, to try to quantify how many voters cannot cast ballots due to the ballot-request deadline, but his analysis should be rejected. In his expert report, Dr. Salling claims to approximate, using data from thirteen sample Ohio counties, the number of inmates statewide that were unable to vote as a result of incarceration the weekend before Election Day in the 2012, 2014, 2016, and 2018 general elections. Dr. Salling employed several methods to calculate these numbers, with results ranging from 761–1371 incarcerated voters. *See* Incarcerated Voter Report at 8, Salling Dep. Ex. 9. Ultimately, Dr. Salling concluded that "there are about 1,000 persons who were unable to vote as a result of being detained after the

absentee ballot request deadline and held through Election Day, in each of the last four federal general elections." *Id*. at 9.

Dr. Salling's report fails to create a genuine dispute of material fact that a cognizable class of voters exists who are burdened by the absentee-ballot deadline. The Court should give no weight to Dr. Salling's conclusions for three reasons: (1) Dr. Salling's methodology is so unreliable that the Court should wholly exclude his analysis, (2) Dr. Salling admits that the numbers contained in his report are inflated due to inaccuracies and overcounting, and (3) even if the Court accepts his conclusions as correct, Dr. Salling has shown only a minimal burden on voting by incarcerated voters.

**Dr. Salling's analyses are fundamentally flawed and should be excluded.** Dr. Salling's methodological errors are fully set forth in the Secretary's contemporaneously filed motion to exclude Dr. Salling. While the Secretary need not repeat that analysis here, a summary of the worst methodological lapses follows:

- **Dr. Salling heavily relied on an algorithm he never saw.** In his report, Dr. Salling attempted to match the roster of inmates who were arrested after the absentee-ballot deadline with a national voter registration database to determine the likelihood that each late-jailed inmate was registered to vote. *Id*. at 1–2. The match was achieved through an algorithm that Dr. Salling never saw or tested and could not describe. Salling Dep. 112:25–113:16; 135:24–136:14.

- **Dr. Salling used a nationwide, not Ohio, database of registered voters.** Dr. Salling used a nationwide voter registration database to determine whether the incarcerated individuals were registered to vote in Ohio. Dr. Salling admitted that he

did not attempt to filter out anyone who was registered to vote in another state.  *Id*. at 148:2–4.

- **Dr. Salling admitted that the choice of the 13 counties included in his report was a questionable sample that he did not choose.**  Just thirteen of Ohio's 88 counties, including the eleven largest, appear in Dr. Salling's report.  Incarcerated Voter Report at 1 & n.3, Salling Dep. Ex. 9.  When he received this data from plaintiffs' counsel, Dr. Salling asked for data from more counties, particularly smaller counties, at least implicitly recognizing that the thirteen-county sample did not provide an adequate basis from which to make any statewide conclusions. Salling Dep. 93:2–14.

These fundamental flaws in methodology render Dr. Salling's analysis and conclusions inadmissible.  For these reasons, and for the reasons fully set forth in the Secretary's motion to exclude Dr. Salling, the Court should therefore not consider Dr. Salling's conclusions in deciding this motion for summary judgment.  *See Sperle v. Michigan Dep't of Corr.*, 297 F.3d 483, 495 (6th Cir. 2002) ("A party opposing a motion for summary judgment cannot use . . . inadmissible evidence to create a genuine issue of material fact."); *cf. Flex Homes, Inc. v. Ritz-Craft Corp. of Michigan, Inc.*, 491 F. App'x 628, 638 (6th Cir. 2012) ("Expert testimony is admissible, at the discretion of the district court, if the witness is sufficiently qualified, the testimony is relevant, and the testimony is reliable.").

**Dr. Salling conceded that the numbers contained in his report are inflated.**  Let's set aside Dr. Salling's overarching methodological deficiencies for the moment.  The Court cannot rely on his conclusions for the additional reason that he repeatedly, openly, and admittedly

inflated the numbers in his report. Below is a summary of some of the inaccuracies Dr. Salling tolerated, and in some cases welcomed, in his calculations:

- Dr. Salling included the largest eleven Ohio counties in his report. He admitted that Plaintiffs' counsel selected these densely populated counties *in order to get* a larger number of persons affected by the absentee-ballot deadline in his final tally. Salling Dep. 92:17–25 ("[W]hy were these particular 13 counties chosen for your analysis in this report? A: They were selected by the plaintiff and we discussed it, and it's my understanding, and I can see the reasoning, that they were selected primarily to acquire data from the larger counties in order to get a larger number of persons in jail prior to the election . . . .").

