**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Tommy Ray Mays, II, *et al.*,

    Plaintiffs,

    v.

Frank LaRose,

    Defendant.

Case No. 2:18-cv-1376

Judge Michael H. Watson

Magistrate Judge Vascura

## <u>OPINION AND ORDER</u>

Plaintiffs sue Ohio Secretary of State Frank LaRose ("Defendant") under 42 U.S.C. § 1983, challenging Ohio election regulations insofar as they establish, for a certain class of eligible voters confined in a jail or workhouse ("Proposed Class"), a deadline of 12:00 p.m. on the Saturday preceding an election for submitting an application for an absentee ballot but, for eligible so-called "hospital-confined voters," a deadline of 3:00 p.m. on Election Day for submitting an application for an absentee ballot.  Plaintiffs bring an as-applied challenge on behalf of the Proposed Class.[1]  They allege that the deadline burdens the

---

[1] In this sense, the lawsuit has characteristics of both facial and as-applied challenges. As the Sixth Circuit has explained:

> A facial challenge to a law's constitutionality is an effort to invalidate the law in each of its applications, to take the law off the books completely.  The plaintiff must establish that no set of circumstances exist under which [the statute] would be valid.  In contrast, an as-applied challenge argues that a law is unconstitutional as enforced against the plaintiffs before the court. . . . [A] claim can have characteristics of as-applied and facial challenges: it can challenge more than just the plaintiff's particular case without seeking to strike the law in all its applications.  In constitutional challenges reaching

Proposed Class members' fundamental right to vote in violation of the First and Fourteenth Amendments[2] and that the disparate treatment of Proposed Class members and hospital-confined voters violates the Equal Protection clause of the Fourteenth Amendment.

Plaintiffs move for class certification, ECF No. 29, and both sides move for summary judgment.  ECF Nos. 54 & 55.  Additionally, Defendant moves to exclude the testimony of Plaintiffs' expert.  ECF No. 53.  For the following reasons, the Court **GRANTS** Plaintiffs' motion for class certification; **GRANTS** Plaintiffs' motion for summary judgment; **DENIES** Defendant's motion for summary judgment; and **DENIES AS MOOT** Defendant's motion to exclude.

## I.     FACTS

### A. Overview and Procedural History

The named plaintiffs in this suit are Tommy Mays, II ("Mays") and Quinton Nelson, Sr. ("Nelson").

---

beyond the plaintiff's circumstances, the plaintiff must satisfy the standards for a facial challenge to the extent of that reach.
*Green Party of Tenn. v. Hargett*, 791 F.3d 684, 691–92 (6th Cir. 2015) (internal quotation marks and citations omitted).  Accordingly, in this case, because Plaintiffs bring this suit on behalf of the Proposed Class but do not seek to invalidate the deadline as it relates to other absentee voters, they must demonstrate that the challenged regulations are unconstitutional in each of their applications to the Proposed Class.  "If even one set of circumstances exists in which the state can constitutionally" treat Proposed Class members and hospital-confined voters disparately vis-à-vis the absentee ballot application deadline, "plaintiffs' claim fails." *See id.* at 692.

[2] Because the Court finds that Plaintiffs prevail on their Equal Protection claim, it need not consider this separate claim that the deadline amounts to an unconstitutional burden on Class members' right to vote, even absent such disparate treatment.

Mays is a registered Ohio voter who was arrested on Saturday, November 3, 2018, around 7:00 p.m., and was unable to pay his bond.  Mays Dep. 11–14, ECF No. 55-9.  Mays testified that he asked how to exercise his right to vote in jail, but no one could "give him a straight answer."  *Id.* at 20.  He also was not eligible to receive visitors the first few days of his incarceration, *id.* at 52, did not have internet access, *id.* at 56, and did not have a calling card to allow him to make any telephone calls after the first, free call to which he was entitled, *id.* at 52, 55–56.

Nelson is a registered Ohio voter and was arrested late in the evening on Friday, November 2, 2018.  Nelson Dep. 59, ECF No. 55-10.  He was not expecting to be arrested, *id.* at 53, and was planning to vote in-person on Election Day.  *Id.* at 79.  Nelson also testified that he was unable to access the commissary until the Wednesday following his arrest and thus did not have access to a stamp, envelope, or phone card prior to the deadline for submitting a request for an absentee ballot.  *Id.* at 86–87.

On Election Day, November 6, 2018, Mays and Nelson filed this lawsuit on behalf of themselves and others similarly situated, seeking, in part, an emergency temporary restraining order ("TRO") requiring the then-Secretary of State[3] to provide them an opportunity to vote.  Mot., ECF No. 3.  The Court held a hearing later that morning and issued injunctive relief only as to Mays and

---

[3] Defendant LaRose has since been substituted for Jon Husted.

Nelson.  Order, ECF No. 12.  The Montgomery County Board of Election

delivered absentee ballot applications and absentee ballots to them, thereby

permitting them to vote absentee.  *See* Seskes Dep. 114–115, ECF No. 55-4;

*see also* Mays Dep. 44–49, ECF No. 55-9; Nelson Dep. 72–77, ECF No. 55-10.

Named Plaintiffs now seek permanent relief for the Proposed Class.

   B. <u>Absentee Voting in Ohio</u>

      The framework for obtaining and casting an absentee ballot is governed by

Ohio Revised Code §§ 3509.01, *et seq*.  Any qualified elector may vote by

absentee ballot.  O.R.C. § 3509.02.  The general procedure for requesting an

absentee ballot is as follows:

> A qualified elector shall make a written application for an absentee
> ballot to the director of the elections for the county in which his or her
> voting residence is located.  O.R.C. § 3509.03.  The application must
> contain:
>
> (1) The elector's name,
> (2) The elector's signature,
> (3) The address at which the elector is registered to vote,
> (4) The elector's date of birth,
> (5) One of the following:
>    (a) The elector's driver's license number,
>    (b) The last four digits of the elector's social security number, [or]
>    (c) A copy of the elector's current and valid photo identification, a
>    copy of a military identification, or a copy of a current utility bill,
>    bank statement, government check, paycheck, or other
>    government document . . . [(besides the notice of voter
>    registration)] that shows the name and address of the elector.
> (6) A statement identifying which absent voter's ballots are requested,
> (7) A statement that the person requesting the absentee ballot is a
> qualified elector,

(8) If the request is for primary election ballots, the elector's party affiliation,

(9) If the elector desires ballots to be mailed to the elector, the address to which those ballots shall be mailed.

O.R.C. § 3509.03(B).

Under the statute, the absentee ballot application must be delivered to the respective Director of the county Board of Elections no earlier than January 1 of that election year (or ninety days before the day of the election, whichever is earlier), and no later, if mailed, by 12:00 p.m. on the third day before an election, or, if delivered in person, by 6:00 p.m. the Friday preceding an election. O.R.C. § 3509.03(D). In practice, however, Defendant accepts applications to vote absentee that are submitted by 12:00 p.m. three days before an election, whether that application is itself mailed to the Director or submitted in person. *See* Seskes Dep. 35–37, ECF No. 55-4; *see also* Kelly Dep. 16, ECF No. 55-6; Directive 2019-14 at 5-4 ("Voters may submit applications to receive an absentee ballot by mail beginning . . . and ending 12:00 p.m. noon the Saturday before Election Day.").

A separate section of the Ohio Revised Code governs absentee voting by disabled/confined persons. Under § 3509.08(A), "[a]ny qualified elector, who, on account of the elector's own personal illness, physical disability, or infirmity, or on account of the elector's confinement in a jail or workhouse under sentence for a misdemeanor or awaiting trial on a felony or misdemeanor, will be unable to travel from the elector's home or place of confinement to the voting booth in the

elector's precinct on the day of any general, special, or primary election may make application in writing for an absent voter's ballot to the director of the board of elections of the elector's county." O.R.C. § 3509.08(A). The application must include all of the requirements set forth in § 3509.03(B) and state the "nature of the elector's illness, physical disability, or infirmity, or the fact that the elector is confined in a jail or workhouse . . . ." O.R.C. § 3509.08(A).

