# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  March 03, 2020

Ms. Naila S. Awan
Kathryn C. Sadasivan
Demos, 80 Broad Street, Fourth Floor
New York, NY 10004

Mr. Chiraag Bains
Demos, 740 Sixth Street, N.W., Second Floor
Washington, DC 20001

Mr. Jonathan Diaz
Mr. Mark Gaber
Ms. Danielle Marie Lang
Ms. Dana Paikowsky
Campaign Legal Center, 1101 14th Street, N.W., Suite 400
Washington, DC 20005

Mr. Benjamin Michael Flowers
Mr. Michael Jason Hendershot
Mr. Zachery P. Keller
Ms. Ann Yackshaw
Office of the Attorney General
30 E. Broad Street, 16th Floor
Columbus, OH 43215

Mr. Jonathan M. Manes
MacArthur Justice Center
160 E. Grand Avenue
Sixth Floor
Chicago, IL 60611

Re:  Case No. 19-4112, *Tommy Mays, II, et al v. Frank LaRose*
Originating Case No. : 2:18-cv-01376

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue herewith

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0068p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

TOMMY RAY MAYS, II and QUINTON NELSON SR.,
individually and on behalf of all others similarly
situated,

*Plaintiffs-Appellees,*

*v.*

FRANK LAROSE, in his official capacity as Secretary of
State of Ohio,

*Defendant-Appellant.*

No. 19-4112

─────────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:18-cv-01376—Michael H. Watson, District Judge.

Argued: February 13, 2020

Decided and Filed: March 3, 2020

Before: MERRITT, THAPAR, and NALBANDIAN, Circuit Judges.

─────────────────

### COUNSEL

**ARGUED:** Zachery P. Keller, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus,
Ohio, for Appellant.  Mark P. Gaber, CAMPAIGN LEGAL CENTER, Washington, D.C., for
Appellees.  **ON BRIEFS:** Zachery P. Keller, Benjamin M. Flowers, Michael J. Hendershot,
Ann Yackshaw, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for
Appellant. Mark P. Gaber, Danielle M. Lang, Jonathan M. Diaz, Dana Paikowsky, CAMPAIGN
LEGAL CENTER, Washington, D.C., Naila S. Awan, Kathryn C. Sadasivan, DĒMOS, New
York, New York, Chiraag Bains, DĒMOS, Washington, D.C., Jonathan Manes RODERICK
AND SOLANGE MACARTHUR JUSTICE CENTER, Chicago, Illinois, for Appellees.

No. 19-4112                          *Mays v. LaRose*                          Page 2

―――――――――――――

**OPINION**

―――――――――――――

NALBANDIAN, Circuit Judge.  There is no dispute that Ohio is generous when it comes to absentee voting—especially when compared to other states.  Any registered voter may cast their vote by absentee ballot, for any reason or no reason at all, starting about a month before election day. But there are limits.  The State requires almost all registered voters to request an absentee ballot by noon, three days before Election Day.  The lone exception is for unexpectedly hospitalized electors.  Those electors may request an absentee ballot until 3 p.m. on Election Day.

Here, police arrested Plaintiffs Tommy Ray Mays, II and Quinton Nelson Sr. the weekend before Election Day 2018.  Foreseeing their confinement lasting through the upcoming election, and with no other way to vote, they sued Ohio's Secretary of State for access to absentee ballots.  They brought this suit on behalf of themselves and a class of similar individuals.  The suit alleges an Equal Protection claim, challenging the State's disparate treatment of hospital-confined and jail-confined electors, and a First Amendment claim, challenging Ohio's absentee ballot request deadline, both as applied to unexpectedly jail-confined electors.  The trial court granted both plaintiffs a temporary restraining order that permitted them to vote in November 2018.  But the court declined to extend that relief to the class.

Following the November 2018 election, Plaintiffs requested class certification and both sides moved for summary judgment.  The district court certified the class and granted summary judgment for Plaintiffs and those similarly situated, holding that the burden Ohio's disparate treatment of hospital-confined and jail-confined electors places on Plaintiffs' right to vote is not justified by a strong enough State interest.  We disagree and now REVERSE the district court's grant of summary judgment to Plaintiffs, REVERSE the district court's denial of summary judgment to LaRose, and REVERSE the district court's certification of a class.

No. 19-4112                          *Mays v. LaRose*                          Page 3

## I. Background

Police arrested Nelson around 10 p.m. on Friday, November 2, 2018.  The next day, Saturday, November 3, 2018, police arrested Mays shortly after 7 p.m.  Neither Mays nor Nelson had taken advantage of Ohio's early in-person or absentee voting opportunities and both Plaintiffs declared that they intended to vote in-person on Election Day.  But neither Plaintiff could post bail.  And after their arraignments both Plaintiffs realized they would remain in jail through Election Day—meaning they would be unable to vote in-person on Election Day.  Mays asked jail officials if the State would allow him to vote but he never received an answer.  Nelson never asked anyone at the jail if he could vote but he testified that even after the booking process was complete, he had no access to mail supplies, outside visitors, or any other way to contact the Board of Elections.

Under Ohio law, registered voters ("electors") have three options for casting their vote. Any elector, including non-felon jail-confined electors, may vote absentee, so long as they deliver their request for an absentee ballot to the Board of Elections by noon, three days before Election Day.[1]  Ohio Rev. Code Ann. §§ 3509.02, 3509.03.  There is a single exception to this otherwise generally applicable deadline: electors who themselves, or whose minor children, are hospitalized because of an unforeseeable accident or medical emergency that occurs after the deadline has passed may request an absentee ballot until 3 p.m. on Election Day. Ohio Rev. Code Ann. § 3509.08(B); (R. 55-34, Ohio Election Office Manual at PageID # 3016.)  And electors may vote in person, either at their designated polling place on Election Day or during the early voting period at each county's designated early voting center.[2]  Ohio Rev. Code Ann. §§ 3501.32, 3509.051.