- Dr. Salling made no attempt to ascertain whether the individuals included in his analysis wanted to or intended to vote in the elections studied. Without any underlying analysis or basis, Dr. Salling simply stated it's "logical" to conclude that anyone registered to vote is interested in voting. *Id.* at 117:9. Of course, the Court need not rely on Dr. Salling's logic to determine how many registered voters want to vote—turnout information is available on the Secretary's website. Of the elections in Dr. Salling's report, turnout was in 71 percent in 2012, 40 percent in 2014, 71 percent in 2016, and 56 percent in 2018, contradicting Dr. Salling's claim that all registered voters are interested in voting. *See* Official Election Results, *available at* https://www.sos.state.oh.us/elections/election-results-and-data/ (last visited July 19, 2019).

- Dr. Salling included all inmates arrested on Friday and Saturday without attempting to discern the time of arrest, thus including those arrested before the absentee-ballot

deadline.  Salling Dep. 148:20–24 ("Q: If someone were booked on the Friday before an election but there was no booking time, were they included in your analysis? . . . A: I think they were.").  Likewise, Dr. Salling's report included all inmates held through Tuesday without attempting to exclude those released before the close of the polls on Election Day.  *Id.* 149:1–5 ("Q: If they were released on the date of the election, but there was no release time, were they included in your analysis?  . . . A: Probably.").  This, too, artificially inflated his final tally of late-jailed individuals affected by the absentee-ballot deadline.

- Finally, Dr. Salling made no attempt to remove inmates who experienced facility transfers, not arrests, the weekend before Election Day.  Salling Dep. 108–09.

Taken together, Dr. Salling's errors overinflated the numbers reported in his conclusion and call into question his report's reliability.  Without Dr. Salling's inflated numbers, Plaintiffs can only show that two individuals—Tommy Mays and Quinton Nelson—were approached by counsel in jail and subsequently requested to circumvent the Saturday-noon absentee-ballot deadline.  Two is not enough to show that the ballot-request deadline "imposes 'excessively burdensome requirements' on [a] class of voters."[1]  *See, e.g., Crawford*, 553 U.S. at 202 (plurality opinion) (quoting *Storer*, 415 U.S. at 738) (when plaintiffs could point to a handful of citizens affected by a voter ID law, the Court found that the law did not impose an unconstitutional burden).

---

[1] In fact, this is the path the district court erroneously took in 2014.  *See Fair Elections Ohio v. Husted*, 47 F. Supp. 3d 607 (S.D. Ohio 2014).  There, the district court determined that plaintiffs "proffered persuasive authority for the proposition that . . . the severity of the burden on a cognizable subset of voters . . . is the proper focus of the Court's analysis."  *Id.* at 614 (citation and quotation marks omitted).  The district court found this standard is met "even if one voter in an election cycle . . . is deprived of his voting right."  *Id.* But this was wrong, and the Court should not repeat the mistake here.  The Sixth Circuit on appeal warned that "the district court's constitutional analysis does not appear sufficient."  *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014).

**Dr. Salling confirms that the burden is minimal.** But even if the Court overlooks Dr. Salling's methodological shortcomings and tolerates his exaggerated numbers, the Court can only reach one conclusion: the absentee-ballot deadline imposes a minimal burden on the ability to vote. To place the estimated 1,000 potential late-jailed individuals in context, this number represents just .012 percent of the 8,070,917 registered Ohio voters in 2018 and .022 percent of the 4,503,116 voters who cast ballots in the 2018 general election. And unlike voters whose inability to obtain necessary voter identification will prevent them from voting in every election, any single late-jailed individual will presumably only experience this unusual factual scenario once in a lifetime. In citing these numbers, the Secretary does not intend to dispute the fundamental right to vote of all registered Ohio voters. Instead, the numbers demonstrate the paucity of evidence Plaintiffs presented to the Court.

Moreover, the burden on Plaintiffs does not differ in any meaningful way from the burden suffered by other individuals who experience unforeseen emergencies on Election Day. All Ohio citizens, with one small exception, must comply with the Saturday-noon deadline for requesting an absentee ballot. And all eligible Ohio voters, including Plaintiffs, receive approximately a month of time to vote early; allowing anyone to prevent the potential consequences of an Election Day or election weekend emergency. All told, the burden imposed by the absentee-ballot deadline, whether on Ohio voters generally or late-jailed individuals specifically, is minimal.