The deadline for delivering an absentee ballot application to the Director under § 3509.08(A) is 12:00 p.m. on the third day before an election. *Id.* This provision does not specify the manner of delivery, and Defendant has taken the position that a jail-confined voter's absentee ballot application under § 3509.08(A) can be delivered either by mail or in person by any family member or friend.[4] *See* Def. Mot. Summ. J. 6, ECF No. 54; Resp. to Cert. 15, ECF No. 35; Directive 2019-14 at 5-20.

Once a request has been timely made under § 3509.08(A), the confined absent voter's ballot can be delivered: (1) by mail to the voter's residence or place of confinement, or (2) by two Board employees (one from each major

---

[4] Thus, the deadline for submitting an application to vote absentee-by-mail for disabled/confined (but not hospital-confined) voters mirrors the general deadline for submitting an application to vote absentee-by-mail. *Compare* O.R.C. § 3509.08(A) (deadline of 12:00 p.m. Saturday before Election Day to submit by mail or in-person a request for an absentee ballot by disabled/confined persons) *with* Directive 2019-14 at 5-4 ("Voters may submit applications to receive an absentee ballot by mail beginning . . . and ending 12:00 p.m. noon the Saturday before Election Day."). Plaintiffs do not challenge the deadline on behalf of either all disabled/confined voters or all absentee voters, however, and attack § 3509.08(A) and the disparate treatment with hospital-confined voters solely with respect to the Proposed Class.

political party), who will hand deliver the ballot to the voter and return it to the Board. O.R.C. § 3509.08(A). If the voter is confined to a private or public institution within the county, the ballot must be delivered by the latter method. *Id.*

Ohio Revised Code § 3509.08(B) carves out a limited exception for a qualified, disabled/confined elector who is either personally hospitalized or whose minor child is hospitalized as a result of an accident or unforeseeable medical emergency ("hospital-confined voter") and permits such people to submit an absentee ballot application by 3:00 p.m. on Election Day.[5] O.R.C. § 3509.08(B). The application must be made in writing, contain all the information required by § 3509.03(B), indicate the hospital where the applicant or applicant's child is confined, and may request that a family member deliver the absentee voter's ballot to the applicant. O.R.C. § 3509.08(B)(2). If the applicant does not request delivery by family member and is confined to a hospital within their county of residence, the ballot is delivered by two Board employees belonging to the two major political parties. *Id.* If the applicant does not request delivery by family member and is confined to a hospital outside of their county of residence, the

---

[5] Although nothing in O.R.C. § 3509.08(B) requires that the hospital-confined voter be hospitalized after 12:00 p.m. on the Saturday before Election Day, Directive 2019-14 includes such a requirement. Directive 2019-14 at 5-12 ("An absentee voter who is confined to a hospital or whose minor child is confined to a hospital due to an accident or unforeseeable medical emergency occurring after the absentee voting by mail application deadline of 12:00 p.m. noon on the Saturday before Election Day may vote by absentee ballot.").

ballot is mailed to the voter.[6]  *Id.*  All applicants under this section must affirm,

under penalty of election falsification, that their hospitalization was unforeseen.

Seskes Dep. 120, ECF No. 55-4.

## II.    STANDARDS OF REVIEW

### A. Class Certification

The Court retains broad discretion in determining whether an action may

be certified as a class action but must first perform a "rigorous analysis" of the

requirements under Federal Rule of Civil Procedure 23.  *Stout v. J.D. Byrider*,

228 F.3d 709, 716 (6th Cir. 2000) (internal quotation marks omitted).  Rule 23(a)

establishes four prerequisites to class certification: numerosity, commonality,

typicality, and adequacy.  Fed. R. Civ. P. 23(a); *see also Young v. Nationwide*

*Mut. Ins. Co.*, 693 F.3d 532 (6th Cir. 2012) (citing *Sprague v. Gen. Motors Corp.*,

133 F.3d 388, 397 (6th Cir. 1998) (en banc)).  "In addition to fulfilling the four

prerequisites of Rule 23(a), the proposed class must also meet at least one of

the three requirements listed in Rule 23(b)."  *In re Whirlpool Corp. Front-Loading*

*Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013).

### B. Summary Judgment

The standard governing summary judgment is set forth in Federal Rule of

Civil Procedure 56(a), which provides: "The court shall grant summary judgment

---

[6] There is a different procedure that applies to out-of-county-hospital-confined voters who are disabled and require a reasonable accommodation under the Americans with Disabilities Act.  Directive 2017-06; Seskes Dep. 145, ECF No. 55-4.

if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must grant summary judgment if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing there is a genuine issue of material fact for trial, and the Court must refrain from making credibility determinations or weighing the evidence. *Pittman v. Cuyahoga Cty. Dep't of Children and Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Thus, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pittman*, 640 F.3d at 723 (quoting *Anderson*, 477 U.S. at 251–52).

The Court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."

*InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).  The Court may rely on the parties to call attention to the specific portions of the record that demonstrate a genuine issue of material fact.  *Wells Fargo Bank, N.A. v. LaSalle Bank N.A.*, 643 F. Supp. 2d 1014, 1022 (S.D. Ohio 2009).

The parties have filed cross-motions for summary judgment.  Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.  The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion.  In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party."  *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).  "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record."  *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. State of La. (Bd. of Trs. for State Colls. & Univs.)*, 757 F.2d 698, 705 (5th Cir. 1985)).  The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation.  *Taft Broad.*, 929 F.2d at 248.

## III.    ANALYSIS

### A. Class Certification

Named Plaintiffs move to certify this case as a class action and seek to represent the following class of individuals:

> All individuals arrested and held in detention in Ohio on or after close of business for the county election board on the Friday prior to the Election who (1) are eligible to vote in Ohio and are registered to do so, (2) did not vote absentee in person or by mail prior to their detention, (3) were provided neither an absentee ballot nor transportation to a voting center nor access to any other method of voting while held in detention, and (4) will remain in detention through close of polls on Election Day.

Mot. for Class Cert. 1, ECF No. 29.

Defendant opposes the motion on three primary bases: 1) class certification is unnecessary to provide Plaintiffs their requested relief; 2) Plaintiffs fail to satisfy the prerequisites for class certification under Federal Rule of Civil Procedure 23 to certify a class; and 3) the Proposed Class's definition is too imprecise.  Memo in Opp. Class Cert. 2, 16, ECF No. 35.  For the following reasons, Plaintiffs' motion for class certification is **GRANTED**.

### 1. Necessity of Class Certification

Defendant first argues that the Proposed Class should not be certified because class certification is unnecessary.  Memo in Opp. 6–9, ECF No. 35.  In support, Defendant cites to *Craft v. Memphis Light, Gas & Water Div.*, 534 F.2d 684, 686 (6th Cir. 1976).  In that case, the Sixth Circuit found "no error in the district court's refusal to certify a class action" relating to injunctive and

declaratory relief claims because "the district court properly recognized that such relief to the extent 'granted [would] . . . accrue to the benefit of others similarly situated', and, consequently, . . . 'no useful purpose would be served by permitting this case to proceed as a class action' because 'the determination of the constitutional question can be made . . . regardless of whether this action is treated as an individual action or as a class action.'" *Id.* (quoting *Ihrke v. N. States Power Co.*, 459 F.2d 566, 572 (8th Cir. 1972), *vacated and remanded to dismiss as moot*, 409 U.S. 815 (1972)).

Plaintiffs argue that *Craft* was abrogated by subsequent Supreme Court precedent: *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010)[7] and *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362–63 (2011)[8]. Neither of those cases directly addresses *Craft* or whether "necessity" is a requirement in Rule 23(b)(2) cases. Instead, Plaintiffs cite the Third Circuit for the proposition that a necessity requirement "over and above Rule 23's enumerated criteria would create conflict with *Shady Grove* . . . ." Reply 2, ECF No. 38 (quoting *Gayle v. Warden Monmouth Cty. Corr. Inst.*, 838 F.3d 297, 310 (3d Cir. 2016)). The Third Circuit may be correct, but this Court owes its

---

[7] In *Shady Grove*, the Supreme Court rejected the argument that "Rule 23 neither explicitly nor implicitly empowers a federal court 'to certify a class in each and every case' where the Rule's criteria are met" and stated that Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the specific criteria to pursue his claim as a class action." *Shady Grove*, 559 U.S. at 398–99.