By Election Day morning, Plaintiffs realized they had no remaining option to vote.  So they sued Ohio's Secretary of State ("the Secretary") on behalf of themselves and similarly

---

[1]Electors may begin submitting absentee requests as early as January 1 of the election year or ninety days before Election Day, whichever is earlier. Ohio Rev. Code Ann. § 3509.03(D).

[2]In-person early voting begins the day after voter registration closes. It runs for around four weeks through the day before Election Day and includes opportunities to vote in the evenings and on weekends.  (R. 55-34, Ohio Election Official Manual at PageID # 3010–12); *see also Obama for America v. Husted*, 697 F.3d 423, 426–28, 437 (6th Cir. 2012).

situated jail-confined electors.[3]  They alleged that Ohio's refusal to allow jail-confined electors to request an absentee ballot on the same terms as hospital-confined electors violates the Equal Protection Clause of the federal Constitution's Fourteenth Amendment.  They further alleged that Ohio's generally applicable deadline for requesting absentee ballots violates the First Amendment's guarantee of the right to vote, as applied to jail-confined electors with no other way to vote.  Last, Plaintiffs sought to certify a class under Federal Rule of Civil Procedure 23, seeking relief for all jail-confined electors who the State arrested after close of business on the Friday before the election, who had not voted early, and who would remain in jail through Election Day.

The district court granted a temporary restraining order against the Secretary, requiring him to provide absentee ballots to Mays and Nelson on Election Day.  Following discovery, both parties moved for summary judgment.  The district court certified the Plaintiffs' proposed class, granted the Plaintiffs' motion for summary judgment on their Equal Protection claim, and denied the Secretary's motion for summary judgment.  The Secretary appeals.

## II.  Standing

"Every federal appellate court has a special obligation to assure itself . . . of its own jurisdiction[.]"  *Alston v. Advanced Brands & Importing Co.*, 494 F.3d 562, 564 (6th Cir. 2007) (citation omitted).  So we directed the parties to address Plaintiffs' standing in supplemental briefing.  They agree that Plaintiffs have standing to bring their claims.  And for the most part they are correct.

Article III imposes three standing requirements for plaintiffs in federal court: an injury-in-fact, causation, and redressability.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  The only one that raises concerns here is causation.  That requirement is met when there is a causal connection between a plaintiff's injury and the conduct complained of, that is, the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Id*. (cleaned up).  Because a

---

[3]Plaintiffs originally named Jon Husted as Defendant.  Frank LaRose succeeded Husted as Secretary of State of Ohio in January 2019 and accordingly replaced Husted as Defendant.

combination of Ohio's deadline for requesting an absentee ballot and the State's confinement of Plaintiffs caused their inability to vote, Plaintiffs have standing to bring their claims.

The Secretary concedes police arrested Mays after the deadline to request an absentee ballot had passed, that he asked jail officials if he could vote from jail, and that he could not post bail and remained in jail through Election Day.  (Appellant's Suppl. Br. at 1–2.)  Whether Mays actually requested an absentee ballot once jailed is immaterial because any such request would have been futile.  Ohio law sets a deadline of noon, three days before Election Day for any elector to request an absentee ballot.  Ohio Rev. Code Ann. §§ 3509.02, 3509.03.  While the State allows unexpectedly hospital-confined electors an extended deadline, that exception does not apply to unexpectedly jail-confined electors.  Ohio Rev. Code Ann. § 3509.08(B); (R. 55-34, Ohio Election Office Manual at PageID # 3016.)  So by the time police arrested Mays, he had no way to request an absentee ballot under Ohio law.  And because the State confined Mays through Election Day, he could not vote in-person, either early or on Election Day.

When doing so would be futile, Article III does not require plaintiffs to take actions simply to establish standing.  *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988); *Clements v. Fashing*, 457 U.S. 957, 962 (1982); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365–66 (1977).  Whether Mays asked to vote absentee from jail is irrelevant because at the time police arrested Mays, Ohio law dictated that there was no way for him to request an absentee ballot.  So it was the State's absentee ballot request deadline and confinement of Mays that caused his inability to vote.

The Plaintiffs are not similarly situated, however, with regard to the Equal Protection issue.  Ohio law treats hospital-confined and jail-confined electors differently: the State gives unexpectedly hospital-confined electors an extended deadline to request an absentee ballot but does not do the same for unexpectedly jail-confined electors.  Ohio Rev. Code Ann. § 3509.08(B); (R. 55-34, Ohio Election Office Manual at PageID # 3016.)  Any elector jailed during this same window must comply with the normal deadline.  Mays falls within the class of electors affected by this policy.  Police arrested him around seven hours after the deadline passed.  Had a hospital admitted him at the same time, the State would have allowed him to request an absentee ballot.  But he was in jail, so he could not.  Thus, Mays's inability to vote is

fairly traceable to Ohio's disparate treatment of confined electors and he has standing to challenge that State action.

Nelson's case is a different story. Police arrested Nelson fourteen hours before the deadline to request an absentee ballot. Had a hospital admitted Nelson at the same time, Ohio law still would have required him to comply with the Saturday noon deadline. (*See* R. 55-34, Ohio Election Office Manual at PageID # 3016.) But because "we have at least one individual plaintiff who has demonstrated standing to assert these rights as his own[,] . . . we need not consider whether the other individual . . . [has] standing to maintain the suit." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977). So we proceed to the merits of Plaintiffs' claims.