> **2. Ohio's deadline serves compelling election-administration interests given all that election officials need to do near and on Election Day.**

Ohio has substantial interests in its absentee-ballot deadline, far outweighing any limited burden that deadline imposes on voters. Because states prescribe the "Times, Places and Manner" of holding elections, U.S. Const. art. I, § 4, cl. 1, states have a strong interest in the

"structuring" of their elections. *Burdick*, 504 U.S. at 433. The Boards of Elections must ensure that over 8 million registered Ohio voters—and *only* those registered voters—can vote in each of the ways permitted by Ohio law. The task is enormous. Accordingly, the state has a strong interest in rules and regulations that ease the burden on the Boards of Elections. *See, e.g.*, *NEOCH*, 837 F.3d at 635 (finding that Ohio has an important regulatory interest in ensuring that election officials are not "overburdened" and in "reducing the administrative strain felt by boards of elections"); *Ohio Democratic Party*, 834 F.3d at 634–35 (finding the state's regulatory interest in balancing voting options with the burdens on the boards to be "ample justification" for a law setting the early voting period after the voter-registration deadline). This interest is particularly acute in the days leading up to and through Election Day, when the Boards are particularly busy. Indeed, Jan Kelly, the Director of the Montgomery County Board of Elections, described this time period as "crazy busy." Kelly Dep. 83:5.

Boards must attend to a litany of tasks leading up to Election Day. In the months before an election, employees prepare absentee ballots for mailing. In some counties, Boards may need to mail tens of thousands of absentee ballots—the Secretary's records reveal that Cuyahoga County mailed 178,319 absentee ballots in the month leading up to Election Day 2018. In Montgomery County, where Plaintiffs reside, the Board of Elections mailed 41,552 absentee ballots to registered voters. *See* Absentee Supplemental Report, *available at* https://www.sos.state.oh.us/elections/election-results-and-data/2018-official-elections-results/ (last visited July 19, 2019).

Sherry Poland, the Director of the Hamilton County Board of Elections, described the processing of absentee-ballot applications. After the candidates and issues for the ballot are finalized, the Board begins to process absentee-ballot applications. The Board ensures that the

information in the ballot application matches the information in the Board's voter-registration system. Poland Dep. 13:21–25. If a match exists, the Board then creates and mails an absentee-ballot packet containing the ballot, instructions, an identification envelope, and a return envelope. *Id*. 14:2–6.

Boards of Elections, of course, cannot just send out absentee ballots and wash their hands of the matter. They also must count the absentee ballots as they come in, examining the ballots for any deficiencies and sending letters to voters to correct those deficiencies. Smith Dep. 102:16–19. In Hamilton County, Ms. Poland explained that Board employees review the identification envelopes, again matching the information to the information in the voter-registration system. Poland Dep. 55:15–22. If the information is accurate, the Board reviews the absentee ballot for damage or other anomalies before scanning the ballot into the system. *Id.*

While the Board processes absentee-ballot requests and completed absentee ballots, it simultaneously conducts early in-person absentee voting. The weekend before the election always sees the most voters in the early voting period. In presidential election years, the Board and its employees must staff the early voting area from 8:00 a.m. to 7:00 p.m. on Friday, from 8:00 a.m. to 4:00 p.m. on Saturday, from 1:00 p.m. to 5:00 p.m. on Sunday, and from 8:00 a.m. to 2:00 p.m. on Monday. In staffing the early voting area, the Board must devote resources to crowd control, checking in and assisting voters, and monitoring electioneering activities. In Hamilton County, this can occupy 40 or more Board employees. Declaration of Sherry Poland ¶ 4, *attached as* Exhibit 1.

In addition to their duties to absentee voters, Boards receive a continuous stream of questions from other voters and poll workers in the weeks leading up to an election. Smith Dep. 104:7–9; Kelly Dep. 83:23–84:3. In Hamilton County, the Board staffs two different help desks:

25

one for voters and one for poll workers.  The voter help desk answers common voter questions like where their polling places are and what forms of voter identification are acceptable. Meanwhile, the poll-worker help desk has 50 employees whose sole job is to answer specialized questions from poll workers through Election Day.  Poland Decl. ¶¶ 8–9.

At the same time, Boards must locate and train thousands of poll workers beginning three weeks before Election Day.  In Montgomery County, for example, the Board is responsible for training 1,700 precinct election officials.  Kelly Dep. 83:17–20.  In Hamilton County, poll-worker training continues through the Saturday before Election Day, with six trainings on Friday and up to four on Saturday.  Poland Decl. ¶ 7.  The weekend before an election, some poll workers will drop out, forcing the Board to find and train replacements or reassign poll workers from other precincts. *Id.*; Smith Dep. 104:4–6.

A few days before an election, Boards begin to deliver the physical voting equipment to hundreds of polling locations throughout the county.  Smith Dep. 103:4–6; Kelly Dep. 83:17–20 (describing the 170 polling locations in Montgomery County).  In Hamilton County, this process involves 25 distribution centers staffed by Board employees, from which a poll worker for each precinct must pick up ballots and supplies the Saturday before the election.  If a poll worker no shows—a yearly occurrence—the Board must make alternative arrangements for delivering the supplies.  Voter equipment is delivered separately the weekend before the Election, with Board staff members accompanying the equipment to each polling place.  Poland Decl. ¶¶ 6–7.