[8] "When a class seeks an indivisible injunction benefiting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident." *Dukes*, 564 U.S. at 362–63.

jurisprudential allegiance to the Sixth Circuit, which has had opportunity to find that *Shady Grove* or *Dukes* abrogated *Craft* and declined to do so.

In *Hill v. Snyder*, 821 F.3d 763, 771 (6th Cir. 2016), the Sixth Circuit noted that "there is some confusion regarding this circuit's precedent on whether or not class certification is required to extend declaratory and injunctive relief to non-plaintiffs." As part of this discussion, the Sixth Circuit noted that it had previously distinguished *Craft* in *Ball v. Wagers*, 795 F.2d 579 (6th Cir. 1986), a case cited by Plaintiffs in this case, and "seemingly distanced [itself]" from *Craft* in another case, *Tesmer v. Granholm*, 333 F.3d 683 (6th Cir. 2003) (en banc). But *Tesmer* was later reversed by the Supreme Court, and "[the Sixth Circuit] has yet to revisit the subject." *Hill*, 821 F.3d at 771. After reviewing the case history, the Sixth Circuit remanded the case to the district court to "reconsider whether class certification may indeed be necessary and appropriate in this case . . . ." *Id.* This remand instruction explicitly directing the district court to consider necessity is inconsistent with Plaintiffs' argument that necessity is no longer a consideration in this Circuit when certifying a class under Rule 23(b)(2).

Nevertheless, the Court need not (and therefore does not) weigh in on whether *Craft* is still good law for two reasons. First, and most importantly, the Court is not persuaded that *Craft mandates*, as opposed to permits, denial of class certification in cases where it is unnecessary. Second, in *Ball, supra*, the Sixth Circuit determined that *Craft* did not control when there had been "an inordinate delay resulting in the mooting of the class representative's claim [or] a

claim which, by its nature, may be capable of repetition yet evading review." *Ball*, 795 F.2d at 581 n.2.

The first exception to *Craft* that *Ball* described does not apply here. There has not been inordinate delay in this case that has resulted in Mays's and Nelson's claims being mooted.[9] However, the second exception to *Craft* does apply—i.e. the claims at issue, by their nature, may be capable of repetition yet evading review. *Ball*, 795 F.2d at 581 n.2. Both parties agree in their briefing that these claims are capable of repetition yet evading review. *See* Memo in Opp. 2, ECF No. 35 (Defendant stating that "Plaintiff's claims are capable of repetition yet evading review"); Reply 3, ECF No. 38 (Plaintiffs contending that "[i]t is difficult to imagine a claim that is *more* capable of repetition yet evading review than the one at issue in this case"). The Court follows the Sixth Circuit's guidance and does not apply *Craft* in this case because the claims are capable of repetition yet evading review. *Ball*, 795 F.2d at 581 n.2.

Even if necessity was a prerequisite to certification under Rule 23(b)(2), because Plaintiffs bring an as-applied challenge instead of a facial challenge, the

---

[9] Indeed, as Defendant points out, an exception to mootness likely applies here because this is an election law case. Memo in Opp. 8, ECF No. 35 (arguing that "[m]ootness does not apply when a 'situation is capable of repetition yet evading review.'" (quoting *In re 2016 Primary Election*, 836 F.3d 584, 588 (6th Cir. 2016)). The Sixth Circuit has explained at various times that "the evading-review requirement is 'somewhat relaxed in election cases' even if 'the challenging parties do not have cognizable legal interests' by the time the case reaches us." *In re 2016 Primary Election*, 836 F.3d at 588 (quoting *Libertarian Party of Mich. v. Johnson*, 714 F.3d 929, 932 (6th Cir. 2013)). Therefore, Named Plaintiffs' claims would not be moot even in the absence of class certification, and the first exception to *Craft* does not apply.

Case No. 2:18-cv-1376                                                      Page 14 of 46

Court would likely have found that class certification was necessary.  Plaintiffs do not seek to invalidate the current absentee voting scheme entirely; rather, they argue that the scheme unconstitutionally burdens one specific subset of people. In order to extend that relief to all affected individuals, class treatment is appropriate.  Furthermore, without class certification, the parties disagree on how broadly applicable a judgment in favor of Plaintiffs would be.  *See* Memo in Opp. 14–16, ECF No. 35 (Defendant suggesting that individuals who are "foreseeably" arrested, who could have met the current deadline for submitting an application, or who previously received an absentee ballot would not be entitled to relief). Class certification provides clarification regarding the universe of people who will be entitled to relief based on the Court's orders.

In any case, Defendant's necessity argument is tied to his assertion that class certification will prejudice the State of Ohio.  *See* Memo in Opp. 10, ECF No. 35.  No such prejudice will result.  Defendant contends that "[g]ranting unneeded Rule 23(b)(2) classes will add an extra layer of litigation proceedings (and costs)" to constitutional litigation involving the State.  *Id.*  But there is very little added cost or procedural complexity by certifying the Proposed Class. Because this class action is being certified pursuant to Rule 23(b)(2), the Court is not required to afford the class notice of the action and declines to do so.  *See Dukes*, 564 U.S. at 362.  Therefore, the only added costs from class certification are the relatively minimal costs incurred by the parties in briefing the class certification motion and the Court's expenditure of time ruling on the same.  Even

if the Court were required (or permitted) to balance the costs of class certification against the benefits—which it does not believe is required—those costs would not change the Court's decision.

## 2. The Requirements of Federal Rule of Civil Procedure 23

Plaintiffs seek class certification under Rule 23(b)(2).[10] For purposes of his response, Defendant has assumed that the Proposed Class satisfies the numerosity and adequacy requirements. Memo in Opp. Class Cert. 11 n.2, ECF No. 35. Therefore, the Court analyzes only whether the Proposed Class meets the commonality and typicality requirements, which "'tend to merge' in practice because both of them 'serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Whirlpool*, 722 F.3d at 853 (quoting *Dukes*, 564 U.S. at 349 n.5).

"To demonstrate commonality, plaintiffs must show that class members have suffered the same injury," *id.* at 852; however, it is insufficient to show only that the Proposed Class "have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 350. Instead, "[t]heir claims must depend upon a

---

[10] Defendant does not argue that the Proposed Class fails to meet the requirements of Rule 23(b)(2). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, 564 U.S. at 360 (quoting Nagareda, 84 N.Y.U. L. Rev., at 132). Here, certification of the Proposed Class will allow "a single injunction or declaratory judgment [to] provide relief to each member of the class." *Id.* Each class member will not be "entitled to a different injunction or declaratory judgment against the defendant." *See id.*

common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* The key consideration is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)). "Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims.'" *Whirlpool*, 722 F.3d at 852 (quoting *Sprague*, 133 F.3d at 399).

Plaintiffs have presented common questions for which the Court can generate common answers that will resolve this litigation, although Plaintiffs frame the common issues in broad terms:

- Whether Defendant has precluded eligible voters held in detention in Ohio county jails from exercising the fundamental right to vote;

- Whether Ohio law governing absentee voting by pretrial detainees and detainees with misdemeanor convictions, Ohio Rev. Code § 3509.08, is consistent with the U.S. Constitution;

- Whether declaratory relief holding unconstitutional Ohio's practice of disenfranchising qualified electors who are jailed the weekend before election day and who remain confined through election day is appropriate; and

- Whether injunctive relief is appropriate to require the Secretary of State to direct all members of all County Boards of Elections to provide a reasonable and practicable means of voting for all eligible, confined voters, at least equivalent to that provided for late-hospitalized persons pursuant to Ohio Rev. Code § 3509.08.

Mot. Class Cert. 6, ECF No. 29.  But because the Court's substantive analysis focuses on the Equal Protection aspects of this case, the primary common issue the Court relies on for certification is whether the Proposed Class is entitled to be treated equally with similarly-situated hospital-confined voters for purposes of submitting an absentee ballot application.