### III. *Plaintiffs' Equal Protection Claim*

"We review a district court's grant of summary judgment de novo to determine whether there is a genuine dispute as to any material fact." *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020). When there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate. Fed. R. Civ. P. 56(a). In conducting this inquiry, we view all evidence in the light most favorable to, and draw all inferences in favor of, the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The State's interests in efficiently allocating its election resources and administering elections in an orderly manner outweigh the moderate burden its disparate treatment of confined electors places on Mays's right to vote. So summary judgment is appropriate for the Secretary, not Mays.

"[V]oting is of the most fundamental significance under our constitutional structure." *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). "It does not follow, however, that the right to vote in any manner . . . [is] absolute." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). The Constitution explicitly provides State legislatures with authority to regulate the "Times, Places and Manner of holding Elections[.]" U.S. Const. art. I, § 4, cl. 1. So while States can regulate elections, they must be careful not to

unduly burden the right to vote when doing so. The Equal Protection Clause provides one check against any such undue burden. *See McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969) ("[O]nce the States grant the franchise, they must not do so in a discriminatory manner.").

Normally, we evaluate Equal Protection claims using the well known "tiers of scrutiny": facially discriminatory government action requires increasingly important government justification and a much closer means-end relationship as the State's distinctions move from those based on non-protected classes such as economic status, to protected classes such as gender, and on to the most rigorously protected classes such as race. *Compare San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 24–25 (1973), *with United States v. Virginia*, 518 U.S. 515, 532–33 (1996), *and Loving v. Virginia*, 388 U.S. 1, 11–12 (1967). But when a "plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters," this court's precedent requires us to apply the *Anderson-Burdick* framework.[4] *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012).

---

[4]It's unclear whether the Supreme Court ever intended *Anderson-Burdick* to apply to Equal Protection claims. That Court has only applied the framework in the context of generally applicable laws. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190–203 (2008) (Stevens, J., announcing the judgment of the Court) (generally applicable voter identification law); *Burdick v. Takushi*, 504 U.S. 428, 433–34 (1992) (generally applicable prohibition on write-in voting); *Norman v. Reed*, 502 U.S. 279, 288–89 (1992) (generally applicable requirements for ballot access for a new political party); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (generally applicable filing deadline for independent candidates). And in two of those cases, the Court made clear: "we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis." *Anderson*, 460 U.S. at 786 n.7; *Norman*, 502 U.S. at 288 n.8 (same). Further, the Supreme Court has explained *Anderson-Burdick* as a "two-track approach"; strict scrutiny applies when the burden is severe and a deferential balancing analysis applies for "nonsevere, nondiscriminatory restrictions[.]" *Crawford*, 553 U.S. at 204–05 (Scalia, J., concurring). It was this court, in *Obama for America*, that created the three-track approach we now must apply in Equal Protection cases that implicate the right to vote. *See* 697 F.3d at 428–33.

Other courts that have considered Equal Protection claims in the voting context don't apply *Anderson-Burdick*. *See Jones v. Governor of Fla.*, --- F.3d ----, 2020 WL 829347 at *19–67 (11th Cir. Feb. 19, 2020) (per curiam) (conducting an Equal Protection analysis of Florida's felon re-enfranchisement policy with no discussion of *Anderson-Burdick*). And neither did this Circuit in a similar case before *Obama for America*. *See Johnson v. Bredesen*, 624 F.3d 742, 746–50 (6th Cir. 2010) (deciding the same issue as *Jones*, also with no discussion of *Anderson-Burdick*). That makes sense because it's difficult to fit a disparate treatment claim into that framework.

*Anderson-Burdick* first asks us to weigh the magnitude of the burden placed by the State's action on the plaintiff's right to vote. *See Burdick*, 504 U.S. at 433–34. But State action making it easier for some electors to vote—such as providing them an extended deadline to register for absentee ballots—doesn't make it *harder* to vote for electors that don't get the same benefit. Rather, it's the generally applicable absentee ballot deadline that places

No. 19-4112                        *Mays v. LaRose*                        Page 8

Under *Anderson-Burdick*, we first look to the burden the State's regulation imposes on the right to vote. *Burdick*, 504 U.S. at 434; *Obama for Am.*, 697 F.3d at 428. When States impose "'reasonable nondiscriminatory restrictions'" on the right to vote, courts apply rational basis review and "'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)); *see Obama for Am.*, 697 F.3d at 429. But when States impose severe restrictions on the right to vote, such as poll taxes or limiting access to the ballot, strict scrutiny applies. *Burdick*, 504 U.S. at 434 (citing *Norman v. Reed*, 502 U.S. 279, 289 (1992)); *Obama for Am.*, 697 F.3d at 429. It is when cases fall between these two extremes that the *Anderson-Burdick* framework departs from the traditional tiers of scrutiny and creates its own test.

For these intermediate cases, where the burden on the right to vote is moderate, we must weigh that burden against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). Only where the State's interests outweigh the burden on the plaintiff's right to vote do voting restrictions not offend the Equal Protection Clause. *Obama for Am.*, 697 F.3d at 433. While this standard is flexible, we must ultimately "make the 'hard judgment' that our adversary system demands." *Crawford*, 553 U.S. at 190 (Stevens, J., announcing the judgment of the Court).

Turning to this case, we begin by identifying the burden that Ohio's disparate treatment of confined electors places on Plaintiffs' right to vote. Precedent from this court and the Supreme Court suggests that we must evaluate this burden from the perspective of only affected electors and within the landscape of all opportunities that Ohio provides to vote. Viewing the facts this way, we conclude that the burden on Plaintiffs' right to vote is intermediate, somewhere "between slight and severe." (R. 70, Op. & Order at PageID # 4319.)

---

the burden, if any, on Plaintiffs' right to vote. So it takes some legal gymnastics to quantify the "burden" that the State's disparate treatment places on Plaintiffs' right to vote.