The Boards must ensure that each polling location is prepared to open at 6:30 a.m. on Election Day.  To that end, the Hamilton County Board of Elections conducts an organizational meeting on Monday night, where each polling locations checks its supplies, makes sure the public has access to the polling place, and verifies that the voting equipment works properly.

The Board operates the poll-worker help desk to assist with poll workers' questions during the set-up process and also employs nearly 100 troubleshooters who can travel to polling places experiencing more complicated problems. Poland Decl. ¶ 9.

Boards need to transmit accurate lists of voters to the poll workers for Election Day voting, detailing who has already voted early or requested an absentee ballot and who is eligible to vote on Election Day. Smith Dep. 105:18–106:6; Poland Decl. ¶ 10. Because in-person voting runs through Monday at 2:00 p.m., the Board cannot prepare this list until the close of Monday's voting. While larger counties like Hamilton County may have the ability to transmit the updated lists electronically, smaller counties must hand deliver updated lists to polling locations. Poland Decl. ¶ 10.

While they prepare for Election Day voting, the Boards also must accommodate § 3509.08's provisions regarding jailed and confined voters. Boards organize teams of employees, who travel to hospitals, jails, and nursing homes to deliver and collect ballots. Smith Dep. 12:10–24, 15:12–19. For example, the Butler County Board of Elections creates bipartisan teams of four. *Id.* 38:8–11; *see also* Ohio Rev. Code § 3509.08(A). The teams typically visit nursing homes during the early voting period. The Butler County team turns to the jail the Friday before the election, bringing blank ballots to the jail, waiting for the inmates to complete their ballots, and returning them to the Board of Elections. Smith Dep. 39:12–16, 42:7–24. Hospitals are "very difficult" for the Butler County teams to cover. *Id.* 53:21. The hospitals contact the Butler County Board of Elections between noon on Saturday and 3:00 p.m. on Election Day, and the Board sends a team to the hospitals, as needed. *Id.* 14:3–12.

Hamilton County uses a similar process. It hires a team of eight employees to travel to the county's nursing homes in the weeks leading up to Election Day. Poland Dep. 65:23–24.

The team then votes the county jails on the Monday before Election Day.  *Id*. 31:11–13.  On Election Day, the team travels to county hospitals after 3:00 p.m. to deliver absentee ballots to hospitalized voters under § 3509.08(B).  *Id*. 50:21–51:15.  Hospitalized voters' ballots must be received by the Board by the close of polls at 7:30 p.m.  *Id*. 56:18–21; Seskes Dep. 47:12–16.

These, of course, form only the regular and expected duties of Boards around an election. When unforeseen circumstances arise—the death of a candidate or the failure of voting machines—the Boards must divert resources to deal with those issues as well.

Boards find it difficult to complete these tasks with their current levels of staffing.  The Montgomery County Board of Elections has to make do with just four full-time staff, supplemented by ten seasonal staff for elections season.  Kelly Dep. 27:7–16.  Other Boards operate with even less resources.  If Boards were forced to treat late-jailed individuals the same as hospitalized voters, the Boards could not cope.  For example, the Butler County Board of Elections already struggles to vote hospitalized voters.  If it were forced to similarly extend the absentee-ballot deadline to jails, it would be "difficult, yes, to reach out and make sure everyone was in place."  Smith Dep. 53:14–15.  The director of the Hamilton County Board of Elections agreed, opining that the Board would need additional staff to have the capacity to vote late-jailed individuals on Election Day.  Poland Dep. 45:20–46:3.  Without a significant increase in resources, Hamilton County could not accommodate a 3:00 p.m. absentee-ballot-request deadline for jailed voters.  Poland Decl. ¶ 13.

And yes, if late-jailed individuals were able to vote under the procedures available to hospitalized voters, it's likely that some smaller counties may experience elections in which no late-jailed individual requests a ballot.  But this does not lessen the burden on the Board.  The Board must train its staff to conduct Election Day voting and ensure that it has adequate staff in

place to dispatch two Board employees to *both* the jails and the hospitals on Election Day. That the Board ultimately might not need to send its staff to the jails is immaterial.

In short, the Saturday-noon deadline is necessary to facilitate an efficient and orderly election. Boards must shift their focus from absentee-ballot requests to the many other duties necessary to make voting on Election Day possible. Setting a deadline for absentee-ballot requests is therefore a completely reasonable and justified regulatory step, directly related to administering the election process.