Defendant argues that three factual differences among members of the Proposed Class destroy commonality and typicality.  While some of these factual differences potentially do exist, none of them negate the Court's ability to resolve the overarching issue with respect to the Proposed Class as a whole.

First, Defendant asserts that the Proposed Class improperly includes people who were foreseeably arrested.  Memo in Opp. Class Cert. 14–15, ECF No. 35.  While Defendant is arguably correct that some arrests are more foreseeable than others—e.g. someone who attempts to steal a car from the police department's parking garage is more likely to be arrested than someone who committed no crime—foreseeability is an issue for both hospitalized voters and jail-confined voters; therefore, the issue can be handled for both sets of people in the same way.  As explained above, the central issue creating commonality among the class is whether these jail-confined individuals are entitled to be treated equally with hospital-confined individuals for purposes of applying for an absentee ballot.  Currently, hospital-confined individuals are required to affirm on their absentee ballot application that they or their children are confined in the hospital "as a result of an accident or unforeseeable medical

emergency." Nothing prevents Defendant from including a similar affirmation on the application for jail-confined individuals. In fact, that is just what the prior Secretary of State did when he was ordered to make absentee voting available to jail-confined voters in *Fair Elections Ohio v. Husted*, 47 F. Supp. 3d 607 (S.D. Ohio 2014). He developed an absentee ballot application for jail-confined voters that included as a reason for requesting the application that the individual was "confined in the county jail due to an unforeseeable arrest." *See* Plaintiffs' Mot. Summ. J. Ex. 27, ECF No. 55-29. Even someone who could not legitimately certify that he was unforeseeably arrested is properly in the class, because the question is whether he is entitled to be provided the same application with the same restrictions as a similarly-situated hospital-confined individual.

Second, Defendant contends that the Proposed Class includes people who can meet Ohio's absentee deadline. Memo in Opp. Class Cert. 15–16, ECF No. 35. As discussed later, even for a member of the Proposed Class who is able to meet the current deadline, the earlier cutoff for jail-confined individuals compared to hospital-confined voters still creates some burden. And the common issue of whether Defendant is justified in treating hospital-confined individuals differently than jailed individuals applies to any individuals burdened by the current absentee voting deadlines.

Third, Defendant states that the Proposed Class includes people who have already received an absentee ballot through the mail. *Id.* at 16. While this certainly could be true, again, it is a potential factual difference that does not

defeat commonality for purposes of class certification. Any jailed individual who previously received an absentee ballot still has an interest in resolving the question of whether they are entitled to the same voting deadlines as hospital-confined individuals. Like hospital-confined individuals (who may also have previously received an absentee ballot), jailed individuals will have different factual circumstances, but the common question of whether similarly situated individuals in both groups should be treated equally is at the heart of this lawsuit.

3. Precision of the Class Definition

Defendant's final objection to class certification is that the Proposed Class definition lacks precision because of the inclusion of its fourth requirement—that class members "will remain in detention through close of polls on Election Day." Memo in Opp. Class Cert. 16–19, ECF No. 35. Defendant argues that this portion of the class definition will hamper the ability of election officials to "quickly tell who meets the definition and who does not." *Id.* at 18. Defendant's arguments fails for two reasons.

First, the Sixth Circuit has rejected a requirement of "ascertainability," equivalent to Defendant's precision argument, in the context of a Rule 23(b)(2) class, which Plaintiffs seek. *Cole v. City of Memphis*, 839 F.3d 530, 541–42 (6th Cir. 2016).[11] The Sixth Circuit felt "assure[d]" by the advisory committee's notes

---

[11] Defendant attempts to distinguish *Cole* on the basis that *Cole* "focused on a negative injunction." Memo in Opp. Class Cert. 18, ECF No. 35. However, there is no ambiguity in the language of *Cole* to allow different results in cases involving negative versus

to Rule 23(b)(2) "that ascertainability is inappropriate in the (b)(2) context." *Id.* at

542. "Because the focus in a (b)(2) class is more heavily placed on the nature of

the remedy sought, and because a remedy obtained by one member will

naturally affect the others, the identities of individual class members are less

critical in a (b)(2) action than in a (b)(3) action." *Id.* (quoting *Shelton v. Bledsoe*,

775 F.3d 554, 561 (3d Cir. 2015)). There is no requirement that the Proposed

Class be any more precise (or ascertainable).

Second, Defendant's argument that any requirement that Proposed Class

members remain detained through Election Day will hamper the ability of election

officials to "quickly tell who meets the definition and who does not" rings hollow.

This is not a new problem for election officials, nor is it any different a problem

than that caused by the hospital-confined statute. Under the current statutory

scheme, the deadlines contained in § 3509.08(A) and (B) apply only to those

qualified electors who, "on account of the elector's . . . confinement . . . will be

unable to travel from the elector's home or place of confinement to the voting

booth in the elector's precinct on the day" of the election. O.R.C. § 3509.08(A);

*see also* § 3509.08(B) (stating same for hospital-confined persons). Thus, even

as it stands, election officials must determine, for every application that comes in

under the disabled/confined persons statute (either jail-confined or hospital-

confined), whether that elector qualifies for a ballot due to their expected inability

---

affirmative injunctions. Defendant does not cite any authority suggesting such
ambiguity.

to vote in person.  In other words, if Plaintiffs are granted relief with their

Proposed Class definition, election officials will have to identify individuals who

will remain in confinement only to the same extent they *already must* any time a

ballot comes in under O.R.C. § 3509.08(A) by the existing by 12:00 p.m.

deadline.  Thus, the simple act of carrying this requirement over from the statute

into the class definition creates no new implementation problem for election

officials.[12]

For these reasons, the Court **GRANTS** Plaintiffs' motion for class

certification, ECF No. 29, and certifies the Proposed Class as submitted by

Plaintiffs.

B. Summary Judgment

1. The Standard for Plaintiffs' First Amendment and Equal Protection Claims

Voting is a fundamental and precious right and "[o]ther rights, even the

most basic, are illusory if the right to vote is undermined."  *Wesberry v. Sanders*,

376 U.S. 1, 17 (1964).  On the other hand, "[t]here is no constitutional right to an

absentee ballot," only a right to vote.  *Obama for Am. v. Husted*, 697 F.3d 423,

439 (6th Cir. 2012) (White, J., concurring in part and dissenting in part) (citing

---

[12] To the extent ballots delivered to jail-confined voters under § 3509.08(A) do not already contain it, Defendant could simply add the following affirmation contained on hospital-confined voters' ballots: "I understand that if an absentee ballot is mailed to me and I change my mind and go to my polling place to vote on Election Day, I will be required to vote a provisional ballot that cannot be counted until at least 11 days after Election Day."  Form No. 11-B.

*McDonald v. Bd. of Election Commr's of Chicago*, 394 U.S. 802 (1969)). And,

"there must be a substantial regulation of elections if they are to be fair and

honest and if some sort of order, rather than chaos, is to accompany the

democratic processes." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)

(internal quotation marks and citation omitted). "To achieve these necessary

objectives, States have enacted comprehensive and sometimes complex election

codes. Each provision of these schemes . . . affects—at least to some degree—

the individual's right to vote . . . ." *Id.* "Nevertheless, the state's important

regulatory interests are generally sufficient to justify reasonable,

nondiscriminatory restrictions." *Id.* Indeed, voting regulations do not

automatically trigger strict scrutiny even when they impact the right to vote

because, as the Supreme Court has instructed, "states 'may, and inevitably must,

enact reasonable regulations of parties, elections, and ballots to reduce election-

and campaign-related disorder.'" *Libertarian Party of Ohio v. Blackwell*, 462 F.3d

579, 585 (6th Cir. 2006) (quoting *Timmons v. Twin Cities Area New Party*, 520

U.S. 351, 358 (1997); citing *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

Still, "'[t]he right to vote is protected in more than the initial allocation of

the franchise. Equal protection applies as well to the manner of its exercise.'"