The traditional Equal Protection tiers of scrutiny instead focus on how the State chooses to classify its citizens when drawing lines and then imposes differing requirements on the State's justifications for those classifications accordingly. They are thus better suited for analyzing disparate treatment claims—even in the voting context. Nonetheless, we are bound by *Obama for America*, so we apply *Anderson-Burdick*.

All binding authority to consider the burdensome effects of disparate treatment on the right to vote has done so from the perspective of only affected electors—not the perspective of the electorate as a whole.  In *O'Brien v. Skinner*, the Supreme Court considered whether New York's law excluding jail-confined electors from eligibility for absentee ballots violated the Equal Protection Clause.  414 U.S. 524, 525 (1974).  In holding that it did, the Court looked only to the effect of New York's law on jail-confined electors, not on the entire electorate, or even on all electors excluded from eligibility for absentee ballots.  *Id*. at 529–30.  Similarly, in *Obama for America*, this court evaluated whether Ohio's restriction of early in-person voting violated the Equal Protection Clause.  697 F.3d at 425.  In determining that it likely did, we looked only to the burden on electors who were likely to vote during the eliminated times.  *Id*. at 431 (noting that affected electors were "disproportionately women, older, and of lower income and education attainment" and of "lower incomes and less education than election day voters" (internal quotation and citation omitted)).

While Justice Scalia's concurrence in *Crawford* explained that Supreme Court "precedents refute the view that individual impacts are relevant to determining the severity of the burden [State action] imposes [on the right to vote]."  553 U.S. at 205 (Scalia, J., concurring).  He goes on to say that "[s]ubsequent cases have followed *Burdick*'s generalized review of *nondiscriminatory* election laws."  *Id*. at 206 (emphasis added).  And *Crawford* involved a voter identification law that applied non-discriminately to all voters.  *Id*. at 185.  Ohio's absentee ballot request deadline facially discriminates between classes of electors.  And in cases of disparate treatment, courts have always treated the perspective of the burdened elector as the relevant perspective.

Similarly, *Rosario v. Rockefeller* tells us that we must evaluate the burden on disparately treated voters considering all available opportunities to vote.  *See* 410 U.S. 752, 757 (1973).  There, the Court evaluated New York's primary registration system, which required voters to register for party primaries during the preceding general election.  *Id*. at 753–54.  The Plaintiffs were electors who could have registered during the previous general election but did not and then sued because the State excluded them from participating in the successive primary.  *Id*. at 756.  In determining that New York's law placed only a minimal burden on these electors' right to

vote, the Court considered all options provided by the State and held Plaintiffs' failure to register when they had the chance against them:

> The petitioners do not say why they did not enroll prior to the cutoff date; however, it is clear that they could have done so, but chose not to. Hence, if their plight can be characterized as disenfranchisement at all, it was not caused by [the statute at issue], but by their own failure to take timely steps to effect their enrollment.

*Id*. at 758.

The Court did not determine that the State severely burdened or disenfranchised Plaintiffs by looking only to the time after the State's deadline had passed. Rather, it considered all voting opportunities that the Plaintiffs *could have* taken advantage of, even if they were no longer a possibility at the time of litigation. True, *Rosario* predates *Anderson* and *Burdick*. But these early cases still evaluated the burden on affected voters, only without the balancing inquiry that *Anderson* and *Burdick* established. What's more, *Burdick* agrees. *See* 504 U.S. at 436–37 ("[A]ny burden on voters' freedom of choice and association is borne only by those who fail to identify their candidate of choice until days before the primary.").**5**

Considering Ohio's absentee ballot request deadlines from the perspective of unexpectedly jail-confined electors and given the alternative voting opportunities that Ohio provides, the burden those laws place on Plaintiffs' right to vote is moderate. We reserve rational basis review for "reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788. Because Ohio's absentee ballot request deadline facially discriminates between two classes of electors—hospital-confined and everyone else—our precedent dictates that the burden that law places on the right to vote is more than minimal. *See Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 663–65 (6th Cir. 2016) (affirming the district court's finding that Michigan's elimination of straight ticket voting imposed an intermediate burden on the right to vote because that state action "would likely have a larger impact on African-American voters." (internal quotation marks and citation omitted)); *Obama for Am.*, 697 F.3d at 431–32 (rejecting

---

**5**And the Court considered the burden Hawaii's prohibition on write-in voting placed on the Plaintiff's right to vote within the context of all ballot access opportunities the State provided for independent candidates. *See* 504 U.S. at 435–37.

No. 19-4112                              *Mays v. LaRose*                              Page 11

rational basis review in a case involving early voting periods that discriminated between military and non-military electors).

Strict scrutiny is the standard for cases where "the State totally denied the electoral franchise to a particular class of residents, and there was no way in which the members of that class could have made themselves eligible to vote." *Rosario*, 410 U.S. at 758; *see also Norman*, 502 U.S. at 289. Ohio provides all electors the opportunity to vote early. Plaintiffs had around four weeks before their arrest to vote early in-person. Ohio Rev. Code Ann. § 3509.051; (R. 55-34, Ohio Election Official Manual at PageID # 3010–12.) And they had over ten months before their arrest to request an absentee ballot. Ohio Rev. Code Ann. §§ 3509.02, 3509.03. Just as in *Rosario*, Plaintiffs' choice to not participate in the opportunities Ohio provides to vote other than on Election Day was, at least in part, the cause of their inability to vote. *See* 410 U.S. 757.

True, Plaintiffs planned to vote in-person on Election Day and did not foresee their arrest. But any Ohio elector can be called away unexpectedly. *See Obama for Am.*, 697 F.3d at 435 ("any voter could be suddenly called away and prevented from voting on Election Day"). As Justice Blackmun said in *O'Brien*:

> The plight of detainees elicits concern, of course, for a detainee may not be guilty of the offense with which he is charged. Yet the statutes' effect upon him, although unfortunate, produces a situation no more critical than the situation of the voter, just as unfortunate, who on election day is away attending a funeral of a loved one in a distant State. These are inequalities, but they are the incidental inequalities of life, and I do not regard them as unconstitutional.