### 3.  Ohio's approach easily satisfies *Anderson-Burdick* balancing.

Considering the above, the *Anderson-Burdick* balancing is not difficult in this case. Ohio voters have many opportunities to vote beginning weeks before Election Day. Voters who are jailed the weekend before Election Day let multiple weeks of early in-person and absentee voting pass without making any effort to vote. Accordingly, any burden on the right to vote due to the absence of special procedures for those arrested over the weekend before Election Day is minimal. Moreover, Plaintiffs have presented no credible evidence of the number of late-jailed individuals who faced this scenario in the past four elections.

In contrast, the Secretary offers strong justifications for the absentee-ballot deadline. With more than 8 million registered voters, over 70 percent of whom cast ballots during presidential election cycles, Boards of Elections are required to do a lot of work in a defined period of time with a small, often seasonal, staff. Deadlines for certain Board tasks allow for the orderly administration of elections, permitting the Boards to complete certain tasks, like absentee voting, in time to turn to others, like Election Day voting.

Perhaps more importantly, Plaintiffs' requested relief has no logical endpoint. There is no meaningful difference between the burden faced by late-jailed individuals and the many unforeseeable circumstances that could affect other voters. The Constitution surely does not

require Boards of Elections to create special last-minute delivery procedures and deadline exceptions for every conceivable emergency.  This Court need not and should not adopt such a rigid standard.

**IV.    Ohio's election laws do not raise any equal protection problem.**

Jailed individuals *already receive* the same generally applicable absentee-request deadline that applies to nearly all other voters:  Saturday at noon before Election Day.  *Compare* Ohio Rev. Code § 3509.08(A), *with* Ohio Rev. Code § 3509.03(D).  Yet, Plaintiffs still try to force this Court into an unduly narrow perspective.  To claim unequal treatment of late-jailed individuals, they tunnel down to the one small group of people—those facing unexpected hospitalizations—that receive an absentee-request-deadline exception.  *See* Compl. ¶ 29, Doc. 1, PageID 7 (citing Ohio Rev. Code § 3509.08(B)).  But, under equal protection, Ohio lawmakers could reasonably and justifiably decide to grant this small group of people a deadline exception without opening the door for everyone else.  Thus, to the extent this case is truly about supposed unequal treatment, Ohio's election laws readily pass constitutional muster.

**A.    When no suspect class is at stake, equal protection is flexible and generally allows classifications; and it compares *only* similarly-situated individuals.**

Equal protection is far from a bar on differential treatment.  Instead, the Constitution typically grants legislators "broad authority" to distinguish between different groups.  *Fitzgerald v. Racing Ass'n*, 539 U.S. 103, 108 (2003).  This is particularly true in areas that involve complex rules—like taxes and elections—where helping one group of people "inevitably requires that some [other] persons who have an almost equally strong claim to favored treatment be placed on different sides of the line."  *Id.* (quotations omitted); *see also McDonald*, 394 U.S. at 810–11.  In such situations, "the fact the line might have been drawn differently at some points

is a matter for legislative, rather than judicial, consideration." *Fitzgerald*, 539 U.S. at 108 (quotations omitted).

In a traditional equal-protection analysis, the classification's nature typically foreshadows the outcome. When no suspect class is at stake (such as race or gender), rational basis review applies. *Fowler v. Benson*, 924 F.3d 247, 261 (6th Cir. 2019). Such review is incredibly lenient. One current Justice, for example, has described it as "near-automatic approval." *United States v. Alvarez*, 132 S. Ct. 2537, 2552 (2012) (Breyer, J., concurring). Under the standard, a law survives "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (internal quotations omitted). The standard requires deference in many ways: the State is not required to produce evidence; the Court cannot second-guess legislative wisdom; the Court does not require a precise fit between means and ends; and the challenger must negate any conceivable reason for a statute. *Id.* at 319–22; *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993); *see also Armour v. City of Indianapolis, Ind.*, 132 S. Ct. 2073, 2083 (2012) ("[T]he Constitution does not require the [State] to draw the perfect line nor even to draw a line superior to some other line it might have drawn. It requires only that the line actually drawn be a rational line.").

The Sixth Circuit also discussed equal protection in the elections context. *See, e.g.*, *Jolivette v. Husted*, 694 F.3d 760, 770–71 (6th Cir. 2012); *Obama for Am.*, 697 F.3d at 428–36. In *Obama for America*, the Sixth Circuit held that, in the elections context, equal protection triggers *Anderson-Burdick* balancing.[2] *Id.* at 428–29. Under this approach, the Court must look

---

[2] This approach is debatable. *Anderson-Burdick* balancing measures the burden state action has on voting rights against state justifications. It then decides whether *that* burden is too great. Traditionally, equal protection addresses a *distinct* issue: whether the State is justified in distinguishing between different groups. Arguably, therefore, the two analyses should be

31

to the "precise character" of the interests at stake.  *Id.*  As discussed above, the end result is often a deferential standard akin to rational basis.  *See AFSCME*, 814 F.3d at 338.