*League of Women Voters v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008) (quoting

*Bush v. Gore*, 531 U.S. 98, 104–05 (2000)). "That is to say, the right of suffrage

is subject to the imposition of state standards *which are not discriminatory* . . . ."

*Harper v. VA. State Bd. of Elections*, 383 U.S. 663, 665 (1966) (internal quotation

marks and citation omitted) (emphasis added); *McDonald*, 394 U.S. at 807 ("[O]nce the States grant the franchise, they must not do so in a discriminatory manner." (citation omitted)).  Thus, "[t]he Equal Protection Clause applies when a state either classifies voters in disparate ways, or places restrictions on the right to vote." *Obama for Am.*, 697 F.3d at 428 (internal citations omitted).

In the face of an equal protection challenge to an election regulation, the Court balances these competing interests, considering the nature of the burden the regulation places on voters when setting the standard of review to apply. "While a rational basis standard applies to state regulations that do not burden the fundamental right to vote, strict scrutiny applies when a state's restriction imposes 'severe' burdens." *NE Ohio Coalition for Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012) (citing *Obama for Am.*, 697 F.3d at 428).

If, however, the Court finds that Plaintiffs' right to vote is burdened but not "severely" burdened, the Court analyzes Plaintiffs' Equal Protection claim under the flexible *Anderson-Burdick* standard.[13]  *E.g.*, *Obama for Am.*, 697 F.3d at 430 ("[W]hen a state regulation is found to treat voters differently in a way that burdens the fundamental right to vote, the *Anderson-Burdick* standard applies." (citations omitted)).

Under the *Anderson-Burdick* test,

---

[13] Defendant recognizes that this Court is bound by *Obama for America*, but he reserves the right to challenge on appeal the notion that challenges to election regulations brought under the Equal Protection clause should be reviewed under the *Anderson-Burdick* framework.  Def. Mot. Summ. J. 31–32 n.2, ECF No. 54.

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789). "There is no 'litmus test' to separate valid from invalid voting regulations; courts must weigh the burden on voters against the state's asserted justifications and 'make the 'hard judgment' that our adversary system demands.'" *Obama for Am.*, 697 F.3d at 429 (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008) (Stevens, J., announcing the judgment of the Court)). "However slight that burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 533 U.S. at 191 (citation omitted).

Moreover, because Plaintiffs raise an Equal Protection claim, Defendant's proffered justification must satisfy *two* requirements. First, he must justify the regulation's restriction of Class members' voting rights, generally.[14] Second, he must justify the regulation's disparate treatment of hospital-confined voters and the confined voters in Plaintiffs' Class. *See Obama for Am.*, 697 F.3d at 432.

> These two strands are part of the same equal protection analysis. If the State merely placed "nonsevere, nondiscriminatory restrictions" on all voters, the restrictions would survive if they could be sufficiently justified. *See Crawford*, 553 U.S. at 190, 128 S. Ct. 1610 (discussing

---

[14] If Plaintiffs had not raised an Equal Protection challenge to the election regulation, the *Anderson-Burdick* analysis would end there.

the application of the *Anderson-Burdick* standard to "reasonable, nondiscriminatory restrictions").  On the other hand, if the State merely classified voters disparately but placed no restrictions on their right to vote, the classification would survive if it had a rational basis.  *See McDonald*, 394 U.S. at 807–09, 89 S. Ct. 1404 (applying rational basis review where no burden on the right to vote was shown).  However, the State has done both; it has classified voters disparately and has burdened their right to vote.  Therefore, both justifications proffered by the State must be examined to determine whether the challenged statutory scheme violates equal protection.

*Obama for Am.*, 697 F.3d at 432.  The Court turns now to applying this standard.

      2.  <u>The Burden on Voting Rights</u>

Under the *Anderson-Burdick* test, the Court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate."  *Anderson*, 460 U.S. at 789.

Plaintiffs contend the Court should define the magnitude of the burden imposed on their right to vote by considering specifically the effect that the absentee-ballot deadline in Ohio Revised Code § 3509.08(A) has on those in the Class.

Defendant, on the other hand, urges the Court to consider the burden that the deadline imposes on all Ohio voters given the myriad other available avenues for voting in Ohio.  When considered in that context (which includes the ability to request a mail-in absentee ballot beginning January 1 of the election year or ninety days before the election day (whichever is earlier) and ending at 12:00

p.m., three days before the election; the ability to vote absentee in person for the twenty-one days preceding the election; and the ability to vote in person on Election Day), Defendant argues, the deadline imposes only a minimal burden on the right to vote. *See* Def. Mot. Summ. J. 17–18, ECF No. 54.

The Supreme Court has recognized that it has not yet "identifi[ed] any litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters." *Crawford*, 553 U.S. at 191. There appears to be a difference in assessing the burden based upon whether a facial or as-applied challenge is lodged. *See, e.g.*, *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) (remanding an as-applied challenge to a Wisconsin voter ID law and stating that, in an as-applied challenge, a plaintiff's contention "that high hurdles for some persons eligible to vote entitle those particular persons to relief" is "potentially sound" because "[t]he right to vote is personal and is not defeated by the fact that 99% of other people can secure the necessary credentials easily.").

On this score, the Court agrees with Plaintiffs. Because this is an as-applied, rather than a facial, challenge to the deadline in § 3509.08(A), the Court should not quantify the severity of the burden by looking at how that deadline affects the ability of all disabled/confined but not hospital-confined persons (all

persons to whom § 3509.08(A) applies) to vote.[15]  Rather, the Court considers
how severely (if at all) the deadline burdens the voting rights of persons in the
Class.

The decision to consider the specific burden on the Class does not fully
explain how the Court should quantify the burden, however.  That is because,
even as it relates to Class members, the parties differ on how the Court should
view the burden caused by the regulation.  Plaintiffs contend that people in the
Class have not yet voted at the time of arrest, cannot meet the § 3509.08(A)
deadline for submitting absentee ballots due to the jail mail system and other
issues with incarceration, and will be unable to vote in person because, by
definition, they will be detained through the close of polls on Election Day.  This
leaves them with no available alternatives to exercise their right to vote.
Therefore, Plaintiffs contend, when assessing the burden imposed on the Class,
the Court must quantify the deadline as imposing a severe burden because the
deadline amounts to a total ban on voting for Class members.  A total ban on
voting requires the Court to apply strict scrutiny, they argue.

Defendant argues that, even considering the burden as it applies to Class
members only, the challenged regulation (§ 3509.08(A)) must be considered in
the context of all voting opportunities that Class members had under Ohio's

---

[15] Or even, because the challenged deadline mirrors the general absentee-voting
deadline for all Ohioans in § 3509.03, how the deadline impacts the voting rights of all
Ohioans.

election framework.  The Court cannot consider only the effect that the deadline has after it has been missed, Defendant contends, or else "potential allegations of severe burden are endless."  *Crawford*, 553 U.S. at 208 (Scalia, Thomas, Alito, JJ., concurring); *see also Citizens for Legis. Choice v. Miller*, 144 F.3d 916, 922 (6th Cir. 1998) ("To accept [Plaintiff's] view, however, every restriction would burden some identifiable group."  (Finding that age ceilings which prevent the election of candidates who have reached a certain age would be deemed a "permanent[], and unfair[] burden" on those plaintiffs who prefer candidates with significant life experience)).  In other words, all as-applied challenges to a deadline, made by someone who missed the deadline and consequently cannot vote, would be subjected to strict scrutiny because that person's right to vote was severely burdened "by the deadline," which Defendant argues cannot be the case.  Rather, when considering the deadline in the entire context of voting opportunities in Ohio that were available to Class members, Defendant argues that the deadline imposes merely a slight burden.