414 U.S. at 537 (Blackmun, J., dissenting). There are easily several reasons why an elector may be unable to vote in person on Election Day—and the Secretary's briefs list many—but Plaintiffs could have avoided all that uncertainty by taking advantage of the opportunities Ohio provides to vote early. In this regard, the Plaintiffs are no more burdened than any other elector.

Because Plaintiffs are not totally denied a chance to vote by Ohio's absentee ballot deadlines, strict scrutiny is inappropriate. *See Rosario*, 410 U.S. at 757; *see also Norman*, 502 U.S. at 289. Finding the burden these laws place on Plaintiffs between minimal and severe, it is best classified as a moderate burden. So the laws survive if the State's justifications for them outweigh this moderate burden. *See Obama for Am.*, 697 F.3d at 433.

No. 19-4112                          *Mays v. LaRose*                          Page 12

The Secretary puts forth several justifications for Ohio's disparate treatment of confined electors.  He broadly asserts the State's interest in the orderly administration of elections and then lists several interests that fall within this category: "preserving the integrity of the election process, maintaining a stable political system, preventing voter fraud, protecting public confidence, and reducing administrative costs."  (Appellant's Br. at 28–29 (citations omitted)). Justice Stevens's plurality opinion in *Crawford* recognized the relevance and legitimacy of a State's interest in the "orderly administration" of elections.  553 U.S. at 196 (Stevens, J., announcing the judgment of the Court).  And courts have recognized all the subsidiary interests as relevant and legitimate as well.  *See id.* at 197; *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 634 n.8 (6th Cir. 2016).  The Secretary's argument is that the State and its regional election boards possess limited resources devoted to elections.  These election boards have many tasks that they must complete in the days before an election and on Election Day.  If Ohio required its election boards to process absentee ballots from jail-confined electors in the days just before an election and on Election Day, it would frustrate the boards' ability to accomplish these tasks, tasks necessary to preserving the integrity of the election process, maintaining a stable political system, preventing voter fraud, and protecting public confidence—and to a much greater degree than allowing for late applications from hospital-confined electors.

As this court said in *Obama for America*, "the list of responsibilities of the board of elections is long, and the staff and volunteers who prepare for and administer elections undoubtedly have much to accomplish during the final few days before the election."  697 F.3d at 432–33.  The record here supports a similar finding.  During the weekend before an election, each county's board of elections must: authenticate, prepare, and mail absentee ballots; examine, verify, and count completed absentee ballots as electors return them; notify voters who voted incorrectly that they need to correct their ballot; staff early-voting locations; locate, hire, and train poll workers for Election Day; field and respond to questions from poll workers and voters; compile a list of eligible electors who have not voted early; deliver absentee ballots to hospital-confined electors and homebound and jail-confined electors who requested absentee ballots before the deadline; and deliver physical voting equipment, ballots, and supplies to polling locations.  And on Election Day, the boards must oversee each polling place, answer questions

from voters and poll workers, again deliver absentee ballots to hospital-confined electors, and resolve any unforeseen responsibilities that arise.

The Secretary argues that requiring election boards to process late absentee requests from jail-confined electors during the weekend before and on Election Day will prevent the boards from accomplishing the above-listed tasks, which are necessary to achieve all the relevant and legitimate state interests he proffers. As he puts it: "[b]ecause humans are bound by the laws of physics, they cannot be in two places at once, and so many resources dedicated to accommodating jailed voters cannot be spent completing other tasks." (Appellant's Reply Br. at 21.) But the Secretary need not rely on physics or even common sense.

The record shows that the election board in Ohio's third-largest county would need more staff to process late absentee requests from jail-confined electors. And some counties' election boards only operate with two staff members. Boards in small counties such as these could accomplish none of their other tasks while processing and delivering late-requested absentee ballots to jail-confined electors. Further, jail-confined electors are not similarly situated with hospital-confined electors because of the location of their confinement. Board staff that deliver absentee ballots to jails must engage in advanced planning to ensure that they will be able to locate the elector in the jail, pass through the jail's security, and verify that the elector will be present at the jail when they arrive. This advance planning—which would take up time during the already busy pre-election period—is unnecessary to deliver absentee ballots to hospital-confined electors.

And finally, we note that the federal Courts of Appeals have recognized, as a general matter, that "[p]risoners are not similarly situated to non-prisoners." *Roller v. Gunn*, 107 F.3d 227, 234 (4th Cir. 1997) (upholding a court filing fee unique to prisoners); *accord Smith v. Corcoran*, 61 F. App'x 919 (5th Cir. 2003) (per curiam) (rejecting a prisoner's *Bivens* claim regarding the refusal of postal officials to investigate alleged tampering with his mail); *Boivin v. Black*, 225 F.3d 36, 44 (1st Cir. 2000) (affirming the constitutionality of a statutory cap on attorneys' fee awards for prison litigation claims); *Allen v. Cuomo*, 100 F.3d 253, 260–61 (2d Cir. 1996) (finding no constitutional problem with the lack of a hardship waiver for disciplinary surcharges for inmates found guilty of violating prison rules); *Scher v. Chief Postal Inspector*,

No. 19-4112                                   *Mays v. LaRose*                                   Page 14

973 F.2d 682, 683–84 (8th Cir. 1992) (affirming dismissal of a *Bivens* claim based on refusal of postal employees to investigate a complaint regarding treatment of prisoners' mail). Although none of these cases involves the exact scenario at issue here, they confirm that there are countless reasons that jail-confined citizens are not similarly situated to those outside jail. So at a minimum, Plaintiffs face an uphill battle to establish that jail-confined electors and hospital-confined electors are similarly situated. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979) ("[S]imply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations.").