Importantly, the same foundational equal-protection principles apply to elections.  That is, even in the elections context, "[t]he Equal Protection Clause does not forbid classifications." *Obama for Am.*, 697 F.3d at 435 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).  "It simply keeps governmental decision makers from treating differently persons who are in all *relevant* respects alike."  *Id.* (quoting *Nordlinger*, 505 U.S. at 10).  That is critical here: even with elections, the comparison must be between groups that are "similarly situated" and thus alike in *all* relevant ways.  *Id.*  Flipped around, being *somewhat* similar is not enough.

Comparing the Sixth Circuit's decisions in *Obama for America* and *Jolivette* is helpful in this regard.  In *Obama for America*, the Court found that the plaintiffs were likely to succeed on their claim that granting military and overseas electors extra *in-person* voting hours violated equal protection.  697 F.3d at 434–36.  It acknowledged that these electors were different from the general public in that "their *absence from the country* . . . makes them distinct."  *Id.* at 435 (emphasis added).  But the Court found "no relevant distinction" with respect to "in-person early voting" occurring *within the country.  Id.*  By contrast, in *Jolivette*, the Court rejected an equal protection claim challenging different treatment of independent and partisan candidates for ballot-access purposes.  694 F.3d at 770–71.  There, the plaintiff's "equal-protection claims [did] not get off the ground because independent candidates and partisan candidates are not similarly situated for purposes of election regulations."  *Id.* at 771. The main difference being that independent candidates are excused from the primary process that naturally limits partisan candidates.  *Id.*

---

independent.  At this stage, *Obama for America* is binding, and Ohio prevails under its framework.  But the Secretary reserves the right to challenge the framework at a later stage.

Finally, the Supreme Court has held that giving one group absentee-voting privileges does not automatically mean that others must receive them too. In *McDonald*, the Court examined Illinois' election laws that allowed four classes to vote absentee: people out of county; people physically incapacitated; people observing religious holidays; and people serving as poll workers. 394 U.S. at 803–04. Unsentenced inmates claimed that their exclusion from absentee voting violated equal protection because, they said, there was no legitimate reason for treating them differently from other incapacitated persons. *Id.* at 806. The Court rejected this challenge, noting that States have "wide leeway" to pass legislation even if it "appears to affect similarly situated people differently." *Id.* at 808. The Court stressed the irony of using "Illinois' willingness to go further than many States in extending the absentee voting privileges" as the basis for a discrimination lawsuit. *Id.* at 811.

**B.      Granting any group an absentee-request exception requires legislative line-drawing since Ohio cannot realistically give an exception to all.**

Here, Plaintiffs again view things too narrowly. Their "jails versus hospitals" packaging leaves much out. As noted in opening, anyone who skips Ohio's many early-voting options risks that some unforeseen event will prevent them from voting on Election Day. To focus on one example, consider people in car accidents. A 2017 report noted that 303,298 traffic accidents occurred in Ohio that year. *Traffic Crash Facts*, Ohio Department of Public Safety, at 2, (April 2018), https://ohiohighwaysafetyoffice.ohio.gov/Reports/2017CrashFacts.pdf (last visited July 19, 2019). That averages out to over 830 crashes each day. And that number was less than 2016. *Id.* The inference being that car crashes likely interrupt the Election Day of hundreds of Ohioans each year. In short, many people might have sympathetic reasons, largely or fully out of their control, for being unable to vote on Election Day.

33

Both this Court and the Sixth Circuit have acknowledged as much. When denying preliminary relief in an earlier late-jailed case, this Court noted that there was no clear reason for distinguishing between late-jailed individuals and "non-incarcerated individuals who may be prevented from voting due to unforeseeable circumstances such as a last minute business trip or a death in the family that require those individuals to travel during the election and the weekend prior thereto." *Fair Elections Ohio*, 2012 U.S. Dist. LEXIS 161614, at \*55–56 n.9. The Sixth Circuit has similarly observed "*any* voter could be suddenly called away and prevented from voting on Election Day." *Obama for Am.*, 697 F.3d at 435 (emphasis added). For example, "personal contingencies like medical emergencies or sudden business trips could arise, and police officers, firefighters and other first responders could be suddenly called to serve at a moment's notice." *Id.*