The Court finds that the challenged deadline imposes upon the Class a burden that, although not severe, is not trivial.  The Court agrees that, even though it considers only the burden that the deadline imposes on the Class, it must still consider the deadline in the context of all voting opportunities available to the Class under Ohio's election framework.  To that end, Class members have the same early voting opportunities as everyone else in Ohio, save the ability to vote early in-person from the time of arrest until the end of in-person early voting

on the Monday preceding the election. They thus had opportunities to vote prior to their arrest, and the deadline itself therefore did not bar them from voting. *Cf., e.g.*, *Crawford*, 553 U.S. at 208 (Scalia, Thomas, Alito, JJ., concurring) (supporting the notion that finding a severe burden every time a particular voter is unable to vote after missing a deadline would lead to "endless" allegations of severe burdens); *O'Brien v. Skinner*, 414 U.S. 524, 536–37 (1974) (Blackmun, Rehnquist, JJ., dissenting) ("Line drawing is necessary, . . . and by the very process of line drawing, someone will be left out or treated differently."); *Rosario v. Rockefeller*, 410 U.S. 752, 758 n.7 (1973) (even involuntary failure to meet a deadline does not amount to a denial of the right to vote lest plaintiffs could make such an argument "any time a State imposes a time limitation or cutoff point for registration or enrollment"); *Citizens for Legislative Choice*, 144 F.3d at 922.

Moreover, Ohio law does not disenfranchise someone until they are convicted of a felony, which is why the election scheme provides confined pretrial detainees and those convicted of a misdemeanor the opportunity to submit a request for an absentee ballot. The deadline in § 3509.08(A) simply dictates when that request must be received. Some people in the Class may be unable to meet that deadline, but it has not been established that all Class members will be unable to meet the deadline. For instance, Plaintiffs argue that the statute requires absentee ballot requests to be received by mail if they are submitted between 6:00 p.m. on the Friday before the election and 12:00 p.m. on the Saturday before the election, but § 3509.08(A) does not contain such a

restriction.  Rather, the statute uses passive language, stating only that the

application must be "delivered to the director" by 12:00 p.m. on the Saturday

preceding the election, O.R.C. § 3509.08(A), and Directive 2017-02 states that

"[a] request in writing in any form, a verbal request in person or by phone, or the

completion of some manner of automated form of application (telephonic or web-

based) initiated by an individual voter constitutes a proper request for an

absentee ballot application and is not prohibited."  Directive 2019-14 at 5-2.[16]

And, as discussed earlier, Defendant has taken the position that the Ohio

Revised Code allows absentee ballot applications to be submitted in person by a

family member or friend.  Plaintiffs have failed to present evidence that no

Proposed Class member will be able to take advantage of any of these methods

and timely submit an application under the current deadline.

---

[16] This provision, however, is itself inconsistent with both the language of O.R.C.
§ 3509.03(A) ("[A]ny qualified elector desiring to vote absent voter's ballots at an
election shall make written application for those ballots . . . ."); § 3509.08(A) (stating that
any qualified confined elector "may make application in writing for an absent voter's
ballot."); and § 3509.08(B) (stating that qualified electors confined to a hospital may
apply "in writing") as well as the remaining provisions in the directive, Directive 2019-14
at 5-2 (requiring a signature as part of the application); *id.* at 5-4 ("To cast an absentee
ballot by mail, voters apply using . . . any written application . . . ."); *id.* at 5-11 (confined
voters apply with "any written application"); *id.* at 5-12 (hospital-confined voters may use
"any written application"); *id.* at 5-20 ("Non-UOCAVA absentee ballot applications must
be mailed or delivered to the Board of Elections in person.  A Board may not accept or
process a non-UOCAVA absentee ballot application received by fax or e-mail.").  Thus,
at the very least, there is an issue of fact as to whether any Class member could meet
the deadline contained in § 3509.08(A), either because they could submit the
application via fax, email, phone call, etc., or because their jail's policies would not
prevent a family member from delivering the application to the class member and then
to the Director by the deadline.  Because the Court finds that the deadline imposes a
burden even if some class members can meet the deadline, and that the State has
failed to justify its disparate treatment, this issue of fact need not be resolved.

Because Class members had various other opportunities to vote prior to their arrest and theoretically could still vote under the challenged regulation by submitting their request for an absentee ballot by the deadline, the deadline does not constitute a severe burden.

But, it is also not a slight burden. For those in the Class who cannot meet the deadline, no practicable alternative to vote remains. Those people "will in fact be precluded from voting" if not granted the additional time to submit requests for absentee ballots. *Obama for Am*, 697 F.3d 431; *id.* at 433 (finding a moderate burden likely existed, in a facial challenge, when a particular subset of early voters would probably be precluded from voting if deprived of the extra voting time given to military voters, even though alternative methods of voting existed). And, importantly, this case is unlike *Rosario*, where the plaintiff knew of a deadline in advance and its failure to meet the deadline was within its control, or even *Obama for America*, where the voters knew of the shortened in-person voting deadline in advance and could attempt to take advantage of other voting opportunities. In this case, the Class are all persons who anticipated either being able to meet the general absentee ballot deadline (i.e., having unrestricted access to paper, pens, envelopes, stamps, the mail, etc.) or being able to vote in person on Election Day. Their inability to do so was due to State action—their arrest. Thus, for those Class members who have no means to submit an absentee ballot request by the deadline, "it is the State which is both physically preventing appellants from going to the polls and denying them alternative

means of casting their ballots."  *O'Brien*, 414 U.S. at 533 (Marshall, Douglas, Brennan, JJ., concurring); *cf. Libertarian Party of Ohio*, 462 F.3d at 585–86 (considering the burden caused by the overall State action—the combined effect of the challenged regulations).  The deadline is thus some burden on Class members' right to vote.

Even for any Class members who are able to meet the current deadline by having, for instance, a family member or friend submit an application, the regulation is still some burden.  Due to the inherently short timeframe between arrest and the deadline for those in the Class, meeting the deadline will likely require extraordinary efforts—efforts Class members must make during their first hours of incarceration and at the expense of focusing on their legal cases, acclimating to incarcerated life, etc.—in order to exercise their right to vote.

Considering the likely significant impact of the restriction given the realities of life for incarcerated individuals, the Court concludes that the deadline creates a burden that falls between slight and severe.[17]  The Court recognizes that this

---

[17] Other Supreme Court cases addressing jail voting are only of limited help to assessing the severity of the burden at issue here because they were decided pre-*Anderson-Burdick* and involve the complete denial of absentee ballots rather than a deadline for submitting applications for absentee ballots.  *See McDonald*, 394 U.S. 802 (applying, pre *Anderson-Burdick*, rational basis review to the refusal to grant absentee ballots to detainees because the record lacked evidence that the detainees had no alternative means of voting and, thus, failed to show that the denial of absentee ballots had any impact on their fundamental right to vote); *Goosby v. Osser*, 409 U.S. 512 (1973) (finding, pre *Anderson-Burdick*, that *McDonald* did not render "wholly insubstantial" a claim that state election laws absolutely denied detained persons the

conclusion differs from the conclusion in a previous opinion of this Court, *see Fair Elections*, 47 F. Supp. 3d at 614 ("The character and magnitude of Plaintiffs' alleged injury is the complete deprivation of the voting rights of late-jailed voters."), but believes the difference is warranted because evidence changes from case to case, and the evidence submitted in this case does not show that every Class member will be unable to meet the existing deadline.

### 3. The State's Justifications

The Court's characterization of the burden as more than trivial means that not just any justification proffered by the State will suffice. Indeed, the Supreme Court has cautioned time and again that "[h]owever slight [the] burden may appear, . . . it must be justified by *relevant* and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (internal quotation marks and citation omitted) (emphasis added). And the Supreme Court has reiterated, post *Anderson-Burdick*, that although "'evenhanded restrictions that protect the integrity and reliability of the electoral process itself' are not invidious and satisfy the standard set forth in *Harper*," "even rational restrictions on the right to vote are invidious if they are unrelated to voter

---

right to vote but not considering such a claim on the merits); *O'Brien*, 414 U.S. at 530 (pre *Anderson-Burdick*, as-applied challenge finding that absentee registration and voting laws that covered some categories of voters but not detainees confined in their own county of residence amounted to a "'severe . . . burden on the . . . exercise of the franchise'" and violated Equal Protection (quoting *Rosario*, 410 U.S. at 760)).

qualifications." *Crawford*, 553 U.S. at 189–90 (quoting *Anderson*, 460 U.S. at 780, 788 n.9).