True, there is evidence that Ohio's most populous county would not need any more staff to accommodate late requests from jail-confined electors the same as hospital-confined electors and that doing so would impose no greater burden on the board. But as we said in *Obama for America*, one county, or even several counties, "cannot speak for all of Ohio's counties." 697 F.3d at 433. So just because Franklin County has enough staff to accommodate late requests from jail-confined electors without imposing a greater burden does not mean that Ohio's other counties will be able to as well. Even more important, this conclusory evidence ignores testimony from the same witness about the planning between Franklin County's Board of Elections and the jails in that county. The witness testified that there is an exchange of information before the Board's visit to the jails to deliver absentee ballots that allows the jail to pre-clear board staff members for security purposes and prepare the jail-confined electors for the voting process. So the witness's testimony that extending late absentee voting to jail-confined electors would not burden Franklin County's Board of Elections depends on her experiences with smooth jailhouse voting—a process that benefits from advanced planning. Late requests from jail-confined electors, especially those received on Election Day morning, do not allow for this advanced planning and will likely result in an increased burden.

Plaintiffs challenge the Secretary's justifications on several grounds. They claim that the justifications are simply a "*post hoc* litigation rationalization[,]" that testimony from the Secretary's Rule 30(b)(6) designee forecloses his ability to now provide these justifications, and that *Obama for America* rejected similar justifications. (Appellee's Br. at 30.) None of these contentions is persuasive.

No. 19-4112                                    *Mays v. LaRose*                                    Page 15

Plaintiffs cite only *United States v. Virginia*, 518 U.S. at 533, to argue that post hoc rationalizations cannot satisfy intermediate scrutiny.  But that case was a challenge to gender discrimination.  *Id.* at 519–20.  And as discussed, voting cases in this Circuit differ from other Equal Protection claims regarding intermediate scrutiny; the *Anderson-Burdick* framework applies.  *See Obama for Am.*, 697 F.3d at 429.  No opinion from this court or the Supreme Court has ever limited the record that the State can build in order to justify a burden placed on the right to vote.  And the language used by this court in *Obama for America* suggests that the State may come up with its justifications at any time.  *See* 697 F.3d at 429 (describing a State's justifications in the *Anderson-Burdick* framework as those "put forward by the State," "asserted" by the State, and "proffered by the State").

This makes sense.  The facially discriminatory State policy at issue in *United States v. Virginia* limited enrollment at a State university to males.  And it is impossible to think about a male-only university without also considering the exclusion of females.  But when Ohio decided to make an exception for unexpectedly hospital-confined electors in 1971, the only immediately apparent class treated differently was all other electors in Ohio.  *See* 1971 Ohio Laws 873, § 3509.08 (Am. S.B. 460).  And under the Supreme Court's then-prevailing *McDonald* decision, a state was free to deny completely absentee ballots to confined persons. 394 U.S. at 807; *see Obama for Am.*, 697 F.3d at 439 (White, J., concurring in part).  Under these circumstances, we see no need to limit consideration of the State's evidence and rationales regarding the differences between the relevant populations here.

The Secretary's Rule 30(b)(6) designee did not bind him from raising the justifications he now proffers for three reasons.  First, the designee testified that she did not know the legislature's rationale for treating classes of confined electors differently—which is not surprising (see *supra*).  She did, however, competently testify that the Secretary's office would be concerned with the staffing implications of allowing late absentee registration for jail-confined electors and the differences between hospitals and jails.  The latter is more relevant for purposes of this as-applied challenge.  Second, counsel for the Secretary contemporaneously objected to the relevant questioning of the designee.  The questions called for the designee to speculate on the intent of the legislature when it enacted the exception for hospital-confined

electors, a topic on which the designee had no personal knowledge.  *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.")   Third, most courts don't treat concessions by Rule 30(b)(6) designees as binding.  *See Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1260 (10th Cir. 2016) (noting "the majority of courts to reach the issue . . . treat the testimony of a Rule 30(b)(6) representative as merely an evidentiary admission, and do not give the testimony conclusive effect") (citation omitted).  So the designee in no way bound the Secretary from proffering the justifications he now provides.

Last, *Obama for America* is distinguishable.  That case involved Ohio's attempt to roll back in part, in-person early voting.  697 F.3d at 427.  Ohio had allowed electors to vote early, in-person, through the Monday before Election Day.  *Id.*  The State changed course and tried to eliminate opportunities to vote early in-person after the Friday before Election Day, except for military electors.  *Id.*  Military electors could still vote through the Monday before Election Day. *Id.*  Plaintiffs, who were not military electors, challenged the State's actions.

In ruling on the likelihood of the Plaintiffs' success on the merits, we determined that the *Anderson-Burdick* framework applied and that the burden on the Plaintiffs' right to vote was moderate.  *Id.* at 428–29.  We then rejected the two justifications proffered by the State: (1) that county boards of elections were too busy preparing for Election Day to accommodate early voters in the weekend leading up to an election and (2) that military service members and their families face unique difficulties in getting to the polls on Election Day.  *Id.* at 432–33.  In so ruling, we held that the State failed to show why officials would now be unable to accomplish the undoubtably significant tasks during the days just before an election while accommodating early voting, given that that there was no evidence that county boards of elections faced such difficulties in prior years when the State allowed early voting during this same period.  *Id.* at 433 ("[T]he State has shown no evidence indicating how this election will be more onerous than the numerous other elections that have been successfully administered in Ohio since early voting was put into place in 2005.").  The Plaintiffs also introduced evidence from some counties showing that more early voting opportunities would actually reduce their burden by spreading out demand.  *Id.*  Last, the State failed to put forth evidence establishing that military electors

were substantially different than non-military electors to justify the disparate treatment.  *Id.* at 434–35.