The upshot is that, for anyone to receive an exception, line-drawing is needed. As discussed at length already, Section II.B.2 *supra*, election officials are *very* busy as Election Day approaches performing *many* different election-related tasks. Thus, viewing the "precise character" of eleventh-hour election administration, *see Obama for Am.*, 697 F.3d at 428–29, these officials cannot be realistically expected to personally deliver (through two opposite-party board employees) absentee ballots to anyone with a good excuse up until 3 p.m. on Election Day. Poland Decl. ¶ 13. Realistically, adding any additional group onto election officials' already-heavy plates will add incremental burdens. *Cf. Ohio Democratic Party*, 834 F.3d at 634 n.8 (recognizing that States "undeniably" have a legitimate interest in cost savings "even if" the savings is "only incremental[]"). One Ohio election official aptly described the difficulty of exempting even a single additional group (late-jailed individuals) from the normal Saturday-noon deadline:

> Q.  Would it be feasible from a resource perspective for the board to provide absentee ballots to jailed voters up to the close of polls on election day? . . .
>
> A.  It would be difficult. . . .
>
> Q.  Why is that?
>
> A.  Because of the many different processes that are occurring on those final few days, that Sunday, Monday and election day itself, as well as the fact, as I mentioned before, additional staff would have to be hired to deliver the ballots to the Justice Center.
>
> Q.  If additional staff and resources were allocated, would it make it easier? . . .
>
> A.  If that became the law in Ohio, we would comply and obtain whatever resources necessary to do that, but it would make things more difficult. It's adding yet another process onto election day.

Poland Dep. 49:10–50:7.  And the difficulty only compounds when one accounts for the many other factual scenarios that might disrupt a person's election-day voting.

From this fuller perspective, Ohio's choice to give hospitalized individuals a deadline exception is easily justifiable.  Under equal protection, lawmakers are generally free to "take one step at a time" and address the areas that "seems most acute to the legislative mind."  *Bench Billboard Co. v. City of Covington, Ky.*, 465 F. App'x 395, 408 (6th Cir. 2012) (quoting *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 489 (1955)).  Here, lawmakers could reasonably decide that hospitalized individuals, when compared to the general electorate, present a group that is (1) particularly worthy of a special deadline exception and (2) distinct and limited enough to allow for feasible (albeit challenging) last-minute absentee voting.  Many other states offer similar exceptions.  *See, e.g.*, Ala. Code § 17-11-3; Conn. Gen. Stat. § 9-150c; Ga. Code. Ann. § 21-2-384(a)(4); Ind. Code Ann. § 3-11-4-1; Iowa Code § 53.22(3); Ky. Rev. Stat. Ann. § 117.077; Mass. Gen. Laws ch. 54, § 89; Minn. Stat. § 203B.04(2); Mont. Code Ann. § 13-13-211(2); N.C. Gen. Stat. 163A-1308(b); 25 Pa. Cons. Stat. § 3146.2(e); S.C. Code Ann. § 7-15-

330; S.D. Codified Laws § 12-19-2.1; Tenn. Code Ann. § 2-6-401(a); Utah Code Ann. § 20A-3-306.5; Va. Code Ann. § 24.2-705; Wis. Stat. § 6.86(3).

Tellingly, even the hospital exception itself reflects the need for tough legislative choices. The exception is limited to those (1) who themselves are unforeseeably hospitalized and (2) whose minor child is unforeseeably hospitalized. Ohio Rev. Code § 3509.08(B). It does not apply to the hospitalizations of spouses, elderly parents, adult children, siblings, or any other close relationship. Such situations, even if similarly sympathetic, fall on the other side of the line.

In short, by crafting a limited exception for hospitalized individuals, Ohio did not open the floodgates to all groups that are somewhat analogous. As in *McDonald*, it would be ironic if Ohio's "willingness to go further" in extending absentee privileges for people facing a special hardship laid the groundwork for a constitutional violation. *See* 394 U.S. at 810-11.

### C. Even comparing jailed and hospitalized individuals only, the two groups are not alike in all ways relevant to last-minute absentee voting.

But even engaging with Plaintiffs' oversimplified "jails versus hospitals" comparison, their claim still fails on summary judgment. For one thing, neither jailed nor hospitalized individuals are a suspect class. So, no reason exists to "suspect" a problem. Instead, Ohio's leeway to distinguish between these two groups should be at its peak. Regardless, any equal-protection analysis "do[es] not get off the ground," *Jolivette*, 694 F.3d at 771, because jailed individuals and hospitalized individuals are not alike in all ways relevant to allowing up-until-afternoon-of-Election-Day absentee voting. Combining common knowledge and undisputed testimony from jail and election officials, they are much different.

Beginning with common knowledge, jails and hospitals are distinctly different facilities. Hospitals are open to the public with staff generally on hand to locate patients in a relatively

36

quick manner. Hospitals provide healthcare services and the patients paying for these services are free to leave at any time.