Defendant offers two justifications for the deadline contained in O.R.C. § 3509.08(A): (1) it imposes only a slight burden on all Ohio voters; (2) it serves a compelling election-administration need. As shown below, these justifications are relevant only to the first requirement that was previously discussed and are not relevant to the second requirement—the need to justify the State's disparate treatment of two similarly situated groups of voters. *See supra*.

### a. Slight Burden

Defendant's first justification can be summarily dismissed because as-applied challenges do not require that a substantial number of a State's voters be affected. (*See* discussion, *supra* III.B.2, distinguishing between as-applied and facial challenges).[18] For the Class, the burden is more than slight. Also, the severity of a burden is not itself a justification for that burden. Even if the burden was slight, it would still need to be justified and cannot be justified on the basis that it is only a slight burden—that reasoning would be entirely circular.

### b. Election Administration

Considering Defendant's next justification—the administrative need for deadlines—, the Constitution and case law clearly establish that "States may

---

[18] For the same reasons, the Court does not need to rely on Plaintiffs' expert, Dr. Salling, and therefore **DENIES AS MOOT** Defendant's *Daubert* Motion challenging Dr. Salling's expert testimony. Mot. to Exclude, ECF No. 53.

Case No. 2:18-cv-1376                                                    Page 35 of 46

prescribe '[t]he Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections." *Burdick*, 504 U.S. at 433 (citations omitted). To that end, the Court does not question a State's need to put a reasonable deadline on the opportunity to request an absentee ballot. Indeed, there is no absolute right to an absentee ballot, *see McDonald*, 394 U.S. at 807 (finding the fundamental right to vote does not extend to a fundamental right to receive an absentee ballot), and given all of the Election Day responsibilities of Boards of Elections, *see* Def. Mot. Summ. J. 23–29, ECF No. 54, there must be a workable deadline. And a generally applicable deadline that applied to all would-be absentee voters would likely survive the *Anderson-Burdick* analysis, even if it resulted in disenfranchisement for certain incarcerated individuals.

However, such a justification is not responsive to the disparate treatment problem. Defendant repeats throughout his briefing that "reasonable, generally applicable elections rules pass" the *Anderson-Burdick* test, *see e.g.*, Def. Reply 2, ECF No. 68, and that is true insofar as general burden-on-the-right-to-vote challenges go. But the regulation challenged here is *not* generally applicable because it contains a different deadline for hospital-confined voters, and Plaintiffs lodge an Equal Protection challenge in addition to arguing that the deadline is itself an unconstitutional burden on the right to vote.

Even if Election Day duties of county Boards prevent their ability to accommodate an extended deadline to all voters and justify the need for a workable deadline for submission of absentee ballot applications, such a fact therefore does not itself justify the *differing treatment* of the two groups of confined voters at issue in this as-applied challenge.  At least in an as-applied challenge, whenever differing treatment imposes a burden on the voting rights of a defined class of eligible voters, rational basis does not apply, and the legislature cannot simply grant one class of voters more favorable voting terms because the legislature values their votes over the votes of others.  There must be another reason to justify the differing treatment.  This is true even if the deadline would have been constitutional had it been equally applicable.  *See League of Women Voters*, 548 F.3d at 476 ("The right to vote includes the right to have one's vote counted on equal terms with others." (citation omitted)); *id.* at 477 ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." (citation omitted)); *see also Obama for Am.*, 697 F.3d at 435 ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all *relevant* respects alike." (internal quotation marks and citation omitted) (emphasis in original)).

To that end, Defendant offers only two arguments justifying the disparate treatment itself: (1) an argument that Class members and hospital-confined

voters are not similarly situated for Equal Protection purposes; and (2) a contention that line drawing is necessary any time special accommodations are made for one class of voters. Neither prevails.

### c. Similarly Situated

In arguing that Class members and hospital-confined voters are not similarly situated, Defendant first relies on *McDonald* for the proposition that a State can extend absentee voting privileges to one group and not another without violating the Equal Protection clause. *See* Def. Mot. Summ. J. 33, ECF No. 54 (citing *McDonald*, 394 U.S. at 803–04). This comparison is problematic, though, because *McDonald* was decided pre *Anderson-Burdick* and because the Supreme Court's decision rested on a lack of evidence that the denial of an absentee ballot impacted the voting rights of the detainees. *See McDonald*, 394 U.S. at 807–09. It is inapposite to this case because the Court has found the challenged regulation burdens the voting rights of Class members.

Defendant next argues that there are major differences between hospitals and jails and that hospital-confined and jail-confined voters are not similarly situated in all aspects relevant to voting. He relies on common knowledge that "jails and hospitals are distinctly different facilities." Def. Mot. Summ. J. 36, ECF No. 54. Defendant argues that it is purportedly easier and faster to locate hospital-confined voters than jail-confined voters. *Id.* at 36–37. Defendant further relies on Lieutenant Fisher's testimony to demonstrate that inmate voting is difficult. Fisher Dep. 57–58, ECF No. 55-27 (explaining the process for jailed

voting in Butler County, including the various hassles of locating the inmate and making a contingency plan if the inmate is out at court or a doctor's appointment).

But many of the reasons proffered, such as locating the individuals in a certain facility and making sure they are available when the Board officials arrive to deliver the ballot, do not adequately justify imposing different deadlines for submitting an absentee ballot application.  The differences between how long a Board of Elections official waits to locate an inmate versus a voter confined to a hospital when attempting to *deliver* the ballot, for example, are not pertinent to whether the State is justified in imposing different deadlines for the *application* for a ballot.

In any event, these groups are similarly situated when it comes to voter availability.  Just as jail-confined voters may be in court or at a doctor's appointment when the Board of Elections official attempts to deliver the ballot, a hospital-confined voter may be in an x-ray room, having other tests run, or be in the middle of a discussion with the doctor.  And if the voter is confined due to his or her minor child's condition, the voter may even be in the hospital cafeteria or another area of the hospital entirely.  The point is, both types of confined absentee voters *could* be away from their rooms when the Board of Elections

officials attempt to deliver the ballot,[19] but that is not relevant to whether the differing deadlines for submitting applications for a ballot are justifiable. To the extent Defendant must also equalize treatment in the provision of the absentee ballots to the two groups—a question beyond the scope of this suit—Defendant could do so by, for example, directing the officials to wait for the same amount of time for each voter or by calling the hospital and jail in advance of the visit and requesting that the voter be made available.

Defendant also cites to the fact that election officials must undergo background checks to gain access to the inmates and that presenting inmates with ballots creates a risk of contraband coming into the jails that is not a concern for hospital-confined voters. Trowbridge Dep. 72–73, 112–13, ECF No. 55-23. Specifically, Defendant argues that jailed voters are not similarly situated to hospital-confined voters because the background checks required to permit Boards of Elections officials into a jail could take a week or longer to complete (which is not an issue when entering hospitals) and because paperclips or other items could be used as weapons by inmates (a concern that also does not exist for hospital-confined persons). *See* Def. Mot. Summ J. 38, ECF No. 54 (citing

---

[19] In any event, at least one employee testified that, at the Franklin County Jail, there has never been any difficulty locating an inmate when it was time to cast his or her ballot. Saxon Dep. 77:20–78:2, 79:5–8, ECF No. 55-22. In fact, the jail employees escort each inmate to a predetermined voting location within the facility so that the inmates are ready when the Board employees arrive. *Id.* at 78:13–21. Butler County Jail also coordinates a predetermined voting time with the county Board of Elections, and jail employees also escort those inmates who have requested absentee ballots to a voting location at the appropriate time. Fisher Dep. 60:14–67:9, ECF No. 55-27.

Trowbridge Dep. 72–73; 112–113 for the background check timeframe); *see also* Def. Mot. Summ. J. 38, ECF No. 54 (discussing contraband concerns).