Here, none of our *Obama for America* rationales apply.  Ohio has never provided jail-confined electors a chance to register for absentee ballots last minute.  And Plaintiffs have not countered the Secretary's evidence that many counties in Ohio will have trouble accommodating the relief Plaintiffs seek, given existing resources.  That Ohio can accommodate hospital-confined electors' late requests does not establish that election boards can do the same for jail-confined electors.  This is because of the increased burden that processing last minute jail-confined electors' absentee requests would impose on the boards, as discussed above.  Plaintiffs also have not shown that providing jail-confined electors the ability to request an absentee ballot at the last minute would ease the State's burden on Election Day.  At best, Plaintiffs have shown that Ohio's most populous county, whose Board of Elections has substantial resources, would not be worse off.  Finally, the Secretary has established real differences between hospitals and jails, which show that electors confined there are not similarly situated.  In all, the Secretary's relevant and legitimate interest in the orderly administration of elections is much stronger here than in *Obama for America*.

The Secretary has the burden of establishing that Ohio's disparate treatment of confined electors furthers the State's interest in orderly election administration.  *See Obama for Am.*, 697 F.3d at 433–34.  And the Secretary has carried his burden here. He has identified several counties that do not have adequate resources to process late absentee ballot requests from unexpectedly jail-confined electors without foregoing other duties necessary to ensure the orderly administration of Ohio's elections.  Thus, he has shown that the State's interests are important and weighty enough to overcome the moderate burden that Ohio's disparate treatment of confined electors imposes on Plaintiffs.

As the Supreme Court said in *McDonald v. Board of Election Commissioners of Chicago*:

Ironically, it is [Ohio's] willingness to go further than many States in extending the absentee voting privileges . . . that has provided [Plaintiffs] with a basis for arguing that the provisions operate in an invidiously discriminatory fashion . . . . Indeed, [Plaintiffs'] challenge seems to disclose not an arbitrary scheme or plan but, rather, the very opposite—a consistent and laudable state policy of adding . . .

No. 19-4112                                   *Mays v. LaRose*                                   Page 18

groups to the absentee coverage as their existence comes to the attention of the legislature. That [Ohio] has not gone still further, as perhaps it might, should not render void its remedial legislation, which need not, as we have stated before, "strike at all evils at the same time."

394 U.S. at 810–11 (quoting *Semler v. Dental Exam'rs*, 294 U.S. 608, 610 (1935)) (footnote omitted). Finding no dispute of material fact and that the Secretary is entitled to judgment as a matter of law, summary judgment is appropriate in favor of the Secretary. So we reverse the district court's grant of summary judgment to Plaintiffs on their Equal Protection claim and reverse the district court's denial of summary judgment to the Secretary on that claim.

### IV.  Plaintiffs' First Amendment Claim

Next, we address Plaintiffs' First Amendment challenge to Ohio's deadline. The trial court expressed some skepticism regarding this challenge but ultimately did not decide the issue given its resolution of the Equal Protection challenge. Although we could remand for consideration of this claim, the issue was fully briefed and raised in the trial court and involves a question of law. In these circumstances, we can exercise our discretion to resolve the issue. *See Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1993).

Ohio's generally applicable deadline for requesting absentee ballots is constitutional because it imposes only a minimal burden on Plaintiffs' right to vote and the same state interests from Plaintiffs' Equal Protection claim justify that burden. "[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). First, there is no constitutional right to an absentee ballot. *McDonald*, 394 U.S. at 807–09. And standing alone, Ohio's deadline of noon, three days before Election Day is nondiscriminatory.[6] Any elector may request an absentee ballot, so long as they deliver that request to the Board of Elections by noon, three days before Election Day. Ohio Rev. Code Ann. §§ 3509.02, 3509.03. Even though this law may eliminate opportunities to vote for electors who

---

[6] As discussed, Ohio law discriminates between hospital-confined electors and everyone else. But Plaintiffs' First Amendment claim challenges only the Saturday noon deadline, as-applied to them; it is their Equal Protection claim that challenges the disparate treatment.

fail to register before the deadline, a state's generally applicable registration cutoff imposes only a minimal burden on the right to vote. *Rosario*, 410 U.S. at 758. Ohio law provides electors over ten months to request an absentee ballot. Ohio Rev. Code Ann. §§ 3509.02, 3509.03. So electors who fail to vote early cannot blame Ohio law for their inability to vote; they must blame "their own failure to take timely steps to effect their enrollment." *Rosario*, 410 U.S. at 758; *see also Burdick*, 504 U.S. at 436–37 ("[A]ny burden on voters' freedom of choice and association is borne only by those who fail to identify their candidate of choice until days before the primary.").

Because Ohio's interest in orderly election administration is weighty enough to justify the moderate burden its disparate treatment of confined electors places on Plaintiffs' right to vote, those interests must be enough to justify the much lower burden that the State's generally applicable absentee ballot request places on their right to vote under rational basis review. Especially given that "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788. Although it didn't reach the claim, the district court suggested that it would have held the same. (R. 70 Op. & Order at PageID # 4322 ("[A] generally applicable deadline that applied to all would-be absentee voters would likely survive the *Anderson-Burdick* analysis, even if it resulted in disenfranchisement for certain incarcerated individuals.").) And this court and the Supreme Court have made similar statements. *See Dunn v. Blumstein*, 405 U.S. 330, 347–48 (1972) (implying that a generally applicable voter registration deadline of thirty days before Election Day is constitutional); *Obama for Am.*, 697 F.3d at 433–34 ("If the State had enacted a generally applicable, nondiscriminatory voting regulation that limited in-person early voting for all Ohio voters, its 'important regulatory interests' would likely be sufficient to justify the restriction.").