Jails house individuals who either have a pending criminal case or are serving a local jail sentence. In Ohio, the county sheriff is statutorily bound to oversee the county jail and "all persons confined therein." Ohio Rev. Code § 341.01. Not only is the county sheriff responsible for overseeing the security of these facilities, but the county sheriff must ensure that the jail meets state standards in order to directly support the life, safety and health of not only jail inmates but also employees, contract employees and volunteers. *Id*. Jails are secure facilities each with their own policies and procedures necessary to ensure the safety of the public and the inmates.

These are *significant* differences when it comes to last-minute absentee voting. Unlike at a hospital, a Board employee visiting a jail cannot simply go to the front desk, ask for a confined voter's location, and then readily gain access to the voter. As one jail official confirmed, "there's a lot of work that goes into" locating jailed individuals, "[i]t's not just somebody walking through the front door of the jail and doing the ballot." Fisher Dep. 58:16-19. Board employees likewise testified that it can sometimes take significant time to vote jailed individuals. *See, e.g.*, Smith Dep. 41:12–42:24 (estimating that it ranges from an "hour" to an "hour and a half" to vote a few people); Poland Dep. 33:21–34:7 (describing that the jail-voting process "can take hours").

One notable issue, and reason last-minute voting would be difficult, is the mobile nature of recently arrested individuals. Jailed individuals can be at "a myriad of different locations." Fisher Dep. 57:16–58:7. Moreover, the "location of inmates" is "dynamic" and "constantly fluctuating." *Id.* at 77:5–8. Jailed individuals in Butler County, for example, could be at one of

three different facilities; at many different housing units within those facilities; at over a dozen different courts; at medical appointments; at dental appointments; at psychological appointments; at attorney visits; at clergy visits; or at other special visits. *Id.* at 57:16–58:7, 76:23–77:4; *see also* Trowbridge Dep. 108:19–109:25, 110:2–7. Individuals arrested on a weekend are particularly likely to be in court for initial proceedings early the next week. *See* Trowbridge Dep. 21:2–19, 108:19–109:04. They also might be released from jail altogether before any absentee voting can take place. *See id.* at 110:8–111:3. Thus, once election officials provide a list of voters, then "it's a research project that begins" on the jail officials' end. Fisher Dep. 57:14–15. And sometimes election officials' schedules do not line up. For example, an election official could "have to wait if the jailed voter is in court." Poland Dep. 33:24–34:2.

In addition to locating jailed individuals, special security concerns also come into play. After all, jailed voting brings someone from outside a secure facility to allow them to interact with a detainee inside a secure facility. This, in turn, requires close monitoring and careful transportation of jailed individuals. Multiple jails require visitors, including election officials, to undergo background checks (which can take a week or longer) to gain access to inmates. *See, e.g.*, Trowbridge Dep. 72:3–73:7, 112:7–113:6; Cavender Dep. 22:23–23:10.

Because contraband is of great concern, jail officials must control all aspects of life inside the jail. Indeed, a spoon in a jail takes on new meaning as a potential weapon. Trowbridge Dep. 113:13–16. Similarly, items as small as a paperclip or single staple are prohibited to inmates. Fisher Dep. 106:7–12. Even the pencil or pen needed to cast a ballot requires strict monitoring by jail officials. *See, e.g.*, Fisher Dep. 106:23–107:15; Trowbridge Dep. 113:7–24.

The bottom line is that, for the purposes of eleventh-hour absentee voting, jails and hospitals are different. The jail setting requires advanced planning and careful monitoring. And jails are

less conducive to the last-minute adjustments needed to vote people on Election Day.  Hospitals, by contrast, are open to the public.  And, even if they present some access hurdles, they do not amount to a jail cell.  Thus, Ohio could justifiably view these groups differently for purposes of last-minute election administration.  And equal protection requires no more.

## CONCLUSION

For these reasons, Secretary LaRose requests that the Court grant his motion for summary judgment.

Respectfully submitted,
DAVE YOST
Ohio Attorney General

*s/ Julie M. Pfeiffer*

JULIE M. PFEIFFER (0069762) *
    * *Trial Attorney*
BRIDGET C. COONTZ (0072919)
ANN YACKSHAW (0090623)
JEFFREY J. BOUCHER (0092374)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
Julie.Pfeiffer@OhioAttorneyGeneral.gov
Bridget.Coontz@OhioAttorneyGeneral.gov
Ann.Yackshaw@OhioAttorneyGeneral.gov
Jeffrey.Boucher@OhioAttorneyGeneral.gov

*Counsel for Defendant Ohio Secretary of State*

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2019, the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*s/ Julie M. Pfeiffer*

JULIE M. PFEIFFER (0069762) *
Assistant Attorney General