But because election officials already undergo whatever background checks are necessary, and jails already deal with the security risks of bringing ballots into jails, these concerns are irrelevant to the *timing* issue that is at the heart of this case. In other words, when a detainee is confined within their own county of residence, Ohio law already requires the absentee ballot to be hand delivered to the detainee by two Board employees belonging to the two major political parties who then deliver the completed ballot back to the Board of Elections. O.R.C. § 3509.08(A). Thus, Boards of Elections and jails already must deal with whatever security concerns arise in connection with that procedure. The only change Plaintiffs seek is that the entire process be shifted from before 3:00 p.m. on Election Day to after 3:00 p.m. on Election Day. Defendant has not cited anything about the security concerns themselves that explains why the Boards of Elections representatives could not still undergo the same procedures they already undergo and simply arrive with the ballots at a later date.[20]

---

[20] Defendant did not argue (or offer any evidence) that Ohio can justify the different deadlines on the basis that one manner of delivering the ballot to hospital-confined voters who submit an application by 3:00 p.m. on Election Day is by having a family member deliver the ballot to the hospital-confined voter (whether the hospital-confined voter is hospitalized within or outside of their county of residence) and that the local Boards of Elections would not have the resources to accommodate ballot requests submitted by the 3:00 p.m. Election-Day deadline without that method of delivery. The Court cannot ignore the fact that the security concerns presented by delivering voting

Similarly, as for concerns about introducing contraband, jail-confined voters are already provided ballots and the necessary equipment to vote them, and there has been no evidence that a jail has refused to make a jail-confined voter available to vote due to concerns about contraband. Nor has Defendant offered evidence concerning a single security incident during inmate-voting.[21] Thus, the security concerns regarding handing a ballot to jail-confined and hospital-confined voters do not prevent the voters from being similarly situated.

In sum, Defendant has failed to show that, when it comes to absentee voting, hospital-confined voters and Class members are not similarly situated in the relevant respects. The Court finds they are similarly situated. Both groups are eligible voters who, for whatever reason, did not take advantage of the available early voting opportunities, expected to be able to vote in the remaining days leading up to Election Day or on Election Day itself, unforeseeably became confined, and must submit an absentee ballot in order to exercise their right to vote. Boards of Elections officials already have access to both groups of voters,

_____

materials to jail-confined voters could justify refusing to permit family members to deliver ballots to jail-confined voters. Defendant might have shown that, without being able to offer the same manner of delivering ballots to jail-confined voters as to hospital-confined voters, the local Boards of Elections would be unable to accommodate requests submitted by 3:00 p.m. on Election Day for, for example, voters confined to a jail outside their county of residence, but he did not. Accordingly, and because the Court is not applying rational basis review, the Court does not find the security concerns justify the differing *deadlines*. The Court is concerned, however, with ensuring that any remedy designed to offer the same deadline for submitting absentee ballot applications to Class members and hospital-confined voters accounts for such security concerns when it comes to prescribing the methods for delivering the absentee ballots to Class members.
[21] In fact, there have been no security incidents during the process of voting inmates at the Franklin County Jail. Saxon Dep. 80:2–5, ECF No. 55-22.

and protocols already exist for voting both groups of voters.  The only current, relevant difference is the time they must submit their applications, which is the difference under challenge.

   d. Line Drawing

Defendant argues that anytime the State decides to offer special treatment to a particular class of voters, line drawing is necessary.  For instance, in this case, he contends, the special treatment cannot practically be granted to all voters who fail to vote early and suddenly find themselves unable to vote in person on Election Day.  Indeed, if it was granted to all such persons, it would cease to be special treatment at all.

The Court agrees that Boards cannot be expected to "personally deliver . . . absentee ballots to anyone with a good excuse up until 3 p.m. on Election Day," Def. Mot. Summ. J. 34, ECF No. 54, and election regulations need not account for all of life's vagaries.  But where election regulations impose a burden on voting rights, the Equal Protection clause prevents the State from granting special treatment to one class of voters who failed to take advantage of early voting and unexpectedly find themselves unable to vote on Election Day without extending that same treatment to similarly situated voters unless there is a sufficiently weighty justification for singling out the category for whom special

treatment *is* given.[22]  But the fact that the State cannot give special treatment to all does not justify the decision to give special treatment to one group in the first place, if a burden is found to exist.  Thus, Defendant's line-drawing argument does not save the day because it neither provides a justification for treating similarly situated confined voters differently under the law nor explains why the Class and hospital-confined voters are not similarly situated.  Defendant's argument that other people will ask for the same treatment if the Court grants relief in this case is not a justification for the disparate treatment at issue here.[23]

## IV.    CONCLUSION

At bottom, Defendant has not presented any reason that justifies offering a more generous deadline for submitting absentee ballot applications only to hospital-confined voters except the Ohio legislature's potential determination that such a group is "particularly worthy" and therefore entitled to greater access to the ballot than those in the Class (or, indeed, other absentee voters).  Def. Mot. Summ. J. 35, ECF No. 54.  But hospitalized persons *are not* more worthy of

---

[22] Defendant's argument that other States provide similar exceptions for people who are hospitalized or face a medical emergency is therefore also not persuasive.  First, the Court has not found that any of the other State's laws have been upheld on an Equal Protection challenge.  Second, the parties have not provided full context for those laws.  For example, those other states very well might provide an extension to the deadline for submitting absentee ballot applications for hospitalized persons but elsewhere in the state regulations provide an alternative means for incarcerated persons to vote.  Or those states' regulations may not render the two classes of voters similarly situated.  For this reason, the mere fact that other states have exceptions for certain classes of voters does not persuade the Court that Ohio's scheme is constitutional.

[23] Indeed, if other voters are burdened by the regulations and truly are similarly situated in all relevant aspects, the State would have to justify the failure to extend the deadline to such voters (or failure to eliminate it for all).

additional voting privileges under our Constitution than jail-confined persons, and offering greater access to the ballot *simply* because the legislature values the former's votes over the latter's is exactly what the Equal Protection clause forbids. *See Obama for Am.*, 697 F.3d at 435 ("Equally worrisome would be the result if states were permitted to pick and choose among groups of similarly situated voters to dole out special voting privileges."). As in *McDonald*, it is Ohio's "willingness to go further than many States in extending the absentee voting privileges . . . that has provided [Plaintiffs] with a basis for arguing that the provisions" violate Equal Protection. *See McDonald*, 394 U.S. at 810–11. But, unlike in *McDonald*, these Plaintiffs have shown that the disparate treatment burdens their fundamental right to vote, and Defendant has failed to justify the disparate treatment. Accordingly, Plaintiffs have established an Equal Protection violation and are entitled to summary judgment.[24]

## V.    REMEDY

Despite the narrow challenge to the differing absentee ballot application deadlines and the limited briefing in this case, Plaintiffs seek broad relief and request that the Court order Defendant to treat Class members and hospital-confined voters exactly alike in all respects. They also seek relief geared toward fixing perceived problems within the specific facilities of incarceration. Pls.' Mot.

---

[24] Indeed, even if the regulations impose only a minimal burden on the Class's right to vote, the State has failed to justify the disparate treatment between the two groups of similarly situated confined voters such that the regulations would still violate the Equal Protection clause.

Summ. J. 33, ECF No. 55. The Court declines to opine on Equal Protection issues that were not fully briefed in this case and is mindful that the Secretary of State's reach is not without limit. Thus, in crafting relief, the Court cannot and will not instruct the Secretary of State to exceed his authority. To the extent Plaintiffs ask for any relief that falls outside the bounds of this lawsuit and ruling—for example, changes to jail-voting policies or equal treatment beyond the deadline for submitting absentee ballot requests—such relief is either beyond the scope of Defendant's authority or this equal protection ruling.

Instead, the Court hereby Orders the following:

A. Defendant is **ENJOINED** from imposing a different deadline for the delivery of absentee ballot applications for Class members than for hospital-confined voters.

B. Unless and until the Ohio legislature equalizes the deadlines for delivering absentee ballot applications for those (at least) in the Class and hospital-confined voters, Defendant shall **DIRECT** Ohio's various Boards of Elections to accept an application for an absentee ballot that is properly delivered by or on behalf of a Class member by 3:00 p.m. on Election Day.

**IT IS SO ORDERED.**

_____ */s/ Michael H. Watson* _____
**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**