True, we may decline to reach issues that the district court does not. *See, e.g.*, *Prime Media, Inc. v. City of Brentwood*, 398 F.3d 814, 825 (6th Cir. 2005). But exercise of that discretion is permissive, not mandatory. And Plaintiffs give us no good reason for exercising that discretion here. The Secretary, on the other hand, gives a good reason for resolving all of Plaintiffs' claims: elimination of any doubt about the constitutionality of Ohio's election laws before the upcoming election. In a case such as this, where the correct result is clear and the

district court alluded to how it would have resolved the issue, resolution of Plaintiffs' First Amendment claim is appropriate. Because Ohio's important regulatory interest in the orderly administration of elections outweighs the minimal burden that the State's absentee ballot request deadline places on Plaintiffs' right to vote, the Secretary is entitled to judgment as a matter of law. So we reverse the district court's denial of summary judgment to the Secretary on Plaintiffs' First Amendment claim.

## V. Class Certification

Even though we are reversing the trial court's decision on the merits here, we review the trial court's class certification decision because it affects the scope of the judgment and the Secretary conceded at argument that we should reach the issue, even if he prevails on the merits of Plaintiffs claims. We review class certification questions for abuse of discretion. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013). "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Id.* (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012)). Federal Rule of Civil Procedure 23 imposes four requirements for class certification: numerosity, commonality, typicality, and adequacy (and some courts have read an implicit fifth requirement into Rule 23; ascertainability). The Secretary challenges commonality and typicality, as well as the ascertainability of the class. Because commonality and typicality resolve the class certification question, we need not reach the ascertainability issue.

Commonality requires that "there are questions of law or fact common to the class." Fed R. Civ. P. 23(a)(2). So all class members' "claims must depend upon a common contention . . . that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Similarly, typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[A]s goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (en banc). These

requirements "tend to merge" because "[b]oth serve as guideposts for determining whether . . . the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 349 n.5 (citation omitted).

> The district court certified a class that included:

> All individuals arrested and held in detention in Ohio on or after close of business for the county election board on the Friday prior to the Election who (1) are eligible to vote in Ohio and are registered to do so, (2) did not vote absentee in person or by mail prior to their detention, (3) were provided neither an absentee ballot nor transportation to a voting center nor access to any other method of voting while held in detention, and (4) will remain in detention through close of polls on Election Day.

(R. 70, Op. & Order at PageID # 4297, 4308.)  This class does not satisfy Rule 23's commonality and typicality requirements.  The class includes any person police arrest between close of business on Friday and the close of the polls on Election Day.  But class members arrested before Saturday's noon cutoff for requesting an absentee ballot have substantially different claims than class members arrested after the deadline.

Take the named plaintiffs for example. Police arrested Mays shortly after 7 p.m. on the Saturday before Election Day.  Had a hospital admitted Mays at the same time, Ohio law would have allowed him to submit a late absentee ballot request.  *See* Ohio Rev. Code Ann. § 3509(B). Because of this disparate treatment, Mays has at least a plausible Equal Protection claim—the claim we analyze above. Nelson is a different story.  Police arrested Nelson around 10 p.m. on the Friday before Election Day.  Had a hospital admitted him at the same time, he would not be eligible for the unexpectedly hospital-confined exception.  That's because the exception applies only to electors who themselves, or their minor children, are hospitalized as a result of an "accident or medical emergency" that occurs *after* the generally applicable deadline for requesting an absentee ballot.  (R. 55-34, Ohio Election Official Manual at PageID # 3016.)  So Ohio law treated Nelson *no differently* than if a hospital admitted him on the same night police arrested him.  Thus, his Equal Protection claim is much weaker than Mays's and would likely be subject to a different tier of scrutiny.  *See Burdick*, 504 U.S. at 434.

No. 19-4112                        *Mays v. LaRose*                        Page 22

The district court said "the primary common issue the Court relies on for certification is whether the Proposed Class is entitled to be treated equally with similarly-situated hospital-confined voters for purposes of submitting an absentee ballot application." (R. 70, Op. & Order at PageID # 4304.)  Because Ohio law treats some class members the same as hospital-confined electors, while also treating some class members differently than their hospital-confined counterparts, resolution of the district court's "primary common issue" cannot lead to classwide resolution in one stroke—the claims of the named plaintiffs do not necessarily resolve the claims of the entire class.  *Contra Dukes*, 564 U.S. at 350; *Sprague*, 133 F.3d at 399.  So the district court misapplied the correct legal standard and abused its discretion in certifying a class.  Thus, we reverse the district court's certification of a class.  Normally, we would remand for further proceedings on the class certification issue.  But because we resolve all of Plaintiffs' claims, any further proceedings relating to class certification are unnecessary.

## VI. Conclusion

For these reasons, we **REVERSE** the district court's certification of a class, **REVERSE** the district court's grant of summary judgment to Plaintiffs, and **REVERSE** the district court's denial of summary judgment to the Secretary.  The mandate shall issue herewith.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 19-4112

TOMMY RAY MAYS, II and QUINTON NELSON SR.,
individually and on behalf of all others similarly situated,

     Plaintiffs - Appellees,

     v.

FRANK LAROSE, in his official capacity as Secretary of State of Ohio,

     Defendant - Appellant.

> **FILED**
> Mar 03, 2020
> DEBORAH S. HUNT, Clerk

Before:  MERRITT, THAPAR, and NALBANDIAN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's certification of a class, its grant of summary judgment to Plaintiffs, and its denial of summary judgment to the Secretary are REVERSED.  IT IS FURTHER ORDERED that the mandate shall issue herewith.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk